BOBBIE STEIN
Attorney at Law
State Bar No.: 113239
503 Dolores Street, Suite 201
San Francisco, CA 94110
Telephone 415/255-0301

Attorney for Petitioner
**JUAN MANUEL ANDAZOLA**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN MANUEL ANDAZOLA )<br><br>      Petitioner, )<br><br>  vs. )<br><br><br>JEANNE S. WOODFORD, Director )<br>of the California Department of )<br>Corrections, and Richard Kirdland, )<br>Warden, Pelican Bay State Prison. )<br><br>      Respondent. )<br>_____ ) | Case No.<br><br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT<br>PETITION FOR WRIT OF HABEAS<br>CORPUS<br><br><br><br>(28 U.S.C. §2254) |

TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

DISTRICT OF CALIFORNIA:


**INTRODUCTION AND SUMMARY OF ARGUMENT**

This petition raises several issues:

The judgment against petitioner was rendered in violation of his constitutional

rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments and the State

violated the mandate of *Brady v. Maryland* (1963) 373 U.S. 83, by its failure to

provide favorable, material, impeaching evidence regarding prosecution witness

Officer Javier Salgado, and by the State's failure to disclose and correct Officer

Salgado's false testimony, which it knew or should have known to be false.

1

Furthermore, the State Court of Appeal acknowledged that there was conflicting critical eyewitness testimony and that the sufficiency of the evidence was "a close question." (Exhibit A, Slip op. pp. 7, 12.) The questions presented in this Petition relate to petitioner's constitutional rights to due process under the Fifth, Sixth, and Fourteenth Amendments where the evidence presented at trial was insufficient to support the petitioner's convictions. The trial record did not disclose substantial evidence from which a reasonable trier of fact could find that petitioner was the shooter. (*Jackson v. Virginia* (1979) 443 U.S. 307, 31, 19.) Neither did the record disclose substantial evidence from which a reasonable trier of fact could find that petitioner premeditated and deliberated beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 31, 19.)

Accordingly, petitioner's convictions should be reversed.

## PROCEDURAL AND FACTUAL BACKGROUND

### *Procedural Background*

On October 8, 2002, an information was filed in Contra Costa County Superior Court charging petitioner with: Penal Code section 187/664, subdivision (a), attempted wilful, deliberate and premeditated murder of Ramiro Pichardo (Count One) and Penal Code section 245, subdivision (a)(2), assault with a firearm upon Ramiro Pichardo (Count Two). (CT 156, 157.)

The information further alleged as to Count One an enhancement for personal use of a firearm causing great bodily injury (Penal Code sec. 12022.53, subds. (b), (c) and (d), and as to Counts One and Two, two separate enhancements for great bodily injury (Penal Code sec. 12022.7, subd. (b)) and personal use of a firearm (Penal Code sec. 12022.5, subd. (a)(1)). (CT 156, 157.)

On September 18 petitioner was found guilty of both premeditated, deliberate attempted murder and assault with a firearm. All enhancements were found true.

(CT 88-90.)

On December 5, 2003, petitioner was sentenced to life with the possibility of parole on Count One with an additional consecutive sentence of 25 years to life for the enhancement pursuant to Penal Code section 12022.53, subd. (d). The remaining enhancements as to Count One were stricken for purposes of sentencing. A concurrent three-year term for Count Two was stayed pursuant to Penal Code section 654. The enhancements on Count Two were stricken for purposes of sentencing. (CT 716.)

Petitioner was given credit for a total of 678 days. (CT 716.) A restitution fine of $10,000 was imposed. A $10,000 fine for parole was stayed. (CT 717.)

A timely notice of appeal was filed on December 5, 2003. (CT 722.) The Court of Appeal affirmed petitioner's conviction on February 22, 2006. On the same date, the Court of Appeal summarily denied petitioner's petition for writ of habeas corpus. (Exhibit J.)

On April 3, 2006, a timely petition for review was filed in the California Supreme Court. On June 14, 2006, the court denied review without comment. (Exhibit B.) On April 5, a timely petition for writ of habeas corpus was filed in the California Supreme Court . On February 14, 2007, the petition was denied without comment. (Exhibit C.) This petition follows.

### Factual Background
#### I.    RAMIRO PICHARDO'S HOSPITAL INTERVIEWS.
##### A.    Interview with Dr. Baker.

On April 3, 2002, surgeon Dr. Burton Baker treated Ramiro Pichardo for injuries that he had sustained earlier that day from a gunshot wound. (RT 437, 440.) According to Dr. Baker, Pichardo, who was alert and oriented, told him that he had been using methamphetamine and marijuana with another man who accused him of stealing something from him and then shot him in the back with a pistol at a distance

of about five feet.  (RT 441, 449.)  The bullet lodged in Pichardo's spinal canal,

rendering Pichardo paralyzed below the waist.  (RT 449, 450.)

In Dr. Burton's opinion, the bullet was fired from an angle slightly above the

left portion of Pichardo's back and went into his body at a straight downward path.

(RT 443, 447.)  The doctor testified that, hypothetically, if a person was bent over at

the waist when shot, he would expect the path of the bullet to travel upward, not

downward.  (RT 446.)

### B.  Interview with Inspector Wasteney.

Pittsburg Police Inspector Wasteney interviewed Pichardo at the hospital later

that night.  (RT 456.)  An alert Pichardo told Inspector Wasteney that he was getting

ready to shake hands with petitioner and the next thing he remembered was that he

was shot from behind.  (RT 469.)  Pichardo believed that he was shot by Denicio

Boforquez, who was commonly known as "Nene"[1].  (RT 455-6.)

### C.  Interview with Officer Tony Del Greco.

Officer Tony Del Greco also paid a hospital visit to Pichardo.  (RT 720.)  Del

Greco, along with Inspector Huppert, spent two and a half to three hours with

Pichardo.  (RT 726.)  Pichardo told Del Greco that he was shot inside the garage

behind petitioner's home after he and Nene had argued.  (RT 459, 721.)  Pichardo

went to the garage to lift weights.  (RT 722.)  He said that Nene had been in a

disturbed mood and had accused him of stealing a CD player.  (RT 721.)  Pichardo

offered more details, saying that he saw Nene move his right hand into his pants

pocket, a move that Pichardo found unusual.  (RT 721-2.)

Pichardo told Del Greco that he had decided to leave the garage within one-

half hour of his arrival.  Pichardo was shot in the back while attempting to shake

---

[1]From two separate photo lineups, Pichardo picked out photographs of
Nene and petitioner.  He identified Nene as the shooter who was standing
behind him and petitioner as the man whose hand he was going to shake.  (RT
470, 306.)

1   hands with petitioner. (RT 724.) Nene was standing behind Pichardo at the time,

2   and Pichardo told the officer that he was 100% certain that it was Nene who had shot

3   him. (RT 724.)

### D. *Interview with Officer Bruce Brown.*

5   Officer Bruce Brown was the lead investigator on the case. He conducted

6   three separate interviews with Pichardo, lasting about one hour each. (RT 674, 676.)

7   Consistent with the other police interviews, Pichardo told Brown that his back was to

8   Nene and that he was shot from behind as he extended his hand to petitioner. (RT

9   701.) During the first interview, Pichardo was relatively positive that Nene was the

10  shooter. (RT 702.)

11  Between the first and second interviews with Brown, however, Pichardo

12  received two phone calls from Nene. (RT 703.) According to Brown, Pichardo was

13  admittedly influenced by these phone calls and began to doubt his own recollection

14  of events. It seemed to Brown as if Pichardo had been threatened. (RT 676.)

15  After the calls Pichardo was "trying to make up theories about how he was

16  shot." Pichardo theorized that petitioner may have reached up onto the shelf, reached

17  around the back and fired the gun. (RT 703.) According to Officer Brown, however,

18  Pichardo's theory in this regard did not make sense. (RT 703.) Officer Brown

19  considered Nene a suspect in the shooting.[2] (RT 677.)

### II. *RAMIRO PICHARDO'S TRIAL TESTIMONY.*

21  At trial, Ramiro Pichardo testified that he remembered going to the garage at

22  around 2:30 in the afternoon on the day of the shooting to clear up an accusation that

23  had been made against him regarding a stolen CD player. (RT 237, 290.) Pichardo

24  had been to the garage before and had met petitioner on two or three occasions. (RT

25  238, 244.) Pichardo never had any negative interactions with petitioner. (RT 245.)

---

[2]Petitioner was arrested days after the shooting on unrelated charges.
(RT 149.)

5

Pichardo spent about two minutes outside the garage with Nene before going inside. (RT 248.) Pichardo and Nene had a casual relationship. They were not close friends, but knew each other as children. The two men had lived in the same neighborhood but had attended different schools. (RT 287.)

Once inside the garage, Pichardo found the radio on and people talking and smoking marijuana. (RT 249.) He testified that he did not see drugs other than marijuana in the garage. Pichardo smoked marijuana before lifting weights. (RT 250.) Pichardo assured Nene that he had not taken the CD player. (RT 251.) Nene suggested that Pichardo leave. (RT 253, 297.)

Pichardo said that he turned around to his left side and looked at petitioner. He was thinking of shaking petitioner's hand but then reconsidered. (RT 253, 255.) Pichardo did not think that petitioner was angry about the CD player but said that he had an angry look on his face. (RT 254, 293, 310.) Pichardo never saw petitioner with a gun. (RT 308.) Pichardo took two to three steps toward petitioner and then blacked out. (RT 253.) He did not see who shot him. (RT 307.)

When Pichardo awoke later he was lying on the garage floor unable to feel anything or stand. (RT 254, 256.) Although Pichardo knew where he was, he was confused about what had happened. (RT 256.) He tried to leave by crawling out. It was only when he saw the blood on the door that he realized that he had been shot. (RT 258.)

Pichardo thought Nene had shot him because Nene had been standing behind him and was the one who told him to leave the garage. (RT 263, 284.) Moreover, petitioner had been standing in front of Pichardo when he was shot. (RT 262.)

Pichardo testified that an apologetic Nene called him while he was in the hospital and said that it was petitioner who had fired the shot. (RT 280, 283, 284.) Pichardo admitted that he changed his mind about who had shot him after speaking to Nene. (RT 285.) At trial, Pichardo testified that he did not know who had shot him. (RT 285.)

6

### III. OTHER PROSECUTION WITNESSES.

#### A. *Griselda Delgado*.

##### 1. *Interview with Officer Ed Sanchez.*

Officer Ed Sanchez spoke with Griselda Delgado on the evening of the shooting. (RT 610, 613.)  In a taped interview, Griselda told Sanchez that she was a friend of petitioner's wife, Marquita, and that she had walked over to visit her when she saw somebody that she did not know, lying face down on the sidewalk in front of the house. (RT 611.)  According to Griselda, Christopher (Mike) Oler was bent over the man, trying to assist him. (RT 612.)  Griselda did not tell Officer Sanchez that she had been in the garage on the day of the shooting.

##### 2. *Statements attributed to Griselda by Officer Javier Salgado.*

A few days after the shooting, Griselda telephoned Officer Javier Salgado after he had left her a message to call.. (RT 357, 358, 560.)  Salgado picked Griselda up at her house and gave her a ride to the police station where she was to provide another statement about the case. (RT 358, 565.)  According to Officer Salgado, Griselda wanted to provide an additional statement because she had lied to Detective Sanchez on the night of the shooting. (RT 565.)  Salgado testified that Griselda told him that she felt guilty about lying and, while on the way to the police station, told him what had really happened in the garage on the day of the shooting. (RT 567.)

At trial, Salgado recounted what he claimed Griselda had revealed to him on the two-minute ride to the station. (RT 575.)  According to Salgado, Griselda told him that she was in the garage at the time of the shooting along with Nene, Michael Oler, petitioner, Pichardo, and Marquita. (RT 567.)  Suddenly, Nene and Pichardo started arguing over a CD player that Pichardo had taken from the residence on his last visit.  At one point, Marquita told them to stop arguing and to leave. (RT 568.)  Pichardo went to shake hands with petitioner, at which point, petitioner reached over to the shelf, grabbed a handgun, and pointed at Pichardo. (RT 568.)  According to this version of the facts, when Pichardo saw the gun, he ducked and turned around

7

1   and was shot in the back by petitioner.  (RT 568.)

2          Once at the police station, Griselda was turned over to Inspector Brown.  (RT

3   362, 573.)  Griselda told Officer Brown that she wanted to tell him something but

4   that she had children at home and would talk apparently only if he promised her

5   safety.  (ART interview transcript 8/25/03.)  Griselda left the station, without giving

6   Brown a statement.  (*Ibid.;* RT 586.)

7          During her trial testimony, Griselda denied telling Officer Salgado that she

8   felt guilty about lying and denied his representations about their conversation on the

9   way to the police station.  (RT 361.)  Moreover, Griselda accused Salgado of making

10  repeated threats to her, telling her that she would lose her children or go to jail if she

11  was lying.  (RT  397, 399, 401.)  Griselda said that one such threat happened before

12  she testified at the preliminary hearing.  (RT 401.)

13         According to Officer Salgado, prior to the preliminary hearing, he was present

14  when Griselda, near tears, spoke of her fear for her family's safety.  Salgado said that

15  Griselda told him that she had witnessed petitioner shoot Pichardo in the back inside

16  the garage.  (RT 581.)  He said that after the preliminary hearing, Griselda had

17  flagged him down and wanted to talk to him.  (RT 583.)  Salgado said that Griselda

18  was crying and said that she was sorry that she was unable to tell the truth at the

19  preliminary hearing, but if she had, her family would have been  put in danger.  (RT

20  583.)

21             *3.  Trial testimony*.

22         Griselda Delgado testified at trial that she had walked into the garage about

23  ten minutes before the shooting and had witnessed an argument between Nene and

24  Pichardo.  (RT 333, 336.)  Griselda told the jury that there were several people in the

25  garage at the time.  Music was playing and people were partying, some smoking

26  marijuana.  (RT 334.)

27         Griselda heard from Nene that Pichardo had stolen his CD player.  (RT 337.)

28  Griselda thought Pichardo was asked to leave, either by Nene or petitioner.  (RT 338,

339.)  From three to four feet away, Griselda saw Pichardo and petitioner shake hands before hearing a bang, like a firecracker.  She then saw Pichardo lying on the floor.  (RT 340-1.)  Griselda never saw petitioner shoot Pichardo.  (RT 385.)

Griselda said that she saw Nene open the door after the shot and leave while petitioner tried to pick Pichardo up from the ground.  (RT 342, 392.)  Everyone else in the garage left, and Griselda called 911.  (RT 342.)  With her four-month-old baby in her arms, Griselda was scared.  (RT 353.)  Griselda denied seeing either petitioner or Nene with a gun.  (RT 392.)

Griselda acknowledged during her trial testimony that after testifying at the preliminary hearing she left the courthouse in tears, but denied telling the police and the prosecutor that she had been afraid to testify truthfully.  (RT 384.)  An inspector working for the District Attorney's office, however, told the jury that after the preliminary hearing, a tearful Griselda apologized to him for not testifying truthfully for fear of reprisal to her and her family.[3]  (RT 499.)

### B. *Juan Carlos Andazola.*

#### 1. *Police Interview*.

Petitioner's cousin, Juan Carlos, was interviewed at the police station by Officer Brown a few days after the shooting.  (RT 640, 680.)  At trial, Juan Carlos said that because of threats made to him by Officer Salgado, and under Salgado's direction, he fabricated the story that he told Officer Brown about the day of the shooting.  (RT 652, 654, 658,659.)  Unbeknownst to Juan Carlos, his interview with Office Brown was videotaped.  (RT 680.)  A redacted tape of the interview was played for the jury.  (RT 696.)

During the interview, Juan Carlos told Officer Brown that he returned to

---

[3]Prosecution witness Inspector Cromwell also testified that he was present before the preliminary hearing in this matter when Griselda denied that she had made a statement to Salgado about seeing petitioner with a gun.  (RT 497.)

1    petitioner's house at around 5:30 p.m. with his girlfriend, Gina Guardado, and

2    petitioner's son.  (ART 18.)  He said that they had been in the kitchen when they

3    heard a commotion.  (ART 3.)  Juan Carlos told Officer Brown that he and Gina

4    walked out of the house and saw petitioner leaving the garage and that he had

5    something on him that he was putting away.  (ART 5.)  The officer suggested that

6    petitioner had a gun.  (ART 6.)  Juan Carlos said, however, that, although he knew

7    petitioner to have a gun and that he had seen him with a gun days before the

8    shooting, he did not see petitioner with a gun on the day of the shooting nor did he

9    see anything in petitioner's hands.  (ART 6, 15.)

10       Juan Carlos also explained to Officer Brown that he did not recall seeing Nene

11   in the garage but that when he and Gina left the scene, Nene was with them.  (ART

12   13.)  At some point petitioner joined the three when they were walking, but was told

13   to go on his own way.  (ART 15.)  Juan Carlos told the officer that he saw petitioner

14   running down from the train tracks.  Later he learned that petitioner had run to his

15   aunt's house.  (ART 19.)  Kathleen Ochoa is petitioner's aunt and Juan Carlos'

16   mother.  (RT 418.)

17       During the interview, Juan Carlos blamed petitioner for the shooting and told

18   the detective that he did not believe that Nene had shot the victim because Nene and

19   Pichardo were friends.  (ART 18.)  Juan Carlos also told Detective Brown that he

20   overheard petitioner tell a friend that he was going to shoot Pichardo in the face but

21   that he moved too quickly[4].  (ART 24, 30.)

22

23

24

25

26

27       [4]At a 402 hearing, Juan Carlos said that he did not see petitioner
     walking near the train tracks.  He further denied seeing petitioner with a gun
     within a few days of the shooting and denied ever hearing petitioner make
28   statements about the shooting.  (RT 619-620.)

## *2. Trial testimony.*

At trial, Juan Carlos testified that on the day of the shooting he was with Gina Guardado.  (RT 553, 625, 627.)  He and Gina had picked up petitioner's seven-year-old son that morning and had brought him back home  at about 4:30 p.m[5].  (RT 627.)  Athough Juan Carlos sometimes socialized with petitioner in his garage, on the day of the shooting, he just dropped off the boy and left the residence within five to ten minutes without noticing what was happening in the garage.  (RT 628, 630.)

Juan Carlos told the jury  that he later learned that the police suspected his friend, Nene, of the shooting.  (RT 635.)  Sometime after the shooting, Nene called Juan Carlos and he and Gina drove Nene to the police station for questioning.  (RT 635, 636.)  Officer Brown interviewed Nene for nearly an hour.  (RT 679.)  Nene was in custody at the time of the interview.  (RT 679.)

When Juan Carlos and Gina returned later to pick Nene up from the station, Juan Carlos was somewhat surprised to learn from Officer Salgado that his friend had been arrested for attempted murder.  (RT 635.)  Nene was later released from custody.  (RT 679.)

Juan Carlos explained to the jury that because of threats made to him by Officer Salgado, and under Salgado's direction, he fabricated the story that he told Detective Brown about the day of the shooting.  (RT 652, 654, 658)  For instance, Juan Carlos said that Salgado told him to say that he saw petitioner after the shooting with his hands under his shirt and to say that he saw him run off toward Harbor Street.  (RT 658.)  Juan Carlos said that Salgado told him to say that he had seen petitioner near the train tracks.  (RT 657.)  Furthermore, according to Juan Carlos, he was instructed by Salgado to say that petitioner

---

[5]During his taped interview, Juan Carlos said that he got back to the house at around 5:30 p.m.  (ART 8.)

had a surprised look on his face at the front of the driveway before he left the

scene and that he should tell Officer Brown that petitioner was acting as if he

had shot someone.  (RT 659, 660.)

Juan Carlos testified that he had to make up the story about petitioner

being the shooter to avoid a prison term himself.  (RT 659.)  He complained

that Officer Salgado had arrested him before and had threatened him in the past

and accused him of committing crimes that he had not committed.  (RT 637,

665.)  He denied telling Salgado to speak to his mother, Kathleen Ochoa,

because she had information about the shooting.  Instead, Juan Carlos said that

Salgado told him that he had already spoken to his mother.  (RT 639.)  He also

denied ever telling Salgado that Nene did not shoot Pichardo.  (RT 639.)

### C. *Gina Guardado*.

Within a few days of the shooting, Gina learned that Officer Salgado

wanted to talk to her.  (RT  542.)  She went to the station and provided a

statement to the police.  (RT 543.)  Because she was aware of the existence of

a warrant for Nene, she and Juan Carlos brought Nene with them to the police

station.  (RT 543.)  Gina never saw Nene again after that day.  (RT 555.)

Gina testified that on the day of the shooting she and Juan Carlos were

dropped off at petitioner's house in the late afternoon.  (RT 533.)  She heard a

commotion and opened the door and saw people leaving  the garage.  (RT 534-

5.)  When she came outside with Juan Carlos, she saw petitioner, Nene,

Marquita, and Mike.  (RT 535.)  Petitioner was not doing anything unusual, he

was just standing there along with everyone else.  (RT 551.)  Juan Carlos,

Nene, and she left the house at the same time as petitioner, heading off in the

opposite direction.  (RT 539, 551.)

Gina testified that at some point petitioner met up with her, Juan Carlos,

and Nene and walked with them for about two minutes before splitting off on

his own.  Petitioner said nothing as they walked.  (RT 541, 542.)  Later, Nene

12

1    also parted company with Gina and Juan Carlos.  (RT 541.)

2        **D.  _Kathleen Ochoa_.**

3        Petitioner's aunt, Juan Carlos' mother, Kathleen Ochoa, testified that

4    petitioner is not welcome in her home because her husband does not get along

5    with him.  (RT 424.)  She was, therefore, surprised by a visit from him.  (RT

6    419.)

7        According to Kathleen Ochoa, when her nephew arrived, he was upset

8    and told her that someone had tried to rob him and that there was a struggle

9    over the gun.  Petitioner did not have a gun with him.  (RT 424.)  She initially

10   testified that petitioner said that he had shot somebody.  (RT 420, 421.)  On

11   cross-examination, however, she admitted that she did not remember exactly

12   what he said.  (RT 423, Slip op. 9.)

13       **E.  _Fermin Ochoa_.**

14       Kathleen Ochoa's husband, Fermin, was also home when petitioner

15   arrived at their house.  (RT 408.)  Speaking through a Spanish interpreter,

16   Fermin testified that petitioner spoke to him in English and told him that he

17   had shot somebody at his home and that his wife and children were still at

18   home.  Fermin said that petitioner did not explain anything more about the

19   shooting.  (RT 410, 411, 413.)  Fermin Ochoa told petitioner to go home.  (RT

20   410.)  Fermin acknowledged that he did not like petitioner.  (RT 413.)

21       **IV.  THE DEFENSE CASE**.

22       The defense relied on a theory of third-party culpability.  (RT 878.)

23   Relying on Ramiro Pichardo's hospital interviews, conducted by the doctor and

24   several police officers, the defense argued that the victim positively named

25   Nene, who had been standing behind him, as his shooter, time and time again.

26   (RT 262, 263, 284, 469, 470, 701, 724, 860, 861, 862, 875.)  There was no

27   dispute that the bullet had entered Pichardo's back consistent with his standing

28   up straight.  (RT 443, 447.)

1    Pichardo's positive identification of Nene as the shooter changed only

2    after he received phone calls from Nene.  (RT 305, 455, 456, 676, 702, 724,

3    863, 872.)  These phone calls, the defense urged, persuaded Pichardo that he

4    may have been wrong about who had shot him.  (RT 676, 862, 872.)

5    The defense argued that it was no coincidence that, at the time of trial,

6    Nene was nowhere to be found.  (RT 877.)  For about two years preceding the

7    shooting, Nene had lived in his car in his uncle's driveway.  (RT 739.)

8    According to Nene's uncle, Pilar Boforquez-Cuadras, after his release from

9    jail, Nene told him that he was planning to go to Arizona.  (RT 743.)  Pilar

10   testified that he had not seen Nene since the police came to his house looking

11   for him in April of 2002.  (RT 740.)

12   At the heart of the defense case was Officer Salgado's credibility.  The

13   defense pointed out that Griselda denied making the statements attributed to

14   her by Salgado which linked petitioner with the crime.  (RT 865, 867.)  The

15   defense suggested that Salgado had lied about what Griselda had said to him

16   and that the officer's theory of what had happened contradicted the doctor's

17   opinion about the shooting.  (RT 868.)  Similarly, Salgado's threats to Juan

18   Carlos, prior to his interview with Officer Brown,  rendered Juan Carlos'

19   videotaped version of the facts suspect.

20   //

21   //

22   //

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**I**.

**STANDARD OF REVIEW**.

This court's review of Mr. ANDAZOLA's petition is governed by the Anti-terrorism and Effective Death Penalty Act (AEDPA).  (*Lindh v. Murphy* (1997) 521 U.S. 320, 326.)  Section 2254, subd.(d) provides that to obtain federal habeas relief, a petitioner in state custody must demonstrate that the state court's adjudication of the merits of his case "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." (28 U.S.C. sec. 2254, subd. (D)(1); *Lockyer v. Andrade* (2003) 538 U.S. 63, 70-1.) A state court's decision is contrary to clearly established federal law if it (1) applies a rule that contradicts the governing law set forth in Supreme Court cases, or (2) confronts a set of facts materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. (*Williams v. Taylor* (2000) 529 U.S. 362, 405-06.)  A state court's decision is an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal principles from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case."  (*Id*. at 413.)[6]

The Supreme Court in *Andrade* held that "clearly established Federal law" under §2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.  (*Lockyer v. Andrade* (2003) 538 U.S. 63, 71-72.)

Generally, habeas proceedings under section 2254 are reviewed for

---

[6]In general, Ninth Circuit precedent remains persuasive authority in determining what is clearly established federal law.  (*Duhaime v. Ducharme* (9th Cir. 1999) 200 F.3d 597, 600-601.)

1   actual prejudice under the "substantial and injurious effect" standard set forth

2   in *Brecht v. Abrahamson* (1993) 507 U.S. 619, rather than the "harmless

3   beyond a reasonable doubt" standard applied in *Chapman v. California* (1967)

4   386 U.S. 18, 24.  (*Fry v. Pliler* (2007) ___ U.S. __, 127 S.Ct. 2321.)  Under the

5   substantial and injurious effect standard, an error is harmless unless it "had

6   substantial and injurious effect or influence in determining the jury's verdict."

7   (*Brecht v. Abrahamson*, supra, 507 U.S. 619, 631, quoting *Kotteakos v. United*

8   *States* (1946) 328 U.S. 750, 776.)  There is no need for harmless error review

9   under *Brecht*, however, where constitutional error is found under *Brady v.*

10  *Maryland* (1963) 373 U.S. 83, or where the evidence was insufficient to

11  sustain the prosecution's burden.  (*Kyles v. Whitley* (1995) 514 U.S. 419, 435,

12  ftnt. 9; *Jackson v. Virginia* (1979) 443 U.S. 307, 31, 19.)

13          Where the court in a habeas proceeding is in "grave doubt as to the

14  harmlessness of an error," the "petitioner must win."  (*O'Neal v. McAninch*

15  (1995) 514 U.S. 434, 436.)

16

17                                    **II.**

18  **FAILURE TO DISCLOSE OFFICER SALGADO'S PATTERN OF
    FALSIFYING POLICE REPORTS AND THE CRIMINAL**

19  **INVESTIGATION INTO HIS CONDUCT VIOLATED PETITIONER'S
    FEDERAL AND STATE CONSTITUTIONAL RIGHTS AND**

20  **REVERSAL IS MANDATED**.

21          Subsequent to petitioner's being sentenced to life in prison, Officer

22  Salgado was fired from the Pittsburg Police Department and pleaded guilty to

23  *five* felony counts of falsifying police reports.  (Exhibit D, Salgado guilty plea

24  form.)[7]  During summation, the prosecutor argued that "Salgado is the

25  lynchpin" and if the jury were to acquit appellant, they would have to believe

26  that Salgado's report had been faked and that Griselda never said those things

27  _____

28          [7]Also see Exhibit D-1, criminal complaint, dated September 22, 2004.

(about seeing petitioner shoot the victim). (RT 842.)  He emphasized this repeatedly, arguing that Salgado was not a "rogue cop" and that in order to believe that Salgado was a liar, they would have to believe that he would write a report to frame somebody and that he would intentionally falsify a report, concluding that "that is totally incredible."  (RT 889, 890, 892.)   Moreover, the prosecutor sarcastically remarked that according to defense counsel, Salgado "committed a crime by making a false report."  (RT 892.)  In fact, Officer Salgado pleaded guilty to doing just that.

Officer Salgado's testimony was a vitally important part of the government's case.  If Salgado had been properly impeached, it would have been very easy for the jury to accept Griselda's testimony that Salgado had fabricated a report about what she had told him.  It would have eliminated the only purported eyewitness account.  Furthermore, proper impeachment evidence would have bolstered Juan Carlos' repudiation of his videotaped interview, where he implicated petitioner.  As such, the verdict below is not worthy of confidence.  (*U.S. v. Cuffie* (1996) 80 F.3d. 514.)  No reasonable juror hearing all of the now available evidence about Salgado's pattern of falsifying police reports over a period of years would vote to convict petitioner on the record below.  Had the jurors seen Salgado as we now see him, they would not have believed his testimony.  This is particularly so in light of the prosecution's weak evidence and the strong defense evidence of third-party culpability.

The prosecution's failure to provide impeaching evidence of Officer Salgado's practice of falsifying police reports and the investigation into this practice deprived petitioner of his Constitutional rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and petitioner's rights under Article I, sections 1, 7, 11, and 15 of the California Constitution. Due process entitles petitioner to a new trial where, as here, the verdict in the

instant matter was not worthy of confidence.  (*United States v. Bagley* (1985) 473 U.S. 667; *Kyles v. Whitley* (1995) 514 U.S. 419, 435, ftnt. 9.) Additionally, the error had a substantial or injurious effect or influence in determining the jury's verdict.  (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 637-9.)

### A. The Prosecution Had a Duty to Disclose Information About Salgado's Pattern of Falsifying Police Reports As Well As Information About the Investigation into Salgado's Misconduct.

Under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), the prosecution was obligated to disclose to the defense critical information about Salgado's pattern of lying and falsification of police reports and the Pittsburg Police Department's investigation into his misconduct.  Although the defense in the instant matter did request impeachment evidence by way of a *Pitchess* motion and a motion to disclose *Brady* material (CT 271, 363), the government's obligation existed even in absence of such requests.  (*U.S. v. Augurs* (1976) 427 U.S. 112.)

Due process requires that  the prosecution disclose material exculpatory evidence on its own motion, without request.  (*See Kyles v. Whitley,* 514 U.S. 419, 432-34 (1995); *United States v. Bagley* (1985) 473 U.S. 667, 682.) Material evidence that must be disclosed includes evidence bearing upon the credibility of government witnesses.  (See *Bagley, id*. at 676; *People v. Rutherford* (1975) 14 Cal.3d 399, 406 [overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn.6; *People v. Kasim* (1997) 56 Cal.App.4th 1330, 1380.)  Furthermore, this responsibility includes the duty  to turn over to the defense *all* material information casting a shadow on a government witness's credibility.  (*United States v. Bernal-Obeso* (9th Cir. 1993) 989 F.2d 331, 333-34.).

Given the extent of the investigation into Salgado's practices and his long-standing history of fabrication of evidence, it is not believable that the

prosecution was unaware of the impeachment evidence.  Salgado falsified 92 police reports over a period of several years beginning in 2001.  It appears that some investigation was being conducted at least as early as March of 2004. (Exhibit E, p. 62.)  The criminal investigation of Salgado's misdeeds indicates that Lt. B. Addington of the Pittsburg Police Department was assigned to investigate Salgado on May 19, 2004[8].  (Exhibit F, p. 10.) An analysis of the investigative reports from Officer Salgado's criminal case reveals that a very small percentage of the subjects of the falsified police reports were ever charged by the District Attorney's office[9].  It is reasonable to assume, therefore, that the District Attorney knew that there were problems with Salgado's arrests and reports since they declined to prosecute so many subjects of his arrests[10].

The prosecutor's actual awareness of exculpatory evidence in the government's hands, however, is not determinative of the prosecution's disclosure obligations.  "Responsibility for *Brady* compliance lies exclusively

---

[8]It should be noted that it was the same agency (Contra Costa District Attorney's Office) that prosecuted both petitioner and Officer Salgado.

[9]For instance, 66 of the 92 police reports were catalogued into 14 groups.  The following is information regarding the number of people arrested and those charged by the District Attorney from each group:
Group 1:  five arrests, no prosecutions
Group 2:  three arrests,  no prosecutions
Group 3:  two arrests, no prosecutions
Group 4:  nine arrests, no prosecutions
Group 5:  two arrests, no prosecutions
Group 6:  five arrests, no prosecutions
Group 7:  nine arrests, no prosecutions
Group 8:  five arrests, one prosecution
Group 9:  four arrests, two prosecuted (one later dismissed) (Nene pled g)
Group 10:  three arrests, one prosecuted
Group 11:  twenty-one arrests, six prosecuted
Group 12:  six arrests, not clear if any prosecuted
Group 13:  two arrests, two prosecuted (one dismissed)
Group 14:  two arrests, two prosecuted

[10]Furthermore, according to a newspaper article, the investigation of Salgado was conducted by two police lieutenants who had previously approved some of the tainted reports. (Exhibit G, p. 66.)

with the prosecution, including the "duty to learn of any favorable evidence
known to the others acting on the government's behalf in the case." (*In re
Brown* (1998) 17 Cal.4th 873 at 878; see also *Kyles, supra,* at 435-40.)
Because the prosecution is in a unique position to obtain information known to
other agents of the government, it may not be excused from disclosing what it
does not know but could have learned. (See *id.,* at 438-40.) "The disclosure
obligation exists, after all, not to police the good faith of prosecutors, but to
ensure the accuracy and fairness of trials by requiring the adversarial testing of
all available evidence bearing on guilt or innocence." (*Carriger v. Stewart* (9th
Cir. 1997) 132 F.3d 463, 480, citing *Kyles, id.,* at 438-42 and *Brady,* 373 U.S.
at 87, 83 S.Ct. at 1196-97.).

The prosecution cannot avoid finding out information favorable to
defendants by keeping itself ignorant, or by declining to make reasonable
inquiries of those in a position to have relevant knowledge. (*In Re Brown,
supra,* 17 Cal.4th 873, 879.) Thus, a "prosecutor cannot adopt a practice of
see-no-evil and hear-no-evil." (*People* v. *Kasim, supra,* 56 Cal.App.4th at p.
1386; *Benn v. Lambert* (9th Cir. 2002) 283 F.3d 1040 at pp. 1054, 1058; see
also *Commonwealth of the Northern Mariana Islands v. Bowie* (9th Cir. 2001)
243 F.3d 1109 at p. 1118 ["[a] prosecutor cannot avoid this obligation by
refusing to search for the truth and remaining willfully ignorant of the facts"].)

In the instant matter, the prosecutor had "reasonable access" to his own
office, and to the Pittsburg Police Department, where Officer Salgado worked.
He should have known that Officer Salgado provided suspicious information in
the past and that his arrests were questionable. Since there were numerous
reports dating back to 2001, the prosecutor should have been aware of the
fabrications in Salgado's reports. Obviously, the prosecutor should have been
aware of any investigation of Salgado by the police department or his own
office since Salgado was a material witness in the instant case. (See *U.S. v.*

1     *Bowie* (D.C. Cir. (1999) 198 F.3d 905.)

2       Moreover, Officer Salgado, *himself*[11], knew of his own fabrications and

3 deliberate falsification of police reports dating back to 2001.  Under *Kyles v.*

4 *Whitley,* this knowledge is imputed to the prosecution.  (*Kyles v. Whitley*

5 (1995) 514 U.S. 419, 438; also see *In re Brown*, *supra,* 17 Cal.4th at 879

6 ["...any favorable evidence known to the others acting on the government's

7 behalf is imputed to the prosecution.  'The individual prosecutor is presumed

8 to have knowledge of all information gathered in connection with the

9 government's investigation,'" citing *U.S. v. Payne* (2nd Cir. 1995) 63 F.3d

10 1200, 1208].)

11       Salgado was aware of the keen importance of his credibility in the

12 instant case where the prosecutor argued, repeatedly, to the jury, that it was

13 "totally incredible" to believe that he would falsify police reports.  Salgado

14 knew that he had falsified reports in the past and very likely knew that there

15 was an ongoing investigation into his past fabrication of evidence.  There was

16 a duty to disclose this to the defense.  The prosecution is charged with any

17 negligence on the part of other agencies acting in its behalf.  "Despite any

18 seeming unfairness to the prosecution, no other result would satisfy due

19 process in this context.  The principle is not punishment of society for

20 misdeeds of a prosecutor but avoidance of an unfair trial to the accused."  (*In*

21 *re Brown*, *supra,* 17 Cal.4th at 881-882, citing *Brady*, *supra,* 373 U.S. at 87.)

22

23         **B. Evidence of Salgado's False Police Reports and Investigation into**
           **His Fabrication of Evidence Was "Material" As His Credibility**
24            **Was the Lynchpin of the Prosecution's Case.**

25     Due process requires that  the prosecution disclose material exculpatory

26

27 _____

28       [11]As did his partner and co-defendant, Officer Jim Hartley.

evidence to the defense, including evidence bearing upon the credibility of government witnesses. (See *United States v. Bagley*, 473 U.S. 667, 676, 682 (1985); *People v. Rutherford* (1975) 14 Cal.3d 399, 406 [overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn.6]; *People v. Kasim* (1997) 56 Cal.App.4th 1330, 1380.) Evidence is "material" if there is a reasonable probability that disclosure would have led to a different result at trial. (See *Kyles, supra*, at 432-34.) In deciding whether the withheld evidence satisfies this standard, the court evaluates its effect cumulatively. (*See id.*, at 436-38.) Gauging the collective impact of the withheld evidence requires this court to step back and consider the strength of the prosecution's case, paying close attention to the critical nature of Salgado's testimony. (See *Barker v. Fleming* (9th Cir. 2005) 423 F.3d 1085.)

    In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant to the crime (*United States v. Petrillo* (2d Cir.1987) 821 F.2d 85, 90; *see also Giglio v. United States* (1972) 405 U.S. 150, 154-55 [*Brady* violation found where government failed to disclose promise not to prosecute cooperating witness on whom government's case against defendant "almost entirely" depended], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case; see *United States v. Badalamente* (2d Cir.1974) 507 F.2d 12, 17-18 [non-disclosure of "hysterical" letters that would have had "powerful adverse effect" on witness's credibility, where that credibility was "crucial to the determination of [the defendant's] guilt or innocence"]; *cert. denied,* 421 U.S. 911 (1975); *Banks v. Dretke* (2004) 540 U.S. 668, 700-01 [evidence impeaching witness who was "the centerpiece" of a case that lacked physical evidence was material]; *Horton v. Mayle* (2005) 408 F.3d 570, 578-79 [withheld evidence was material when it impeached a witness who was "central to the prosecution's case"]).

In the case of *U.S. v. Bowie* (D.C. Cir. 1999) 198 F.3d 905, the prosecutor sent a letter to defense counsel, post-trial, disclosing that one of the testifying officers was under investigation for his testimony in an unrelated case and that the investigation had begun before the start of the defendant's trial. The Court there analyzed the facts under due process principles and *Brady*, where the prosecution failed to disclose evidence affecting the credibility of the government witness. (*Id.* at 908.) In that case, however, the evidence was not deemed "material" because a second officer had largely corroborated the first officer's testimony, thus diminishing the impact of the impeachment evidence. The court, therefore, found that there was not a reasonable probability that the jury would have acquitted the defendant if the wrongfully withheld evidence had been disclosed. (*Id.*, at 912.)

The *Bowie* case stands in sharp contrast to the instant case where Salgado's uncorroborated testimony was the glue that held the prosecution's case together. There was no direct evidence of petitioner's guilt. Indeed, even the victim in the case did not believe that it was petitioner who had shot him.[12] (RT 469, 701,724, 860, 861, 862, 875.) There can be no doubt, therefore, that evidence that Officer Salgado wrote false police reports and framed defendants in the past and that he was being investigated for such conduct was material in the instant case.

The strongest evidence linking appellant to the shooting was the unreliable hearsay statement of Griselda Delgado, which came in through Officer Salgado, and which Griselda denied making. (RT 360, 361, 374, 385, 581.) Other evidence suggesting that it was petitioner who shot Pichardo came from Juan Carlos' statements to Inspector Brown, made under duress from

_____

[12]Pichardo believed that Nene had shot him. He only began to doubt his belief after receiving phone calls from Nene while he was hospitalized after the shooting. (RT 305, 455, 456, 676, 702, 724, 863, 872.)

Salgado's threats[13].  (RT 652, 654, 658.)

Central to the defense theory was that Javier Salgado was a dishonest officer who fabricated evidence and threatened witnesses.  During closing argument, the prosecutor acknowledged that the whole case came down to whether or not Salgado was telling the truth.  Recognizing the importance of his testimony, the prosecutor argued that "Salgado is the lynchpin" and if the jury were to acquit appellant, they would have to believe that Salgado's report had been faked and that Griselda never said those things.  (RT 842.)  The prosecutor's repeated vouching for Salgado's honesty during his argument to the jury underscores the centrality of Salgado's credibility.[14]  (See *Carriger v. Stewart, supra,* 132 F.3d 480, 482.)

Salgado's proposed theory of the shooting, purportedly based on what Griselda allegedly told him, was that Pichardo saw the gun, ducked and bent down and turned around and was shot in the back by appellant.  (RT 587.)

---

[13]Appellant's aunt, Kathleen, testified that she was surprised to see appellant at her house on the day of the shooting.  (RT 420.)  She admitted that appellant was not welcome in her home and that appellant and her husband, Fermin, did not get along.  (RT 424.)  She also stated that in her conversation with appellant, lasting less than a minute, he said something about a shooting, but did not remember his exact words.  (RT 423.)  On cross-examination, Kathleen admitted that appellant may have said something like "a guy got shot"—an event traumatic enough to account for his agitated state, but not an admission of guilt  (RT 423.)

Fermin Ochoa spoke with the assistance of a Spanish interpreter, having told the court earlier that he spoke very little English.  (RT 406, 371.)  He said that appellant had spoken some English to him on the day of the shooting and then switched to Spanish.  (RT 414.)  According to Fermin, appellant told him that he had just shot somebody.  (RT 409.)  Fermin admitted, however, that he had negative feelings toward appellant, that he did not like his actions or the way he treated his children, and that he was not welcome in his home.  (RT 410, 413.)

The possible language barriers and his animosity toward his nephew rendered Fermin's testimony highly suspect.

[14]The impeachment evidence was even more important in a case such as this where the testifying witness was a police officer and not an informant.  Police Officers, by virtue of their status as protectors of society, are often imbued with an air of credibility, whereas the credibility of an informant may be viewed with suspicion by virtue of their often questionable character.

24

1    This theory, however, did not comport with the facts.  A similar theory of the

2    shooting was rejected by Officer Brown[15].  (RT 703.)  Salgado's theory was

3    also inconsistent with Dr. Baker's medical opinion.[16] (RT 447.)

4        By all accounts, Nene had been standing behind Pichardo in the garage

5    when he was shot while appellant stood in front of him.  (RT 262, 263, 284,

6    469, 470, 701, 724.)  Pichardo positively named Nene as the shooter time and

7    time again.  (RT 860, 861, 862, 875.) Evidence that Salgado was a liar would

8    have gone a long way towards rebutting the prosecution's evidence.  There can

9    be no doubt that the withheld evidence, therefore, was material.

10
      ### C. The Outcome of the Trial Would Have Been Different Had the
11    Defense Known of the Wrongly Withheld Information.

12        Information about the many falsified police reports authored by Salgado

13   and the investigation into his misdeeds would have opened up a line of cross-

14   examination that would have been devastating to Salgado's all-important

15   credibility.  (Exhibit H, Declaration of Howard Jameson.)  Given the dearth of

16   credible evidence supporting petitioner's conviction, and the admitted

17   importance of Salgado's testimony to the prosecution, it is reasonably probable

18   that the jury would have acquitted petitioner if the information had been

19   disclosed.

20        To reverse a conviction for a *Brady* violation, it does not have to be

21   more likely than not that the defendant would have been acquitted had the

22   _____

23        [15]Brown testified that Pichardo had been influenced by phone calls that
     he received while in the hospital from Nene and that he began to hypothesize
24   other shooting scenarios.  "That's when he came up with the conclusion that
     Juan Manuel reached up on the shelf, reached around the back and fired.  It
25   would be in an abnormal position which wouldn't make sense.  (RT 703.).

26        [16]Dr. Baker's opinion was that the bullet was fired from an angle
     slightly above the left portion of Pichardo's back and went into his body at a
27   straight downward path.  (RT 443, 447.)  If Pichardo had been bent over, Dr.
     Baker would have expected the path of the bullet to travel upward, not
28   downward.

25

evidence been disclosed.  (See *Kyles v.Whitely*, *supra,* 514 U.S. at 434.)  A reasonable probability has been described as being somewhat greater than 1% but less than 50%.  (*U.S. v. Bowie, supra*, 198 F.3d 909.)  Clearly in this case, at a minimum,  there is a reasonable probability that petitioner would have been acquitted had the defense theory been corroborated by evidence of Officer Salgado's history of fabricating evidence and framing defendants.

The impeachment evidence was significant.  Officer Salgado falsified, not just a few police reports, but 92 of them over a period of three years.  That this was considered a serious breach of police protocol, even amongst the department and the district attorney's office, is obvious from Salgado's eventual termination from his employment and the District Attorney's dismissal of felony cases pending at the time of Salgao's guilty plea.  (Exhibit I, Declaration of Terri Mockler.)   The nondisclosure of favorable evidence here clearly violated petitioner's due process rights, and, as such, there is no need for further harmless error review under *Brecht***.**  (U.S. Const. Amend. 5, 14; *Kyles v. Whitley* (1995) 514 U.S. 419, 435, ftnt. 9.)  Under the totality of the circumstances, the verdict in the instant matter was not worthy of confidence, and due process of law entitles petitioner to a new trial.  (*United States v. Bagley (1985)* 473 U.S. 667; *Kyles v. Whitley* (1995) 514 U.S. 419, 432-34; *Carriger v Stewart, supra,* 132 F.3d 480.)

//

//

//

## III.

## DUE PROCESS PRINCIPLES REQUIRE THAT PETITIONER'S CONVICTION BE REVERSED AS THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT THE SHOOTING WAS WILLFUL, DELIBERATE, AND PREMEDITATED.

The Court of Appeal opined that "[T]hough a close question," there was sufficient evidence of premeditation and deliberation to sustain the jury's finding. (Exhibit A, p.10, 12.)  The court based its conclusion largely on its belief that "clear evidence of motive exists."  *(Id* at.12.)  This is simply wrong.

In considering whether the state court determination resulted in a finding contrary to, or an unreasonable interpretation of, federal law, this court will "look through" the California Supreme Court's summary denial and presume that it adopted the reasoning of the California Court of Appeal, which was the last state court to have issued a reasoned opinion.  (*Ylst v. Nunnemaker* (1991) 501 U.S. 797, 804, 805.)

The Court of Appeal found that the motive for the shooting was that appellant believed that Pichardo had stolen his CD player. (Ibid.)  According to Pichardo, however, appellant did not seem angry about the CD player.  (RT 254, 293, 310.)  Pichardo never had any negative interactions with appellant. (RT 245.)  It was Nene who had been in a foul, disturbed mood and had accused him of stealing a CD player.  (RT 721.)  Furthermore, it was Nene who suggested that Pichardo leave the garage.  (RT 253, 297.)  If anyone had a motive, therefore, to shoot Pichardo, the evidence pointed toward Nene.

Furthermore, there was no evidence of any plan to have Pichardo come to appellant's garage on the day of the shooting or on any other day.  The Court of Appeal strained to find evidence of planning in the fact that Pichardo had heard that appellant thought that he had stolen his CD player and decided to go to appellant's house.  (*Ibid.*)  There was no evidence, however, that appellant had invited Pichardo to the garage or that appellant had any idea that Pichardo was coming over that day.  (*Cf. People v. Sanchez* (2001) 26 Cal.4th 834, 843; *People v. Herrera* (1999) 70 Cal.App.4th 1456 [defendants went to the scene to confront rival gang members].)  Ramiro Pichardo testified that on the day of the shooting, he had gone to appellant's garage of his own volition.  (RT 237,

27

290.)

The Court of Appeal also pointed to the gun located in the garage as evidence of planning. (*Ibid.*) The only evidence that appellant had a gun in the garage, however, came through the untrustworthy testimony of Officer Salgado and the inherently unreliable videotaped statements that Juan Carlos made to Officer Brown under threat from Salgado. That aside, the fact that a defendant used a gun cannot alone be viewed as a factor sufficient in itself to show a plan to kill. (RT 568.) In cases where the use of a weapon has been held to support a finding of premeditation and deliberation, there has been further evidence that the defendant took some time to obtain or prepare the weapon before using it. In those cases it was the very fact that defendant took deliberate steps to ready the weapon that was deemed to show sufficient planning to support the inference of premeditation and deliberation. (See, e.g., *People v. Thomas* (1992) 2 Cal.4th 517; *People v. Perez* (1992) 2 Cal.4th 1117; see also, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 547 [evidence that defendant either retrieved hammer in advance or went to garage to obtain hammer and kill victim was indicative of planning activity]; *People v. Morris* (1988) 46 Cal.3d. 23 ["Defendant's possession of a weapon in advance of the killing, and his rapid escape to a waiting car moments afterwards, amply support an inference of planning activity"], overruled on other grounds in *People v. Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6.)

Neither did the way in which the shooting occurred evidence premeditation and planning. In the instant case, there was no evidence that appellant planned to go anywhere to shoot Pichardo or that he had planned to have him come to his garage for the purpose of killing him. (*Cf. People v. Herrera* (1999) 70 Cal.App.4th 1456; *People v. Sanchez*, *supra,* 26 Cal. 4th 834 [defendants entered into rival territory for the purpose of shooting at enemies while they were in their own neighborhoods].)

Pichardo was shot just once, and the bullet lodged in his back.  (RT 443, 447, 449.)  The Court of Appeal correctly cited case law holding that firing at vital body parts such as the head and neck can show preconceived deliberation.  (Appendix A, p.11.)  The Court, however, did not apply the facts of the instant case to the pertinent case law.  This was not a close-range gunshot to a vital body part and not so particular and exacting as to permit an inference that defendant was acting according to a preconceived design.  (*Ibid.*)

When considering the sufficiency of the evidence of a state court conviction, "a federal court must look to state law to determine the elements of the crime."  (*Quartararo v. Hanslmaier* (2nd Cir. 1999) 186 Fd.3d 91, 97, cert. denied, 528 U.S. 1170 (2000).  The record in this case does not disclose substantial evidence from which a reasonable trier of fact could find that appellant premeditated and deliberated beyond a reasonable doubt.  (*People v. Perez*, *supra*, 2 Cal.4th at 1124.)  The state court's decision was, therefore, contrary to, and an unreasonable interpretation of clearly established federal law.  Therefore, petitioner's conviction must be reversed in accordance with federal due process principles.  (See *In re Winship* (1970) 397 U.S. 358*; Jackson v. Virginia* (1979) 443 U.S. 307, 318-19; U.S.Const. Amend. 5, 14; see also, Cal.Const. Art. 1, sec. 15.)

Furthermore, retrial on this issue is barred by the double jeopardy clause of the United States and California Constitutions.  (*People v. Seel* (2004) 34 Cal.4th 535; U.S. Const. Amd. 5; Cal. Const. Art. 1, sec. 15.)

## IV.

### THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A VERDICT THAT APPELLANT SHOT RAMIREZ.

The Court of Appeal recognized that critical eyewitnesses to the shooting, including the victim, provided conflicting reports of the events.  (Appendix A, p. 7.)  The Court also acknowledged that the victim retreated

from his positive identification of Nene as the shooter only after he had received apologetic phone calls from him while in the hospital. (*Id.* at p.8.) Nonetheless, the Court found that other evidence supported the conclusion that appellant fired the shot. (*Ibid.*)

Evidence must be reasonable, credible, and of solid value. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320; *People v. Koontz* (2002) 27 Cal.4th 1041.)  Furthermore, it must be *substantial*.  It is not enough to point to only some evidence that supports the verdict.  (*People v. Johnson* (1980) 26 Cal.3d 557 at 576, citing *People v. Bassett* (1968) 69 Cal.2d 122, 138.)

At best, when all the evidence is viewed in the light most favorable to the prosecution, it adds up only to a suspicion that appellant might have shot Pichardo.  Therefore, under due process principles, appellant's conviction must be reversed.  (See *In re Winship (*1970) 397 U.S. 358*; Jackson v. Virginia*, *supra,* 443 U.S. at pp. 318, 319; U.S. Const. 14th Amend., Cal.Const. Art. I, sec. 15; *People v. Jones* (1990) 51 Cal.3d 294, 314; *People v. Johnson* (1980) 26 Cal.3d 557.)

### A. *The Evidence Against Appellant Was Not Credible or of Solid Value*.

The evidence that the Court of Appeal found in support of the jury's verdict was the testimony of Delgado, Juan Carlos and his then-girlfriend Gurardado, and the Ochoas.

### 1. *Griselda Delgado's testimony.*

No one testified that they had witnessed the shooting.  The only direct evidence linking appellant to the shooting was the unreliable hearsay statement of Griselda Delgado, which came in through Officer Salgado's testimony. Salgado told the jury that during a two-minute car ride to the police station, Griselda Delgado told him that she had seen appellant shoot Pichardo.  (RT

567-8.)  At trial, Griselda denied telling Officer Salgado that appellant shot Pichardo and denied seeing appellant with a gun.  (RT 361.)  Inspector Cromwell testified that Griselda also denied making the statement attributed to her by Salgado before the preliminary hearing.  (RT 497, 502.)  Moreover, Griselda accused Salgado of making repeated threats to her about her testimony.  (RT 397, 399, 401.)

Salgado's proposed theory of the shooting, purportedly based on what Griselda allegedly told him, was that Pichardo saw the gun, ducked and bent down and turned around and was shot in the back by appellant.  (RT 587.) This theory, however, did not comport with the facts.  Officer Brown rejected a similar theory of the shooting.  (RT 703.)  Salgado's theory was also inconsistent with Dr. Baker's medical opinion.  (RT 447.)

### 2. *Juan Carlos' testimony*.

Juan Carlos admitted that he had not been in the garage during the shooting.  (ART 5, 15.)  Therefore, he had no firsthand knowledge of who pulled the trigger.  Although Juan Carlos implicated his cousin as the shooter in a taped interview with Inspector Brown, he later repudiated those statements at trial.  He, like Griselda, accused Officer Salgado of dishonesty and of threatening him with incarceration.  (RT 639, 652, 654, 658, 660, 665.)

### 3.    *The Ochoas' testimony.*

As the Court of Appeal noted, appellant's aunt, Kathleen, and her husband, Fermin, testified that appellant came to their house after the shooting. (Slip op. 9.) Fermin and appellant did not get along. (RT 424.) On cross-examination, Kathleen admitted that she was unsure of appellant's exact words and that he may have said something like "a guy got shot." (RT 423.)

Fermin Ochoa, who spoke very little English, had the assistance of a Spanish interpreter at trial. (RT 371, 406.) He admitted that he had negative feelings toward appellant and that appellant was not welcome in his home. (RT 410, 413.) According to Fermin, appellant told him that he had just shot somebody. (RT 409.) The possible language barriers and his animosity toward his nephew rendered Fermin's testimony highly suspect. Separate or together, the Ochoas' testimony did not constitute the solid, credible evidence necessary to support a criminal conviction.

### 4. *Gina Guardado***.**

Gina testified that after the shooting she went outside with Juan Carlos and saw appellant, Nene, Marquita, and Mike. (RT 535.) Appellant was not doing anything unusual, he was just standing there along with everyone else. (RT 551.) Juan Carlos, Nene, and she left the house at the same time as appellant, heading off in the opposite direction. (RT 539, 551.)

According to Gina, she learned that Officer Salgado wanted to talk to her a few days after the shooting. (RT 542.) She went to the station and provided a statement to the police. (RT 543.) Furthermore, because she was aware of the existence of a warrant for Nene, she and Juan Carlos brought Nene with them to the police station. (RT 543.)

The Court of Appeal was wrong in its assessment of the evidence. Based on the record in this case, a reasonable jury could not have found beyond a reasonable doubt that appellant shot Pichardo. Accordingly, due

process principles require that appellant's conviction be reversed.  (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318-19; U.S. Const. 5th, 14th Amend., Cal.Const. Art. 1, sec. 15.)

# VI.

## CONCLUSION.

It is difficult to imagine a more unjust scenario than a person being sentenced to life in prison based on the tainted testimony of a police officer who admitted to fabricating evidence in the past and who was terminated from his employment as a police officer because of it.  Officer Salgado's conviction for falsifying police reports casts petitioner's case in an entirely new light.  The withheld impeachment evidence would have devastated Officer Salgado's credibility and the failure to disclose such evidence violated petitioner's due process rights.

The circumstances of petitioner's trial offend the most basic notions of fairness and justice.  His conviction cannot be allowed to stand where it was based on false evidence.  Although the defense argued that Salgado was lying, it could not back up its allegations sufficiently to satisfy the jury because it lacked the proof that ultimately surfaced.  Petitioner was not able to effectively cross-examine Officer Salgado where the prosecution failed to disclose important impeachment evidence.  Furthermore, petitioner's due process rights were violated when the State allowed Officer Salgado to testify falsely.  "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." (*Napue v. Illinois* (1959) 360 U.S. 264; see also *Hayes v. Brown* (9th Cir. 2005) 399 F.3d.972, 981.)

Our criminal justice system is based on the principle of fundamental

1  fairness. "Society wins not only when the guilty are convicted but when

2  criminal trials are fair." (*Brady v. Maryland* (1963) 373 U.S. 83, 87.)

3  Petitioner's trial was not fair.

4      Furthermore, the state court's decision was contrary to, and an

5  unreasonable interpretation of clearly established federal law as the record in

6  this case does not disclose substantial evidence from which a reasonable trier

7  of fact could find that appellant premeditated and deliberated beyond a

8  reasonable doubt. (*People v. Perez*, *supra,* 2 Cal.4th at 1124.) Therefore,

9  petitioner's conviction must be reversed in accordance with federal due process

10  principles. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318-19; U.S.Const.

11  Amend. 5, 14; see also, Cal.Const. Art. 1, sec. 15.)

12      Additionally, when all the evidence is viewed in the light most

13  favorable to the prosecution, it adds up only to a suspicion that appellant might

14  have shot Pichardo. Therefore, under due process principles, appellant's

15  conviction must be reversed for insufficiency of the evidence. (See *Jackson v.*

16  *Virginia*, *supra,* 443 U.S. at pp. 318, 319; U.S. Const. 14th Amend., Cal.Const.

17  Art. I, sec. 15; *People v. Jones* (1990) 51 Cal.3d 294, 314; *People v. Johnson*

18  (1980) 26 Cal.3d 557.)

19

20      For all the foregoing reasons, Petitioner's conviction must, therefore, be

21  reversed.

22  DATED:                               Respectfully submitted,

23

24                                    _____

25                                    BOBBIE STEIN
                                      Attorney for Petitioner
26                                    **ANDAZOLA**

27

28

1

# EXHIBIT TABLE OF CONTENTS

2

3

**EXHIBIT A**
Court of Appeal Opinion

4

**EXHIBIT B**
Supreme Court denial Petition for Review

5

6

**EXHIBIT C**
Supreme Court denial Petition for Writ of Habeas Corpus

7

**EXHIBIT D**.......................................................................................
Javier Salgado Advisement of rights, waiver and plea form

8

9

**EXHIBIT D-1**...................................................................................
Javier Salgado criminal complaint dated September 22, 2004

10

**EXHIBIT D-2**.....................................................................................
Docket and minutes September 23, 2004

11

12

**EXHIBIT E**.......................................................................................
News article *Contra Costa Times*

13

**EXHIBIT F**................................................................ ...........................
Police Report/Supplemental Report

14

15

**EXHIBIT G**................................................................ ...........................
Newspaper article SF Gate, dated October 13, 2004

16

**EXHIBIT H**........................................................................................ .
Declaration of Howard Jameson

17

18

**EXHIBIT I**................................... ........................................................
Declaration of Terri Mockler

19

**EXHIBIT J** ..............................................................................
Court of Appeal summary denial Petition for Writ of Habeas

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF SERVICE BY MAIL

2
Re: In re on Habeas Corpus JUAN ANDAZOLA

3
     I, the undersigned, declare that I am over 18 years of age and not a party

4
to the within cause; my business address is 503 Dolores Street, Suite 201, San

5
Francisco, CA  94110.  Today, I served a true copy of the attached **PETITION**

6
**FOR WRIT OF HABEAS CORPUS** on each of the following, by placing

7
same in an envelopes addressed as follows:

8

9
Attorney General
455 Golden Gate Avenue Rm 11000
10
San Francisco, CA 94103

11
Howard Jameson
Office of the Alternate Public Defender
12
610 Court Street
Martinez, CA 94553-1298
13

Juan Andazola
14
V-15894-ASU-B-2
Pelican Bay State Prison
15
Crescent City, CA 95531

16
     Each said envelope was then sealed and deposited in the United States

17
Mail at Oakland, California, the county in which I am employed, with the

18
postage thereon fully prepaid.

19
     I declare under penalty of perjury of the laws of the State of California

20
that the foregoing is true and correct.  Executed on December     , 2007, at

21
Oakland, California.

22

23
                           _____

24
                           Bobbie Stein

25

26

27

28

BOBBIE STEIN
Attorney at Law
State Bar No.: 113239
503 Dolores Street, Suite 201
San Francisco, CA 94110
Telephone 415/255-0301

Attorney for Petitioner

JUAN MANUEL ANDAZOLA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUAN MANUEL ANDAZOLA                )
                                    )    Case No.
            Petitioner,             )
                                    )    PETITION FOR WRIT OF
      vs.                           )    WRIT OF HABEAS CORPUS
                                    )
                                    )
JEANNE S. WOODFORD, Director        )
of the California Department of     )
Corrections, and Richard Kirdland,  )
Warden, Pelican Bay State Prison.   )
                                    )    (28 U.S.C. §2254)
            Respondent.             )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TOPICAL INDEX

INTRODUCTION AND SUMMARY OF ARGUMENT  . . . . . . . . . . . . . 1

PROCEDURAL AND FACTUAL BACKGROUND . . . . . . . . . . . . . . . . 2

Procedural Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    RAMIRO PICHARDO'S HOSPITAL INTERVIEWS. . . . . . . . . . . . 3

      A.   Interview with Dr. Baker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.   Interview with Inspector Wasteney  . . . . . . . . . . . . . . . . . . . . 4

      C.   Interview with Officer Tony Del Greco . . . . . . . . . . . . . . . . . . 4

      D.   Interview with Officer Bruce Brown . . . . . . . . . . . . . . . . . . . . 5

II.   RAMIRO PICHARDO'S TRIAL TESTIMONY . . . . . . . . . . . . . . . . 5

III.  OTHER PROSECUTION WITNESSES  . . . . . . . . . . . . . . . . . . . . . . 7

      A.   Griselda Delgado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            1.   Interview with Officer Ed Sanchez  . . . . . . . . . . . . . . . . . . 7

            2.   Statements attributed to Griselda by Officer Javier Salgado . . 7

            3.   Trial testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.   Juan Carlos Andazola . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1.   Police Interview  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            2.   Trial testimony  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.   Gina Guardado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.   Kathleen Ochoa  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.   Fermin Ochoa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.  THE DEFENSE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.   FAILURE TO DISCLOSE OFFICER SALGADO'S PATTERN OF
      FALSIFYING POLICE REPORTS AND THE CRIMINAL
      INVESTIGATION INTO HIS CONDUCT VIOLATED
      PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL
      RIGHTS AND REVERSAL IS MANDATED ................. 16

      A.  The Prosecution Had a Duty to Disclose Information About
          Salgado's Pattern of Falsifying Police Reports As Well As
          Information About the Investigation into Salgado's Misconduct
          ................................................. 18

      B.  Evidence of Salgado's False Police Reports and Investigation
          into His Fabrication of Evidence Was "Material" As His
          Credibility Was the Lynchpin of the Prosecution's Case .... 22

      C.  The Outcome of the Trial Would Have Been Different Had the
          Defense Known of the Wrongly Withheld Information ..... 25

III.  DUE PROCESS PRINCIPLES REQUIRE THAT PETITIONER'S
      CONVICTION BE REVERSED AS THE EVIDENCE WAS
      INSUFFICIENT TO PROVE THAT THE SHOOTING WAS
      WILLFUL, DELIBERATE, AND PREMEDITATED .......... 27

IV.   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A VERDICT
      THAT APPELLANT SHOT RAMIREZ ..................... 30

      A.  The Evidence Against Appellant Was Not Credible or of Solid
          Value ......................................... 30

          1.  Griselda Delgado's testimony ...................... 31

          2.  Juan Carlos' testimony ........................... 31

          3.  The Ochoas' testimony .......................... 32

          4.  Gina Guardado ................................ 32

VI.   CONCLUSION ......................................... 33

1

# TABLE OF AUTHORITIES

2

## CASES

3
4
*Banks v. Dretke* (2004) 540 U.S. 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5
*Barker v. Fleming* (9th Cir. 2005) 423 F.3d 1085 . . . . . . . . . . . . . . . . . . 22

6
*Benn v. Lambert* (9th Cir. 2002) 283 F.3d 1040 . . . . . . . . . . . . . . . . . . . 20

7
*Brady v. Maryland* (1963) 373 U.S. 83 . . . . . . . . . 1, 16, 18, 20-22, 26, 34

8
*Brecht v. Abrahamson* (1993) 507 U.S. 619 . . . . . . . . . . . . . . . 16, 18, 26

9
*Carriger v. Stewart* (9th Cir. 1997) 132 F.3d 463 . . . . . . . . . . . . 20, 24, 26

10
*Chapman v. California* (1967) 386 U.S. 18 . . . . . . . . . . . . . . . . . . . . . . . 16

11
*Commonwealth of the Northern Mariana Islands v. Bowie* (9th Cir. 2001)
243 F.3d 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

12
*Duhaime v. Ducharme* (9th Cir. 1999) 200 F.3d 597 . . . . . . . . . . . . . . . 15

13
*Fry v. Pliler* (2007) ___ U.S. __, 127 S.Ct. 2321 . . . . . . . . . . . . . . . . . . 16

14
*Giglio v. United States* (1972) 405 U.S. 150 . . . . . . . . . . . . . . . . . . . . . . 22

15
*Hayes v. Brown* (9th Cir. 2005) 399 F.3d.972 . . . . . . . . . . . . . . . . . . . . . 33

16
*Horton v. Mayle* (2005) 408 F.3d 570 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

17
*In re Brown* (1998) 17 Cal.4th 873 . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

18
*In re Sassounian* (1995) 9 Cal.4th 535 . . . . . . . . . . . . . . . . . . . . 18, 22, 28

19
*In re Winship* (1970) 397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

20
*Jackson v. Virginia* (1979) 443 U.S. 307 . . . . . . . . . . . . . . 2, 29, 30, 33, 34

21
*Kotteakos v. United States* (1946) 328 U.S. 750 . . . . . . . . . . . . . . . . . . . 16

22
*Kyles v. Whitley* (1995) 514 U.S. 419 . . . . . . . . . . . . . . . 16, 18, 20-22, 26

23
*Lindh v. Murphy* (1997) 521 U.S. 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

24
*Lockyer v. Andrade* (2003) 538 U.S. 63 . . . . . . . . . . . . . . . . . . . . . . . . . 15

25
*Napue v. Illinois* (1959) 360 U.S. 264 . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

26
*O'Neal v. McAninch* (1995) 514 U.S. 434 . . . . . . . . . . . . . . . . . . . . . . . . 16

27
*People v. Bassett* (1968) 69 Cal.2d 122 . . . . . . . . . . . . . . . . . . . . . . . . . . 30

28

*People v. Herrera* (1999) 70 Cal.App.4th 1456  . . . . . . . . . . . . . . . . 28, 29

*People v. Johnson* (1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . 30, 34

*People v. Jones* (1990) 51 Cal.3d 294 . . . . . . . . . . . . . . . . . . . . . . . 30, 34

*People v. Kasim* (1997) 56 Cal.App.4th 1330 . . . . . . . . . . . . . . . 18, 20, 22

*People v. Koontz* (2002) 27 Cal.4th 1041  . . . . . . . . . . . . . . . . . . . . . 30

*People v. Morris* (1988) 46 Cal.3d 23 . . . . . . . . . . . . . . . . . . . . . . . . 28

*People v. Perez* (1992) 2 Cal.4th 1117  . . . . . . . . . . . . . . . . . . . 28, 29, 34

*People v. Rutherford* (1975) 14 Cal.3d 399 . . . . . . . . . . . . . . . . . . . . 18, 22

*People v. Sanchez* (2001) 26 Cal.4th 834  . . . . . . . . . . . . . . . . . . . . 28, 29

*People v. Seel* (2004) 34 Cal.4th 535 . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*People v. Thomas* (1992) 2 Cal.4th 517 . . . . . . . . . . . . . . . . . . . . . . . . . 28

*People v. Wharton* (1991) 53 Cal.3d 522  . . . . . . . . . . . . . . . . . . . . . . . 28

*Pitchess v. Superior Court* (1974) 11 Cal.3d 531  . . . . . . . . . . . . . . . . . 18

*Quartararo v. Hanslmaier* (2nd Cir. 1999) 186 Fd.3d 91 . . . . . . . . . . . . 29

*United States v. Augurs* (1976) 427 U.S. 112  . . . . . . . . . . . . . . . . . . . 18

*United States v. Badalamente* (2d Cir.1974) 507 F.2d 12 . . . . . . . . . . . . 22

*United States v. Bagley* (1985) 473 U.S. 667  . . . . . . . . . . . . . . . 18, 22, 26

*United States v. Bernal-Obeso* (9th Cir. 1993) 989 F.2d 331  . . . . . . . . . 18

*United States v. Bowie* (D.C. Cir. 1999) 198 F.3d 905  . . . . . . . . 21, 23, 26

*United States v. Cuffie* (1996) 80 F.3d. 514 . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Payne* (2nd Cir. 1995) 63 F.3d 1200 . . . . . . . . . . . . . . . 21

*United States v. Petrillo* (2d Cir.1987) 821 F.2d 85  . . . . . . . . . . . . . . . 22

*Williams v. Taylor* (2000) 529 U.S. 362  . . . . . . . . . . . . . . . . . . . . . . . 15

*Ylst v. Nunnemaker* (1991) 501 U.S. 797  . . . . . . . . . . . . . . . . . . . . . . 27

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article I, § 1  . . . . . . . . . . . . . . . . . . . . . . . . . 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

California Constitution, Article I, § 15 . . . . . . . . . . . . . . . 17, 29, 30, 33, 34

California Constitution, Article I, § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States Constitution, Amendment V . . . . . . . . 1, 2, 17, 29, 30, 33, 34

United States Constitution, Amendment VI . . . . . . . . . . . . . . . . . . . 1, 2, 17

United States Constitution, Amendment XIV . . . . . . . . . 1, 2, 29, 30, 33, 34

**STATUTES**

28 U.S.C. § 2254(D)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

California Penal Code § 12022.5(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 12022.53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 12022.53(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 12022.53(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 12022.7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 187/664(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

California Penal Code § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

California Penal Code § 245(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2