EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
JOHN H. DEIST, State Bar No. 136469
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5855
  Fax:  (415) 703-1234
  Email:  John.Deist@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **JUAN MANUEL ANDAZOLA,** | C 07-6227 PJH |
| Petitioner, | |
| **v.** | |
| **JEANNE S. WOODFORD, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**

1

**TABLE OF CONTENTS**

2
**Page**

3    PROCEDURAL HISTORY                                                                1

4    FACTUAL BACKGROUND                                                          2

5        Pichardo's Hospital Interviews                                              3

6        Delgado                                                                              4

7        Juan Carlos Andazola                                                          5

8        Kathleen And Fermin Ochoa                                                 6

9    THE STANDARD OF REVIEW                                                     6

10   ARGUMENT                                                                              8

11       I.    THE STATE COURT REASONABLY CONCLUDED THAT THE
               EVIDENCE      WAS      SUFFICIENT    TO    SUPPORT
12             PETITIONER'S CONVICTION FOR ATTEMPTED FIRST
               DEGREE MURDER                                                          8
13
         II.   THE STATE COURT REASONABLY CONCLUDED THAT THE
14             EVIDENCE WAS SUFFICIENT TO SHOW THAT PETITIONER
               SHOT   PICHARDO   WITH   PREMEDITATION   AND
15             DELIBERATION                                                            11

16       III.  THE  TRIAL  COURT  REASONABLY  DECLINED  TO
               INSTRUCT THE JURY WITH A PINPOINT DEFENSE
17             INSTRUCTION   REGARDING   BOFORQUEZ'S
               CONSCIOUSNESS OF GUILT                                           13
18
         IV.   THE PROSECUTOR DID NOT COMMIT *BRADY* ERROR        17
19
     CONCLUSION                                                                          21
20
21

22

23

24

25

26

27

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

i

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Bashor v. Risley*
730 F.2d 1228 (9th Cir. 1984)                                                           15

5

*Bell v. Cone*
6       535 U.S. 685 (2002)                                                                     7

7

*Brady v. Maryland*
373 U.S. 83 (1963)                                                                     17

8

*Brecht v. Abrahamson*
9       507 U.S. 619 (1993)                                                                  7, 17

10      *Chein v. Shumsky*
373 F.3d 978 (9th Cir. 2004) (en banc)                                                  6

11

*Cupp v. Naughten*
12      414 U.S. 141 (1973)                                                                    15

13      *Drayden v. White*
232 F.3d 704 (9th Cir. 2000)                                                           11

14

*Estelle v. McGuire*
15      502 U.S. 62 (1991)                                                                     14

16      *Fry v. Pliler*
__ U.S. __, 127 S.Ct. 2321 (2007)                                                       7

17

*Henderson v. Kibbe*
18      431 U.S. 145 (1997)                                                                    15

19      *Herrera v. Collins*
506 U.S. 390 (1993)                                                                     8

20

*Hines v. Thompson*
21      336 F.3d 848 (9th Cir. 2003)                                                           17

22      *In re Winship*
397 U.S. 358 (1970)                                                                     8

23

*Jackson v. Virginia*
24      443 U.S. 307 (1979)                                                                     8

25      *Juan H. v. Allen*
(9th Cir. 2005) 408 F.3d 1262                                                            8

26

*Kyles v. Whitley*
27      514 U.S. 419 (1995)                                                                 17, 18

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

ii

**TABLE OF AUTHORITIES** **(continued)**

1

**Page**

2

3

*Lewis v. Jeffers*
497 U.S. 764 (1990) .......................................................... 14

4

*Lockyer v. Andrade*
538 U.S. 63 (2003) .......................................................... 7

5

6

*Menendez v. Terhune*
422 F.3d 1012 (9th Cir. 2005) .................................. 13, 14

7

*People v. Bolin*
18 Cal.4th 297 (1998) .................................................. 12

8

9

*People v. Caro*
46 Cal.3d 1035 (1988) .................................................. 12

10

*People v. Koontz*
27 Cal.4th 1041 (2002) ................................................ 12

11

12

*People v. Maxwell*
94 Cal.App.3d 562 (1979) ........................................... 10

13

*People v. Stitely*
35 Cal.4th 514 (2005) .................................................. 11

14

15

*People v. Watson*
46 Cal.2d 818 (1956) ................................................... 15

16

*Prantil v. California*
843 F.2d 314 (9th Cir. 1988) ................................... 14, 15

17

18

*Strickler v. Greene*
527 U.S. 263 (1999) ..................................................... 18

19

*United States v. Agurs*
427 U.S. 97 (1976) ....................................................... 17

20

21

*United States v. Bagley*
473 U.S. 667 (1985) ..................................................... 17

22

*Williams v. Taylor*
529 U.S. 362 (2000) ..................................................... 7

23

24

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam) .................................. 7

25

26

27

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

iii

**TABLE OF AUTHORITIES  (continued)**

|  | Page |
|---|---|
| **Statutes** | |
| Anti-Terrorism and Effective Death Penalty Act (AEDPA) | 6, 8 |
| Penal Code | |
| § 187(a) | 1 |
| § 245(a)(2) | 1 |
| § 664(a) | 1 |
| § 12022.5(a)(1) | 1 |
| § 12022.53 | 2 |
| § 12022.53(b), (c) & (d) | 1 |
| § 12022.7(b) | 1 |
| United State Code, Title 28 | |
| § 2254(d) | 7, 8 |
| § 2254(d)(1) | 7 |
| § 2254(e)(1) | 13 |
| **Other Authorities** | |
| California Jury Instructions, Criminal | |
| No. 2.13 | 16 |
| No. 2.21.2 | 16 |
| No. 2.52 | 16 |
| No. 2.90 | 16 |

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

iv

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOHN H. DEIST, State Bar No. 136469
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5855
     Fax:  (415) 703-1234
8    Email:  John.Deist@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  JUAN MANUEL ANDAZOLA,                     C 07-6227 PJH

15                               Petitioner,  **MEMORANDUM OF POINTS
                                               AND AUTHORITIES IN
                                               OPPOSITION TO PETITION**
16          v.                                **FOR WRIT OF HABEAS
                                               CORPUS**
16  JEANNE S. WOODFORD, Warden,

17                               Respondent.

18

19          Petitioner Juan Andazola seeks federal habeas corpus relief from his state-court

20  convictions for assault with a firearm and attempted murder.

21                         **PROCEDURAL HISTORY**

22          On September 18, 2003, petitioner was convicted by a jury in the Contra Costa County

23  Superior Court of assault with a firearm (Pen. Code, § 245(a)(2))[1] and attempted murder (§§ 187(a),

24  664(a)), with enhancements for great bodily injury (§ 12022.7(b)), personal use of a firearm (§

25  12022.5(a)(1)), and personal use of a firearm causing great bodily injury (§ 12022.53(b), (c) & (d)).

26  Clerk's Transcript on Appeal (CT), lodged as Exhibit 1, at 682-683.  On December 5, 2003, the trial

27  ─────────────────────────────────────────

28          1.  Unless otherwise indicated, all statutory references are to the Penal Code.

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1    court sentenced petitioner to life with the possibility of parole on count 1, with an additional

2    consecutive sentence of 25 years to life for the section 12022.53 enhancement (personal use of a

3    firearm causing great bodily injury).  CT 716-719.

4         Petitioner challenged his convictions on direct appeal and in a petition for writ of habeas

5    corpus filed in the California Court of Appeal on May 23, 2005 and October 21, 2005, respectively.

6    On February 22, 2006, the Court of Appeal affirmed the conviction in an unpublished decision.

7    Exhibit 4.  That same day, the Court of Appeal summarily denied the habeas corpus petition.

8    Exhibit 4.

9         Petitioner submitted his claims to the California Supreme Court in a petition for review

10   (Exhibit 5) and in a petition for writ of habeas corpus (Exhibit 7) filed on April 3, 2006 and April

11   5, 2006, respectively.  Those petitions were summarily denied by the Supreme Court on June 14,

12   2006 and February 14, 2007, respectively.  Exhibits 6 and 8.

13        On December 10, 2007, petitioner presented his claims to this Court in a federal petition

14   for writ of habeas corpus.  On December 19, 2007, this Court ordered Respondent to answer the

15   petition.

16                    **FACTUAL BACKGROUND**[2/]

17        Ramiro Pichardo testified that on the afternoon of April 3, 2002, he went to petitioner's

18   house because he had been told that "the gentlemen at the house" suspected him of stealing a CD

19   (compact disc) player.  Pichardo wanted to clear his name.  He stated that he had been to the house

20   before, had met petitioner on two or three occasions, and had never had negative interactions with

21   petitioner.

22        Upon arriving, Pichardo briefly spoke with a childhood acquaintance, Denicio "Nene"

23   Boforquez (Borforquez), before they both entered a small, one-car garage where a group of people

24

25

26   _____

27        2.  The facts presented here are taken from the opinion of the California Court of Appeal
     (Exhibit 4 at 2-7), with minor stylistic modifications.  A similar statement of facts, with citations to
     the record, can be found in Respondent's Brief on Appeal (Exhibit 3) at 2-10.
28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1   were talking, smoking marijuana,[3/] lifting weights, and listening to music.  Griselda Delgado

2   (Delgado), a man named Mike, and petitioner and his wife, Marquita, were in the garage.  Pichardo

3   lifted weights and smoked marijuana for about half an hour until he was "stoned."  He testified that

4   Boforquez raised the issue of the CD player and Pichardo denied he had stolen it.  Boforquez then

5   suggested that Pichardo leave.

6          Pichardo said he approached petitioner to shake his hand and then suddenly "blacked out."

7   He recalls waking up, unable to feel his legs and, upon seeing his blood on the garage door, realized

8   he had been shot.  After he crawled outside, Boforquez covered him with a blanket and the

9   paramedics arrived.  He was transported to the hospital, where he learned he had been shot in the

10  back.

11  **Pichardo's Hospital Interviews**

12          Later that evening, Pichardo told police officers that he thought he had been shot by

13  Boforquez because Boforquez had been standing behind him, petitioner had been standing in front

14  of him, and Boforquez was the one who had told him to leave the garage.  However, that night, after

15  receiving at least one phone call from Boforquez, Pichardo reassessed his conclusion.  He testified

16  that Boforquez cried and repeatedly apologized for what had happened, and said that petitioner had

17  shot Pichardo.  At trial, Pichardo testified that after approaching petitioner to shake his hand,

18  Pichardo turned around because he saw petitioner's angry face.  Pichardo was, therefore, "pretty

19  sure" that he had been shot in the back immediately after he turned away from petitioner.

20          Officer Bruce Brown (Brown) testified that he interviewed Pichardo three times in the

21  days following the shooting.  In the first interview, Pichardo said he thought he was shot in the back

22  as he was facing petitioner, and he was relatively positive that Boforquez was the shooter.[4/]  Brown

23  testified that he thought Pichardo may have been threatened after the first interview because he

24

25          3.   There is evidence to suggest that Pichardo also used methamphetamine while in the

26  garage.

27          4.   While in the hospital, Picardo repeated this interpretation of events to Pittsburg Police

28  Inspector Wasteney, Officer Del Greco, and Inspector Huppert.

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

3

1   became "wishy-washy" in later interviews.  Pichardo admitted that his conversation with Boforquez

2   had influenced his memory of the shooting, but he denied that Boforquez had threatened him.

3          Dr. Burton Baker treated Pichardo on the evening of the shooting.  He testified that an

4   alert and oriented Pichardo told him that he had been using methamphetamine and marijuana with

5   another man who accused him of stealing something from him and then shot him in the back with

6   a pistol at a distance of about five feet.  The bullet entered below the left shoulder blade and lodged

7   in Pichardo's spinal canal, rendering him paralyzed below the waist.  Dr. Burton believed the bullet

8   was fired from an angle slightly above the left portion of Pichardo's back and went into his body at

9   a straight downward path.  He testified further that if a person was bent over at the waist when shot

10  from behind, he would expect the path of the bullet to travel upward, not downward as it had in

11  Pichardo.

12      **Delgado**

13         Police Detective Ed Sanchez (Sanchez) testified that he interviewed Delgado on the night

14  of the shooting.  She told him that she was a friend of petitioner's wife, Marquita, and that she had

15  walked to petitioner's home shortly after the shooting and did not know the identity of the shooter.

16         Police Officer Javier Salgado (Salgado) testified that he received a phone call from

17  Delgado two days after the shooting, on April 5, 2002.  Delgado told Salgado that her initial

18  statement to Sanchez had been false, and that she wanted to tell Sanchez the truth.

19         Salgado picked Delgado up at her house and gave her a ride to the police station.

20  According to Salgado, during the drive Delgado told him:  she had been inside the garage when

21  Boforquez and Pichardo started to argue about the CD player; Pichardo approached petitioner, who

22  pushed away Pichardo's hand, reached over to a shelf, grabbed a handgun and pointed it at Pichardo;

23  when Pichardo saw the gun, he ducked; petitioner fired one shot into Pichardo's back; at that

24  moment, Boforquez was behind Pichardo.

25         Brown testified that once Delgado reached the police station, he spoke with her in an

26  interview room with a concealed video recorder.  During that conversation, Delgado agreed to tell

27  Brown the truth as long as she would not "get involved" in the case.  When Brown said that he could

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

4

1   not make such a promise, Delgado refused to talk, explaining that she had "kids at home." She left

2   the station without giving Brown a statement.

3           Salgado and Gordon Cromwell (Cromwell), an inspector for the Contra Costa County

4   District Attorney's office, both testified that they were present when Delgado met with an assistant

5   district attorney immediately before petitioner's preliminary hearing on August 14, 2002. Both men

6   thought Delgado appeared nervous, and they heard her express concern that she and her children

7   would be hurt if she testified truthfully at the hearing. Salgado also heard Delgado reiterate that she

8   had seen petitioner shoot Pichardo in the garage. Salgado and Cromwell also testified that they had

9   encountered Delgado at various times after petitioner's preliminary hearing. Delgado apologized

10  to each man for not telling the truth at the hearing, and she explained that she was afraid for herself

11  and her children.

12          At trial, Delgado testified that she had heard Boforquez and Pichardo arguing in

13  petitioner's garage about a stolen CD player, but she claimed she did not see the shooting. She also

14  denied: (1) telling Salgado that she had seen petitioner shoot Pichardo; (2) offering to tell Brown

15  the truth on the condition that she not "get involved"; and (3) later apologizing to Salgado and

16  Cromwell for her preliminary hearing testimony.

17  **Juan Carlos Andazola**

18          Petitioner's cousin, Juan Carlos,[5/] testified that he and Gina Guardado (Guardado) were

19  at petitioner's house on the afternoon of the shooting, but that they were unaware of how the

20  shooting had occurred. Juan Carlos acknowledged that he had implicated petitioner as the shooter

21  in a videotaped interview with Brown on April 5, 2002, but he claimed he did so only because

22  Salgado had threatened to arrest him if he did not identify someone as the shooter.

23          The video of Juan Carlos's interview with Brown was played for the jury. Brown began

24  by telling Juan Carlos that he was arresting Boforquez for attempted murder. Juan Carlos replied,

25  "That's not even what happened" because petitioner had shot Pichardo. Juan Carlos went on to say

26  _____

27          5.   We refer to Juan Carlos Andazola as "Juan Carlos" to avoid confusing him with

28  petitioner.

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1    that he and Guardado had been inside the house when they heard a shot. They went outside and saw

2    petitioner running away from the garage, and it appeared "he was putting something" under his shirt.

3    Juan Carlos had seen petitioner with a .22-caliber revolver in the garage just a few days earlier, but

4    he said he did not see petitioner with a gun on the day of the shooting.

5    Juan Carlos also explained to Brown that he and Guardado had left the scene with

6    Boforquez, but Boforquez separated from them after a few minutes.[6] A short time later, Juan Carlos

7    and Guardado saw petitioner run toward them from some train tracks. Juan Carlos also informed

8    Brown that a day or two after the shooting, he heard petitioner talk about how he wanted to "shoot

9    [Pichardo] in the face but he moved too quick."

10    **Kathleen And Fermin Ochoa**

11    Kathleen Ochoa, petitioner's aunt and Juan Carlos's mother, lived three blocks from

12    petitioner's house with her husband, Fermin Ochoa. Kathleen and Fermin[7] both testified at trial that

13    petitioner came to their house on the afternoon of the shooting. Kathleen said that when petitioner

14    entered her home, he appeared upset and told her that someone had tried to rob him and, during a

15    struggle, a gun had fired. She initially testified that he blurted out something like, "I just shot

16    somebody," but on cross-examination she admitted that she could not remember petitioner's exact

17    words.

18    Fermin testified through a Spanish interpreter that, on the day of the shooting, petitioner

19    had first spoken to him in English and then in Spanish. Petitioner told Fermin that he (petitioner)

20    had shot somebody at his home. Fermin also acknowledged that he did not like petitioner.

21    **THE STANDARD OF REVIEW**

22    The provisions of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) govern

23    this case. *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc). Under AEDPA, when

24

25    _____

26    6. Guardado testified that she left the area with Juan Carlos and Boforquez, but Boforquez
soon separated from them. She also remarked that petitioner joined her and Juan Carlos, but seemed
27    quiet and "didn't have no answers." He left a few minutes later.

28    7. We refer to the Ochoas by their first names to avoid confusion.

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

6

1    reviewing a state criminal conviction, a federal court may grant a writ of habeas corpus only if a

2    state court proceeding "(1) resulted in a decision that was contrary to, or involved an unreasonable

3    application of, clearly established Federal law, as determined by the Supreme Court of the United

4    States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

5    light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

6         Under § 2254(d)(1), a state court decision is "contrary to" clearly established Supreme

7    Court precedent "if the state court applies a rule that contradicts the governing law set forth" in

8    Supreme Court cases or "if the state court confronts a set of facts that are materially

9    indistinguishable from" a Supreme Court decision but "nevertheless arrives at a result different

10   from" that precedent.  *Williams v. Taylor*, 529 U.S. 362 (2000).  A state court decision is an

11   unreasonable application of clearly established Federal law if "the state court identifies the correct

12   governing legal principle" from a Supreme Court decision "but unreasonably applies that principle

13   to the facts of the prisoner's case."  *Id*. at 413.  In considering whether a state court has unreasonably

14   applied Supreme Court precedent, "a federal habeas court may not issue the writ simply because that

15   court concludes in its independent judgment that the relevant state-court decision applied clearly

16   established federal law erroneously or incorrectly.   Rather, that application must also be

17   unreasonable."  *Id*. at 411; see also *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (holding that it

18   is not enough that a federal habeas court is left with a "firm conviction" that a state court violated

19   the Constitution and that the state court determination must also be objectively unreasonable); *Bell*

20   *v. Cone*, 535 U.S. 685, 694 (2002).  In conducting habeas review, a federal court must "presum[e]

21   that state courts know and follow the law."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per

22   curiam).

23        Even if the state court's ruling is clearly contrary to or an unreasonable application of

24   Supreme Court precedent, such an  error would justify overturning the conviction only if the error

25   had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

26   *Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, __ U.S. __, 127 S.Ct. 2321 (2007).

27

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

7

1

2

3

**ARGUMENT**

**I.**

4

**THE STATE COURT REASONABLY CONCLUDED THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT PETITIONER'S CONVICTION FOR ATTEMPTED FIRST DEGREE MURDER**

5

6          Petitioner contends the evidence was insufficient to support his attempted first degree

7    murder conviction in two respects. In Argument I, petitioner contends the jury could not have

8    rationally concluded beyond a reasonable doubt that he shot Pichardo. In Argument II, petitioner

9    contends the jury could not have rationally concluded that he acted with premeditation and

10   deliberation. Neither argument has merit.

11          As a matter of federal constitutional law, "the Due Process Clause protects the accused

12   against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute

13   the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Herrera v.*

14   *Collins*, 506 U.S. 390, 402 (1993) ("a conviction based on evidence that fails to meet the *Winship*

15   standard" is an "independent constitutional violation"). A petitioner for a federal writ of habeas

16   corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state

17   conviction on federal due process grounds. In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the

18   United States Supreme Court held that "the relevant question is whether, after viewing the evidence

19   in the light most favorable to the prosecution, any rational trier of fact could have found the essential

20   elements of the crime beyond a reasonable doubt."

21          After AEDPA, a federal court must apply the standards of *Jackson* with an additional layer

22   of deference. *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, 1274-1275, *citing* 28 U.S.C. §

23   2254(d). As a result, this Court must ask whether the decision of the California Court of Appeal

24   reflected an "unreasonable application of" *Jackson* and *Winship* to the facts of this case. *See Juan*

25   *H. v. Allen*, 408 F.3d at 1277.

26          In evaluating petitioner's claims of insufficiency of the evidence, the California Court of

27   Appeal applied the *Jackson* standard. Exhibit 4 at 7. Thus, the only question is whether the Court

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

8

1   of Appeal acted unreasonably in concluding that a rational trier of fact could have found that

2   petitioner had shot Pichardo.

3               The Court of Appeal analyzed the issue as follows:

4               We recognize that critical eyewitnesses to the shooting, including the victim,
        provided conflicting reports of the events.  We conclude, however, the jury could
5       reasonably have found that petitioner shot Pichardo.  As petitioner argues, Pichardo
        initially thought Boforquez was the shooter.  However, [Pichardo] testified that he
6       "[a]utomatically said [Boforquez] did it" because, at the time of his hospital interviews,
        he thought Boforquez was the only person standing behind him, and [he] did not
7       remember that he quickly ducked and turned immediately before being shot. He admitted
        that Boforquez's apologetic phone call influenced his interpretation of the shooting, not
8       because of any threats issued, but because Boforquez's tearful apology and insistence that
        petitioner shot the gun "caused confusion [as to] who really did do it."[8/]  The jury could
9       have reasonably deduced that the trauma of the event, the fact that the victim was shot in
        the back, the resulting injuries and Pichardo's admitted drug use at the time of the
10      shooting diminished the value of his initial recollection.

11              Other evidence supports the conclusion petitioner fired the shot.  According to
        [Officer] Salgado, two days after the shooting, Delgado told him she saw petitioner fire
12      one shot into Pichardo's back.  Although Delgado recanted this version of events and
        instead testified that she merely heard but did not see the shooting, the jury could have
13      reasonably found her recantation unconvincing.  Both Cromwell and Salgado testified
        that, prior to the preliminary hearing on August 14, 2002, Delgado expressed her fear that
14      her family would be hurt if she testified truthfully.  They also testified that she had
        apologized to them separately for not telling the truth at the preliminary hearing.  Finally,
15      the jury viewed her videotaped conversation with Brown where she affirmed that she had
        "told Salgado that [she] was gonna . . . tell who it was but . . . didn't want to get
16      involved."

17              Juan Carlos, petitioner's cousin, also implicated petitioner as the shooter in a
        videotaped interview with [Officer] Brown.  Juan Carlos told Brown that immediately
18      after the shooting, he approached the garage and saw Boforquez, who wanted to help
        Pichardo, and saw petitioner leave the scene and put something under his shirt or in his
19      pocket.  Juan Carlos implied that petitioner may have been hiding a gun because he had
        seen him with a gun in the garage only a few days earlier.[9/]  [Juan Carlos] further indicated
20      that he saw petitioner run back from the train tracks where he believed petitioner had

21      _____

22      8.  When asked how Boforquez's phone call influenced his interpretation of the shooting,
        Pichardo testified as follows: "I had assumed it was [Boforquez] at first, but then I'm thinking well,
23      he couldn't do that because I know him.  [¶] But then again, the conversation I had before I was
        going to leave was like it might have been considered confrontational.  And then, as he called me
24      at the hospital, I thought why is he crying to me like this over the phone.  And then he's saying Juan
        did it.  So I'm thinking maybe he did do it or maybe he didn't because he was behind me when I did
25      turn, and I didn't see [Boforquez] on the other side of me.  [¶] So I mean that then caused confusion
        because I'm thinking . . . . who really did do it then?"
26

27      9.  Brown asked Juan Carlos, "Did you see a gun in the guy's hand . . . ?"  Juan Carlos
        replied:  "I know he has one."
28

        Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S.*
        *Woodford*, C 07-6227 PJH

                                                9

1    hidden the gun.[10/] [Juan Carlos] also told Brown that he had overheard petitioner bragging
2    to a friend about the shooting, saying petitioner "was gonna shoot [Pichardo] in the face
     but [Pichardo] turned too quick." Although at trial Juan Carlos claimed he had "made up"
3    these statements because he had been threatened by Salgado, the jury viewed the
     videotape of his interview with Brown and, given the specificity of Juan Carlos's account,
4    could have reasonably deduced that his taped statements were not fabrications.

5        [Gina] Guardado also testified that she and Juan Carlos approached Brown a few
     days after the shooting because they both believed the police were after the wrong man
6    (Boforquez).  She added that when she and Juan Carlos met petitioner after the shooting
     he behaved suspiciously and "didn't have no answers" to their questions.

7        Finally, petitioner's aunt, Kathleen, and her husband, Fermin, testified that petitioner
8    came to their home after the shooting and told each of them that he had shot someone.
     Although Kathleen admitted on cross-examination that she was unsure of petitioner's
9    exact words, and Fermin acknowledged that he disliked petitioner, the jury was entitled
     to believe that petitioner had confessed the crime to his aunt and uncle.

10       We therefore find that substantial evidence supports the jury's conclusion that
11   petitioner shot Pichardo.

12   Exhibit 4 at 7-9, footnotes in original.

13       It cannot be said that the Court of Appeal's analysis was unreasonable.  The evidence

14   established beyond question that Pichardo was shot by one of two people: petitioner or Boforquez.

15   The evidence linking Boforquez to the shooting was minimal, while the evidence linking petitioner

16   to the shooting was substantial.  As shown in greater detail in Argument II below, petitioner had

17   both a motive and the opportunity to commit the crime.  Petitioner's behavior immediately before

18   and after the crime was suspicious, while Boforquez's behavior was exculpatory.  Perhaps most

19   important, three of petitioner's relatives testified that he admitted the crime—even bragged about

20   it—within a short time of its occurrence.  Under California law, the testimony of a single witness

21   is sufficient to support a conviction, and a conviction may only be set aside for insufficient evidence

22   if the testimony on which it is based "is so inherently improbable and impossible of belief as in

23   effect to constitute no evidence at all."  *People v. Maxwell*, 94 Cal.App.3d 562, 577 (1979).  In light

24   of these principles, the Court of Appeal reasonably found sufficient evidence that petitioner, not

25   Boforquez, had shot Pichardo.

26   _____

27       10.  When asked, "Do you know where the gun's at?"  Juan Carlos replied, "That's what I
28   was saying, I seen him running down from the train tracks."

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

10

1

## II.

2
3

### THE STATE COURT REASONABLY CONCLUDED THAT THE EVIDENCE WAS SUFFICIENT TO SHOW THAT PETITIONER SHOT PICHARDO WITH PREMEDITATION AND DELIBERATION

4        Petitioner's second argument is an extension of the first. He argues that the evidence was

5   insufficient to show that he had shot Pichardo with premeditation and deliberation.

6        In analyzing the claim, the Court of Appeal first stated the relevant California law: "An

7   intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought

8   and reflection rather than unconsidered or rash impulse. However, the requisite reflection need not

9   span a specific or extended period of time. Thoughts may follow each other with great rapidity and

10  cold, calculated judgment may be arrived at quickly." Exhibit 4 at 11, citing *People v. Stitely*, 35

11  Cal.4th 514, 543 (2005) (internal quotations omitted). The Court of Appeal also noted that

12  premeditation is generally shown by evidence relating to motive, planning activity, and the manner

13  of killing. *Id. See also Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000) (denying federal habeas

14  corpus challenge to first degree murder conviction, noting that "California law recognizes that

15  premeditation can occur in a short period of time, provided that the evidence demonstrates 'cold,

16  calculated judgment" on the part of the killer); *id*. at 709 ("Under California law, 'when manner-of-

17  killing evidence strongly suggests premeditation and deliberation, that evidence is enough, by itself,

18  to sustain a conviction for first-degree murder.").

19       Applying these principles, the Court of Appeal found sufficient evidence of premeditation

20  and deliberation in this case:

21       Though a close question, we believe substantial evidence supports the jury's finding.
         Clear evidence of motive exists. Pichardo testified that he went to petitioner's home
22       because he had been informed by his (Pichardo's) cousin that the "gentleman at the house
         . . . had heard something about [Pichardo] stealing [the gentleman's] CD player, and
23       [Pichardo] had to explain to [the gentlemen, he (Pichardo)] didn't steal no CD player. So
         [Pichardo was] going over there to clear it up. [Pichardo's cousin] said [Pichardo needed]
24       to watch out because [the gentleman's] upset." Further, despite petitioner's contention
         to the contrary, this same testimony reflects an element of planning. One reasonable
25       interpretation of this testimony is that petitioner was not only upset about the theft, but
         wanted Pichardo to come to his house "to explain" the situation. Thus, petitioner had
26       reason to believe Pichardo would come to his home and had an opportunity to provide for
         that eventuality by obtaining a firearm. In fact, petitioner's cousin, Juan Carlos, testified
27       that he had seen petitioner with a firearm in the garage a few days before the shooting.

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1       Pichardo further testified that, after he was asked to leave, he approached petitioner
2   to shake hands. He denied he did so in a provocative fashion. Petitioner had an angry
    look on his face that Pichardo had not noticed before. Unbeknownst to Pichardo,
3   petitioner was positioned near a firearm located in the garage, and, as Pichardo
    approached, petitioner grabbed the weapon and shot him. And, according to Juan Carlos,
4   petitioner stated soon after the shooting that he had intended to "shoot [Pichardo] in the
    face, but he moved too quick." Viewing the evidence in the light most favorable to the
5   People, the jury could have reasonably found that petitioner had a motive to shoot
    Pichardo, had planned to do so unless Pichardo convincingly established his innocence
6   of the theft, had armed himself with a firearm while Pichardo was in the garage and had
    decided to shoot Pichardo in the face. This constitutes sufficient evidence of deliberation
7   and premeditation to support the verdict.

8       [Petitioner] argues that there is no evidence of long-term planning, and, prior to the
    shooting, Boforquez seemed angrier about the theft of the CD player than petitioner. This
9   contention misses the point. As our Supreme Court has frequently commented, "the
    requisite reflection need not span a specific or extended period of time. ""'Thoughts may
10  follow each other with great rapidity and cold, calculated judgment may be arrived at
    quickly . . . .'"" [Citation.]" (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) The evidence
11  presented and the inferences appropriately drawn therefrom provide substantial evidence
    of the requisite state of mind.

12  Exhibit 4 at 12-13.

13      Again, the Court of Appeal's analysis cannot be deemed unreasonable. As the Court

14  noted, the act of obtaining a weapon is consistent with premeditation and deliberation under

15  California law. Exhibit 4 at 11, citing *People v. Koontz,* 27 Cal.4th 1041, 1081-1082 (2002). Even

16  where the assailant did not initially plan the fatal encounter with the victim, his use of a firearm

17  against a defenseless person may show sufficient deliberation to support a finding of first degree

18  murder. Exhibit 4 at 11, citing *People v. Bolin,* 18 Cal.4th 297, 332-333 (1998). Similarly, firing

19  at vital body parts such as the head and neck shows preconceived deliberation. *Id.* Finally, "a close-

20  range gunshot to the face is arguably sufficiently 'particular and exacting' to permit an inference that

21  the defendant was acting according to a preconceived design." Exhibit 4 at 11, quoting *People v.*

22  *Caro,* 46 Cal.3d 1035, 1050 (1988). In sum, the Court of Appeal identified a number of

23  characteristics that are probative of premeditation and deliberation under California law. The Court

24  further found evidence that supported each of those elements: petitioner had a motive to shoot

25  Pichardo, and his behavior before and after the crime showed that he had acted with a pre-existing

26  plan. Thus, the jury, and the Court of Appeal, had ample reason to conclude that petitioner acted

27  with premeditation and deliberation.

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford,* C 07-6227 PJH

12

1

**III.**

2
3

**THE TRIAL COURT REASONABLY DECLINED TO INSTRUCT THE JURY WITH A PINPOINT DEFENSE INSTRUCTION REGARDING BOFORQUEZ'S CONSCIOUSNESS OF GUILT**

4      Petitioner contends the jurors should have been given a "pinpoint" instruction allowing

5  them to acquit him if they found that Boforquez had attempted to persuade Pichardo to testify falsely

6  at trial.  The argument fails because there was no substantial evidence to support such an instruction.

7  In any event, if the failure to give the instruction was error, it was not of constitutional dimension.

8      Toward the conclusion of trial, the defense attorney asked the court to instruct the jury

9  with five special pinpoint instructions, in addition to the standard CALJIC instructions.  *See* CT 527-

10  531, 563-564, 594, 622, 628, 658.  Special Instruction Number 2 read as follows:

11
12
13

> If you find that Domincio Borjorquez [*sic*], aka Nene attempted to or did persuade a witness to testify falsely or attempted to or did fabricate evidence to be produced at the trial, such conduct may be considered by you as a circumstance tending to show a consciousness of guilt.  Such conduct may be sufficient by itself to raise a reasonable doubt as to the guilt of the defendant.  However, its weight and significance, if any, are matter [*sic*] for your determination.

14

15  CT 529.

16      The defense attorney argued that Special Instruction Number 2 was consistent with the

17  defense theory of the case—that Pichardo testified falsely at trial because he had previously been

18  threatened by Boforquez.  RT 766-771, 778-779, CT 529-530.  The trial court declined to give the

19  instruction because it was not supported by the evidence.  RT 779, CT 529.

20      The state court's factual finding that the instruction was not warranted is presumed correct,

21  28 U.S.C. § 2254(e)(1), and "should be the final word on the subject."  *Menendez v. Terhune*, 422

22  F.3d 1012, 1029 (9th Cir. 2005).  In fact, there was no substantial evidence that Boforquez had tried

23  to persuade Pichardo to testify falsely at trial.  The defense attorney argued that Special Instruction

24  Number 2 was supported by the testimony of police officers DelGreco and Brown.  RT 766-771,

25  778-779, CT 529-530.  DelGreco testified that he interviewed Pichardo on the night of the shooting,

26  and that Pichardo said he was "certain" he had been shot by Boforquez.  RT 724.  Brown testified

27  that he interviewed Pichardo three times after the shooting, and that Pichardo's story "kept

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

13

1    changing." RT 675.  Brown thought Pichardo "was trying to make up theories about how he was

2    shot.  And it just seemed to me it wasn't right, like he'd been threatened."  RT 676.

3            Although Brown's initial suspicions might have provided a colorable basis for Special

4    Instruction Number 2, Brown further testified that he specifically asked Pichardo whether he had

5    been threatened (or "influenced") by Boforquez.  RT 676-677, 703.  Pichardo said that his

6    conversation with Boforquez had "influenced" him (RT 703), but he added "no threats [were] ever

7    made" (RT 677).  Further, Pichardo testified at trial that he had received one phone call from

8    Boforquez at the hospital.  RT 280-281.  Boforquez was in a "crying way" and he kept saying, "I'm

9    sorry.  I'm sorry this happened."  RT 280-283, 310-311.  Boforquez did not apologize for the

10   shooting, but he expressed regret that it had happened.  RT 282.  Because Pichardo suspected

11   Boforquez of being the shooter, he asked Boforquez to "turn himself in" to the police.  Boforquez

12   responded, "I can't do that." RT 283.  Pichardo pressed the issue, and Boforquez said that petitioner

13   had been the shooter.  RT 284.  Pichardo further testified that Boforquez's call had "changed" the

14   way he thought about the shooting.  RT 285.  Whereas Pichardo had initially assumed that

15   Boforquez was the shooter, he started to believe, after the call, that petitioner might have been the

16   shooter.  RT 285, 311-312.  Pichardo insisted, however, that Boforquez had not threatened him in

17   any way.  RT 282-283.  In light of this testimony as a whole, there was no basis for an instruction

18   allowing the jury to acquit petitioner by speculating that Boforquez had tried to persuade Pichardo

19   to testify falsely at trial.

20           Even if the trial court had erred in refusing to give Special Instruction Number 2, there

21   would be no basis for federal habeas relief.  Preliminarily, "'federal habeas corpus relief does not

22   lie for errors of state law.'"  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), *quoting Lewis v. Jeffers*,

23   497 U.S. 764, 780 (1990); *Menendez v. Terhune*, 422 F.3d at 1029 ("Failure to give [a jury]

24   instruction which might be proper as a matter of state law, by itself, does not merit federal habeas

25   relief.").  To warrant habeas relief, an error in jury instructions "cannot be merely 'undesirable,

26   erroneous, or even "universally condemned,"' but must violate some due process right guaranteed

27   by the fourteenth amendment."  *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

14

*Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). To prevail, the petitioner must demonstrate that the erroneous charge "'so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). In making its determination, a federal court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Prantil*, 843 F.2d at 817 (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)). A petitioner's burden is "especially heavy" when arguing that the trial court failed to give a requested instruction. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1997).

Here, the Court of Appeal correctly found that if the failure to give petitioner's requested instruction was error, it was harmless under the state law test in *People v. Watson*, 46 Cal.2d 818 (1956). The trial court freely allowed the defense attorney to argue his theory of the case to the jury. *See* RT 779. Accordingly, the defense attorney emphasized in closing argument that Pichardo's trial testimony should be viewed with skepticism in light of his initial belief that Boforquez had been the shooter. RT 861-862. The defense attorney also argued that Pichardo had changed his story because Boforquez had "tried to influence" him through his phone calls. RT 861-863, 872. If the jurors had found the defense theory credible, they were fully permitted to consider it in their deliberations. Indeed, two of the special defense instructions given by the trial court allowed the jury to consider Boforquez's role in the shooting and its aftermath. Special Instruction Number 1 noted that the jurors had heard evidence that Pichardo initially believed he had been shot by Boforquez. RT 813, CT 594, 658. That instruction further told the jurors that petitioner bore no burden of proving that Boforquez had committed the crime, and that if the evidence of Boforquez's role in the shooting raised a reasonable doubt as to petitioner's guilt, the jurors were required to acquit him.[11/] RT 813,

---

11. Special Instruction Number 1 was given as follows:

You have heard evidence that Domincio Bojorquez [*sic*], aka Nene, committed the offenses with which the defendant is charged. The defendant is not required to prove Domincio Bojorquez, aka Nene's, guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that Domincio Bojorquez, aka Nene, committed the charged offenses may by itself raise a reasonable doubt as to the defendant's guilt. However, its weight

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

15

1    CT 594, 658.  Special Instruction Number 4, a modification of CALJIC No. 2.52, allowed the jurors

2    to consider evidence of Boforquez's "flight" to Arizona after the shooting in evaluating petitioner's

3    guilt.[12]  RT 795, CT 563, 628.

4            Other standard instructions also allowed the jury to assess the impact, if any, of

5    Boforquez's phone calls to Pichardo.  CALJIC Number 2.13 instructed the jurors as follows:

6            Evidence that at some other time a witness made a statement or statements that is or
             are inconsistent or consistent with his or her testimony in this trial, may be considered by
7            you not only for the purpose of testing the credibility of the witness, but also as evidence
             of the truth of the facts as stated by the witness on that former occasion.
8

9    RT 791, CT 549.

10           CALJIC Number 2.21.2 instructed the jurors:

11           A witness who is willfully false in one material part of his or her testimony is to be
             distrusted in others.  You may reject the whole testimony of a witness who willfully has
12           testified falsely as to a material point, unless, from all the evidence, you believe the
             probability of truth favors his or her testimony in other particulars.
13

14   RT 793, CT 554.

15           Finally, CALJIC Number 2.90 instructed the jurors as to the presumption of innocence

16   and the prosecutor's burden of proving petitioner's guilt beyond a reasonable doubt.  RT 797-798,

17   CT 571.

18   _____

19           and significance, if any, are matters for your determination.  If after considering all
             the evidence, including any evidence that another person committed the offenses,
20           you have a reasonable doubt that the defendant committed the offenses, you must
             find the defendant not guilty.
21

22   RT 813, CT 594, 658.

23           12.  Special Instruction Number 4 was given as follows:

24           The flight of another person after the commission of a crime, or after that person has
             been accused of a crime, is not sufficient in itself to establish the guilt of that person,
25           but is a fact which, if proven, may be considered by you in light of all other proved
             facts in deciding whether you have a reasonable doubt as to the defendant's guilt.
26           The weight to which this circumstance is entitled is a matter for your to decide.

27

28   RT 795, CT 628.

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1    Under the circumstances, if the jury believed that Pichardo had lied at trial as a result of

2    Boforquez's phone call, they were permitted to consider that in their deliberations. As a result, the

3    Court of Appeal concluded that any failure to give defense Special Instruction Number 2 was

4    harmless state law error, not a federal due process violation. In light of the instructions and

5    argument, there is no reasonable likelihood the jury was misled. For the same reasons, any

6    constitutional error was harmless under *Brecht*.

7

8    ## IV.

    ## THE PROSECUTOR DID NOT COMMIT *BRADY* ERROR

9

10    Shortly after petitioner's trial, one of the prosecution witnesses—Pittsburg police officer

11    Javier Salgado—pleaded guilty to five felony counts of falsifying police reports in unrelated drunk

12    driving cases. All of Salgado's crimes occurred before petitioner's trial. Petitioner contends there

13    is a reasonable probability he would not have been convicted of attempted murder if his jury had

14    been aware of Salgado's criminality. Accordingly, petitioner argues that his conviction was

15    obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[13]

16    In *Brady v. Maryland*, 373 U.S. at 87, the United States Supreme Court held "that the

17    suppression by the prosecution of evidence favorable to an accused upon request violates due

18    process where the evidence is material either to guilt or to punishment, irrespective of the good faith

19    or bad faith of the prosecution." The duty to disclose such evidence: (1) exists even though there

20    has been no request by the accused (*United States v. Agurs*, 427 U.S. 97, 107 (1976)), (2)

21    encompasses impeachment evidence as well as exculpatory evidence (*United States v. Bagley*, 473

22    U.S. 667, 676 (1985)), and (3) extends even to evidence known only to police investigators and not

23    to the prosecutor (*Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). Evidence is "material" under *Brady*

24

25    13. Petitioner submitted this claim to the California Court of Appeal in his state habeas

26    corpus petition. Because the Court of Appeal summarily denied the claim, this Court must conduct
    an independent review of the record to determine whether the state court's decision is contrary to,

27    or an unreasonable application of, established Supreme Court law. *Hines v. Thompson*, 336 F.3d
    848, 853 (9th Cir. 2003).

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1  "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result

2  of the proceeding would have been different."  *Kyles,* 514 U.S. at 433; *see also Strickler v. Greene*,

3  527 U.S. 263, 289 (1999) (a criminal conviction should be reversed under *Brady* if the absence of

4  the suppressed evidence "might have changed the outcome of the trial").

5  　　　　Officer Salgado's conviction for falsifying police reports in unrelated drunk driving cases

6  did not constitute *Brady* evidence in this case because petitioner's conviction was not dependent

7  upon Salgado's trial testimony.  Hence, impeachment of Salgado would not have affected the

8  verdict.

9  　　　　As shown in Argument I above, it is undisputed that Pichardo was shot in petitioner's

10  garage, in the immediate presence of petitioner and Boforquez.  By all accounts, the shooting

11  occurred as Pichardo was approaching petitioner to shake hands.  Pichardo initially thought he had

12  been shot by Boforquez, largely because the bullet struck him in the back and Boforquez was behind

13  him at the time.  Upon further reflection, however, Pichardo believed he had turned away from

14  petitioner immediately before he was shot.

15  　　　　Petitioner's defense at trial focused almost exclusively on Pichardo's conflicting accounts

16  of the shooting.  The defense attorney argued that the jury could not convict petitioner of attempted

17  murder because the victim had given conflicting accounts of the crime.  RT 854-867.  The jury had

18  ample reason to conclude, however, that Pichardo's initial recollection of the shooting was faulty.

19  The shooting (and Pichardo's resulting paralysis) must have been extremely traumatic, and Pichardo

20  admitted that he was "stoned" on marijuana (and possibly under the influence of methamphetamine)

21  at the time of the shooting.

22  　　　　More important, the other prosecution evidence, given by a host of independent witnesses,

23  confirmed that petitioner had shot Pichardo.

24  　　　　Kathleen Ochoa, petitioner's aunt, testified that petitioner came to her house on the

25  afternoon of the shooting and blurted out, "I shot someone."  Fermin Ochoa testified that petitioner

26  made the same admission to him moments later.

27

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

18

1    Petitioner's cousin, Juan Carlos Andazola, implicated petitioner as the shooter of Pichardo

2    in an extremely detailed interview with police officer Bruce Brown on April 5, 2002. Juan Carlos

3    told Brown that he saw petitioner running from the garage, apparently hiding something under his

4    shirt, immediately after the shooting. Juan Carlos believed the hidden object was a gun because he

5    had seen petitioner with a .22-millimeter revolver in the garage just a few days earlier. Juan Carlos

6    also told Brown he had heard petitioner bragging in public about the shooting a few days later.

7    Although Juan Carlos claimed at trial that he "made up" these statements because he had been

8    threatened by Officer Salgado, the videotape of the interview shows that Juan Carlos spoke freely

9    and comfortably.

10    Gina Guardado, Juan Carlos's girlfriend, testified that she and Juan Carlos contacted

11    Officer Brown on April 5, 2002, because they both believed the police were pursuing the wrong

12    man, Boforquez. Guardado added that petitioner had  behaved suspiciously when she and Juan

13    Carlos encountered him immediately after the shooting; petitioner seemed unusually quiet and he

14    "didn't have no answers" to their questions.

15    Officer Salgado added to this evidence by testifying that Griselda Delgado told him, just

16    days after the incident, that she had seen petitioner shoot Pichardo. Salgado testified that Delgado

17    said she saw Pichardo approach petitioner, as if to shake his hand. Petitioner then grabbed a gun

18    from a shelf in the garage and shot Pichardo in the back, as Pichardo was ducking and turning

19    around.

20    Of course, if the jurors believed Delgado's description of the shooting, as reported by

21    Salgado, they had no alternative but to convict petitioner of attempted murder. For this reason, the

22    prosecutor understandably stated in closing argument that Salgado's testimony was "sort of the

23    linchpin" of the case. (RT 841.) This does not mean, however, that Salgado's testimony was

24    indispensable to the prosecution. Delgado's description of the shooting was nearly identical to

25    Pichardo's trial testimony, and was consistent with the undisputed forensic evidence (which showed

26    that Pichardo had been shot in the left shoulder blade from an angle slightly above his back).

27    Delgado's testimony was also consistent with all of the other prosecution evidence discussed above.

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1    Finally, although Delgado recanted her report to Salgado at trial, her recantation was suspect for a

2    number of reasons: (1) Delgado was an obviously fearful witness, as reflected by her reluctant and

3    evasive testimony; (2) her recantation was in part self-contradictory (e.g., she initially told police

4    officer Sanchez that she was outside the garage at the time of the shooting, while she testified at trial

5    that she had been inside the garage, but did not see the shooting because she was talking to

6    petitioner's wife); and (3) Delgado's recantation was refuted not only by Salgado, but by the

7    testimony of District Attorney's Inspector Gordon Cromwell and by Delgado's videotaped

8    conversation with Officer Brown on April 5, 2002, who corroborated Salgado regarding Delgado's

9    recantation.

10        In light of all of this evidence, the Court of Appeal reasonably concluded that the jury

11    verdict against petitioner would not have been affected by the disclosure that Salgado had filed false

12    police reports in a few unrelated drunk driving cases. Thus, there is no basis for federal habeas

13    corpus relief.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

1    **CONCLUSION**

2    For the reasons stated, we ask that the petition for writ of habeas corpus be denied.

3    Dated:  February 4, 2008

4                        Respectfully submitted,

5                        EDMUND G. BROWN JR.
                         Attorney General of the State of California

6                        DANE R. GILLETTE
7                        Chief Assistant Attorney General

                         GERALD A. ENGLER
8                        Senior Assistant Attorney General

                         PEGGY S. RUFFRA
9                        Supervising Deputy Attorney General

10                       /S/

11

12                       JOHN H. DEIST
                         Deputy Attorney General

13                       Attorneys for Respondent

14   40209194.wpd
     SF2007403517
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo of Points & Authorities in Opposition to Petition for Writ of Habeas Corpus, *Juan M. Andazola v. Jeanne S. Woodford*, C 07-6227 PJH

21