BOBBIE STEIN
Attorney at Law
State Bar No.: 113239
503 Dolores Street, Suite 201
San Francisco, CA 94110
Telephone 415/255-0301
BStein8692@aol.com

Attorney for Petitioner
**JUAN MANUEL ANDAZOLA**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN MANUEL ANDAZOLA ) | Case No. C 07-6227 PJH |
| Petitioner, ) | |
| ) | MEMORANDUM OF POINTS AND |
| vs. ) | AUTHORITIES IN RESPONSE TO OPPOSITION TO |
| ) | PETITION FOR WRIT OF HABEAS |
| ) | CORPUS |
| JEANNE S. WOODFORD, Director ) of the California Department of ) Corrections, and Richard Kirdland, ) Warden, Pelican Bay State Prison. ) | |
| ) | (28 U.S.C. §2254) |
| Respondent. ) _____) | |

i

# **TOPICAL INDEX**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.   FAILURE TO DISCLOSE OFFICER SALGADO'S PATTERN OF FALSIFYING POLICE REPORTS AND THE CRIMINAL INVESTIGATION INTO HIS CONDUCT VIOLATED PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS AND REVERSAL IS MANDATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Other Prosecution Evidence Did Not Support a Finding that Petitioner Shot Pichardo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        (1)   Griselda Delgado's testimony . . . . . . . . . . . . . . . . . . . . . . . . . 5

        (2)   The Ochoas' testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        (3)   Juan Carlos Andazola . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        (4)   Gina Guardado . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.   There Is a Reasonable Probability That the Outcome of the Trial Would Have Been Different Had the Defense Known of the Wrongly Withheld Information . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.  THE STATE COURT UNREASONABLY CONCLUDED THAT THE EVIDENCE WAS SUFFICIENT TO PROVE THAT THE SHOOTING WAS WILLFUL, DELIBERATE, AND PREMEDITATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. THE STATE COURT UNREASONABLY CONCLUDED THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT A VERDICT THAT APPELLANT SHOT RAMIREZ . . . . . . . . . . . . . . . . . . . . . . 14

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

**CASES**

*Barker v. Fleming* (9th Cir. 2005) 423 F.3d 1085 . . . . . . . . . . . . . . . . . . . . . . 10

*Brady v. Maryland* (1963) 373 U.S. 83 . . . . . . . . . . . . . . . . . . . 1, 2, 10, 11, 16

*Brecht v. Abrahamson* (1993) 507 U.S. 619 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Hayes v. Brown* (9th Cir. 2005) 399 F.3d.972 . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Winship* (1970) 397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

*Kyles v. Whitley* (1995) 514 U.S. 419 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 11

*Napue v. Illinois* (1959) 360 U.S. 264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Herrera* (1999) 70 Cal.App.4th 1456 . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Morris* (1988) 46 Cal.3d 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Perez* (1992) 2 Cal.4th 1117 . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16

*People v. Sanchez* (2001) 26 Cal.4th 834 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*People v. Seel* (2004) 34 Cal.4th 535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Thomas* (1992) 2 Cal.4th 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Wharton* (1991) 53 Cal.3d 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Quartararo v. Hanslmaier* (2nd Cir. 1999) 186 Fd.3d 91 . . . . . . . . . . . . . . . 14

*U.S. v. Cuffie* (1996) 80 F.3d 514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Bagley* (1985) 473 U.S. 667 . . . . . . . . . . . . . . . . . . . . . . 2, 11

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article I, § 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States Constitution, Amendment V . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATUTES**

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

BOBBIE STEIN
Attorney at Law
State Bar No.: 113239
503 Dolores Street, Suite 201
San Francisco, CA 94110
Telephone 415/255-0301
BStein8692@aol.com

Attorney for Petitioner
**JUAN MANUEL ANDAZOLA**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN MANUEL ANDAZOLA ) | Case No. C 07-6227 PJH |
| Petitioner, ) | |
| ) | MEMORANDUM OF POINTS AND |
| vs. ) | AUTHORITIES IN RESPONSE TO OPPOSITION TO |
| ) | PETITION FOR WRIT OF HABEAS |
| ) | CORPUS |
| JEANNE S. WOODFORD, Director ) of the California Department of ) Corrections, and Richard Kirdland, ) Warden, Pelican Bay State Prison. ) | |
| ) | (28 U.S.C. §2254) |
| Respondent. ) | |
| _____) | |

TO: **THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**:

**INTRODUCTION**

In general, habeas proceedings under section 2254 are reviewed for actual prejudice under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson* (1993) 507 U.S. 619. There is no need for harmless error review under *Brecht*, where constitutional error is found under *Brady v. Maryland* (1963) 373 U.S. 83, or where the evidence was insufficient to

1

sustain the prosecution's burden.  (*Kyles v. Whitley* (1995) 514 U.S. 419, 435, ftnt. 9; *Jackson v. Virginia* (1979) 443 U.S. 307, 31, 19.)  In the instant case, there was both *Brady* error and the evidence was insufficient to sustain the prosecution's burden.  Accordingly, petitioner's convictions should be reversed.  (*Kyles v. Whitley,* 514 U.S. 419, 432-34 (1995); *United States v. Bagley* (1985) 473 U.S. 667, 682.  (See *In re Winship* (1970) 397 U.S. 358*; Jackson v. Virginia* (1979) 443 U.S. 307, 318-19; U.S.Const. Amend. 5, 14; see also Cal. Const. Art. 1, sec. 15.)

## ARGUMENT

### I.

**FAILURE TO DISCLOSE OFFICER SALGADO'S PATTERN OF FALSIFYING POLICE REPORTS AND THE CRIMINAL INVESTIGATION INTO HIS CONDUCT VIOLATED PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS AND REVERSAL IS MANDATED**.

**A.**  *The Prosecution's Case Depended Upon Salgado's Testimony*.

Respondents acknowledge that shortly after petitioner's trial, Officer Salgado pleaded guilty to five felony counts of falsifying police reports.  (Opposition, p. 17; also see Exhibit D, Salgado guilty plea form.)[1] Respondents argue that Salgado's conviction for falsifying police reports in unrelated cases, however, did not constitute *Brady* evidence in the instant case because petitioner's conviction was not dependent upon Salgado's trial testimony and, so, impeachment of Salgado would not have affected the verdict.  (Opposition, p. 18.)  Nothing could be further from the truth.

Notwithstanding respondents' contention that petitioner's defense focused almost exclusively on Pichardo's conflicting accounts of the shooting

---

[1] Also see Petitioner's Exhibit D-1, criminal complaint, dated September 22, 2004.

(Opposition, p. 18.), central to the defense theory was that Javier Salgado was a dishonest cop who fabricated evidence and threatened witnesses. Respondents argue that the prosecutor's refererence to Salgado as the "lynchpin" in the case did not mean that Salgado's testimony was indispensable to the prosecution. (Opposition, p. 19.)  The record, however, speaks for itself.

Respondents' attempt to minimize Salgado's importance to the prosecution and the gravity of his offenses[2] is transparent.  Respondents conveniently ignore the many references to Salgado offered by the prosecutor during his closing arguments.  For instance, the prosecutor argued that "Salgado is the lynchpin" and if the jury were to acquit appellant, they would have to believe that Salgado's report had been faked and that Griselda never said those things (about seeing petitioner shoot the victim).  (RT 842.)  He emphasized this repeatedly, arguing that Salgado was not a "rogue cop" and that in order to believe that Salgado was a liar, they would have to believe that he would write a report to frame somebody and that he would intentionally falsify a report, concluding that "that is totally incredible."  (RT 889, 890, 892.)

The prosecutor sarcastically remarked that according to defense counsel, Salgado "committed a crime by making a false report."  (RT 892.) As we now know, Officer Salgado did just that.  He pled guilty to *five* felony counts of falsifying police reports.  According to the prosecution's own

---

[2] Respondents dismiss the non-disclosed information as unimportant, characterizing it as Salgado filing false police reports in "unrelated drunk driving cases." In fact, as the record shows, the impeachment evidence was significant. Officer Salgado falsified, not just a few police reports, but 92 of them over a period of three years. That this was considered a serious breach of police protocol, even amongst the department and the District Attorney's Office, is obvious from Salgado's prosecution, his eventual termination from his employment and the District Attorney's dismissal of felony cases pending at the time of Salgado's guilty plea. (See Petitioner's Exhibits I and I(1).)

argument, if the jury believed that Salgado would write a report to frame somebody and that he would intentionally falsify a police report (which are now known facts) they could conclude that Salgado was a liar and acquit petitioner.  Had the jurors seen Salgado as we now see him, they would not have believed his testimony.  This is particularly so in light of the prosecution's weak evidence and the strong defense evidence of third-party culpability.

With proper impeachment, it would have been very easy for the jury to accept Griselda's testimony that Salgado had fabricated a report about what she had told him, thus eliminating the only purported eyewitness account of the shooting.  Furthermore, proper impeachment evidence would have bolstered Juan Carlos' repudiation of his videotaped interview, where he implicated petitioner.  As such, the verdict below is not worthy of confidence. (*U.S. v. Cuffie* (1996) 80 F.3d 514.)  No reasonable jury hearing all of the now available evidence about Salgado's pattern of falsifying police reports over a period of years would vote to convict petitioner beyond a reasonable doubt on the record below.

### *B. Other Prosecution Evidence Did Not Support a Finding that Petitioner Shot Pichardo.*

Respondents argue that other prosecution evidence by "a host of independent witnesses confirmed that petitioner had shot Picardo." (Opposition, p. 18.)  This is simply not true.  No one testified that they had witnessed the shooting.  The only direct evidence linking appellant to the shooting was the unreliable hearsay statement of Griselda Delgado, which came in through Officer Salgado's testimony.  By all accounts, Nene had been standing behind Pichardo in the garage when he was shot while appellant stood in front of him.  ( RT 262, 263, 284, 469, 470, 701, 724.)  Pichardo positively named Nene as the shooter time and time again. (RT 860, 861, 862,

875.) None of the witnesses at trial provided solid, credible evidence that petitioner was the shooter.

### *(1) Griselda Delgado's testimony.*

Salgado told the jury that during a two-minute car ride to the police station, Griselda Delgado told him that she had seen petitioner shoot Pichardo. (RT 567-8.) At trial, Griselda denied telling Officer Salgado that appellant shot Pichardo and denied seeing appellant with a gun. (RT 361.) Moreover, Griselda accused Salgado of making repeated threats to her about her testimony.[3] (RT 397, 399, 401.)

Salgado's proposed theory of the shooting, purportedly based on what Griselda allegedly told him, was that Pichardo saw the gun, ducked and bent down and turned around and was shot in the back by appellant. (RT 587.) This theory, however, did not comport with the facts. Officer Brown rejected a similar theory of the shooting[4]. (RT 703.)

Salgado's theory was also inconsistent with Dr. Baker's medical opinion. (RT 447.) The record reveals that, in Dr. Baker's opinion, the bullet was fired from an angle slightly above the left portion of Pichardo's back and went into his body at a straight downward path. (RT 443, 447.) If Pichardo had been bent over, Dr. Baker would have expected the path of the bullet to travel upward, not downward. (*Ibid.*)

Respondents argue that although Delgado recanted her report to Salgado at trial, her recantation was suspect for a number of reasons.

---

[3] Griselda said that Salgado threatened that her children could be taken away from her and that she could go to jail. (RT 581, 374, 385.)

[4] Brown testified that Pichardo had been influenced by phone calls that he received while in the hospital from Nene and that he began to hypothesize other shooting scenarios. "That's when he came up with the conclusion that Juan Manuel reached up on the shelf, reached around the back and fired. It would be in an abnormal position which wouldn't make sense. (RT 703).

1  (Opposition, p. 20.)  First, because Delgado was an obviously fearful witness.
2  The record, however, does not support that interpretation.  Even if it did, that
3  fact would not in any way undermine petitioner's argument that had the jury
4  known of Salgado's past falsification of police reports, they would not have
5  believed his story about what Griselda told him on the way to the police
6  station.

7  Respondents next argue that Griselda's recantation was in part self-
8  contradictory.  (Opposition, p. 20.)  Grieslda admitted that she first told the
9  officer at the scene that she wasn't present at the time of the shooting.  (RT
10 351)  She explained, however, that she was scared at the time, but later told
11 the police that she was present at the scene.  (RT 353.)  Again, this has no
12 bearing on whether or not the jury would have believed Salgado's testimony
13 had they known of his previous misdeeds.

14 Respondents contend that Inspector Cromwell refuted Delgado's
15 recantation as did her videotaped interview with Inspector Brown.  With
16 regard to the short videotape of Griselda's interaction with Brown, the tape
17 showed Griselda telling Officer Brown that she wanted to tell him something
18 but that she had children at home and would talk apparently only if he
19 promised her safety.  (ART interview transcript 8/25/03.)  Officer Brown is
20 heard on the tape to say that he cannot guarantee her anything, "you're a
21 witness to a shooting, ok, either you have, [sic] you can prove somebody's
22 innocence or you can prove somebody's guilt."  (*Ibid.*)  Griselda then asked if
23 she was free to leave.  (*Ibid.;* RT 586.)  The tape does not further respondents'
24 argument.

25 Neither does  Inspector Cromwell's testimony support respondents'
26 position.  Cromwell testified that Griselda denied making the statement
27 attributed to her by Salgado before the preliminary hearing.  (RT 497, 502.)
28 This conflicted with Salgado's testimony that prior to the preliminary hearing,

he heard Delgado reiterate that she had seen appellant shoot Pichardo. (RT 497, 502, 581, 590.)

### *(2) The Ochoas' testimony.*

Although petitioner's aunt, Kathleen, testified that in her conversation with appellant, lasting less than a minute, he said something about a shooting, she did not remember his exact words. (RT 423.) On cross-examination, Kathleen admitted that appellant may have said something like "a guy got shot"—an event traumatic enough to account for petitioner's agitated state, but not tantamount to an admission of guilt (RT 423.)

Kathleen's husband, Fermin, who spoke very little English, said that appellant had spoken some English to him on the day of the shooting and then switched to Spanish. (RT 371 406, 414.) According to Fermin, appellant told him that he had just shot somebody. (RT 409.) Fermin's admitted animus toward his nephew, however, along with possible language barriers, rendered his testimony highly suspect. (RT 410, 413.)

### *(3) Juan Carlos Andazola.*

In his interview, Juan Carlos told Inspector Brown that he had not been in the garage at the time and had not seen the shooting. Neither did he see appellant with a gun on the day of the shooting.[5] (ART 5, 15.) Nonetheless, he told the Inspector that Nene did not shoot Pichardo and blamed his cousin instead. (ART 3,18, 36; RT 645.) Juan Carlos told Brown that he overheard appellant tell a friend that he would have shot Pichardo in the face but that he moved too quickly. (ART 24.)

Juan Carlos, however, repudiated those statements at trial. He, like

---

[5] Juan Carlos told Inspector Brown that he had seen appellant with a gun a few days before the shooting and that it was wrapped up in "a shirt or something" in the garage. (ART 6.) He also told Brown that he thought that appellant was putting something away under his shirt when he left the garage. (ART 15.)

7

Griselda, accused Officer Salgado of dishonesty and of threatening him with incarceration. (RT 639, 652, 654, 658, 660, 665.) Juan Carlos related how Salgado frequently accused him of crimes and threatened him on a daily basis. (RT 637.) He said that Salgado told him that if he did not tell Brown the suggested story, he would get in trouble and would be charged with something. (RT 652, 654.) According to Juan Carlos, Salgado had arrested him before and has tried to scare him. On occasion, Salgado has threatened to fabricate evidence against Juan Carlos[6]. (RT 665.)

The circumstances surrounding Juan Carlos' interview were inherently untrustworthy, as were the statements that he made to Officer Brown. Although the videotape itself does not reveal it, Juan Carlos testified under oath at trial that he made up the story at the behest of Salgado and under threat of incarceration. (RB 13; RT 652, 654, 658.)

In any event, Juan Carlos admitted that he had not been in the garage during the shooting. (ART 5, 15.) Therefore, he had no firsthand knowledge of who pulled the trigger. Juan Carlos' repudiated statements regarding appellant's behavior after the shooting did not provide sufficient evidence to support the verdict.

### *(4) Gina Guardado.*

Respondents argue that Gina and Juan Carlos approached Brown on April 5 "because they both believed the police were pursuing the wrong man, Nene Boforquez." (Opposition, p. 19.) According to Gina, she learned that Officer Salgado wanted to talk to her a few days after the shooting . (RT 542.) She therefore went to the station and provided a statement to the police. (RT 543.) Furthermore, because she was aware of the existence of a warrant

---

[6] According to Juan Carlos, Salgado asked him if he was driving a stolen car when he came to the police station. (RT 652.)

for Nene, she and Juan Carlos brought Nene with them to the police station. (RT 543.)[7]

Respondents further contend that Gina said that appellant "behaved suspiciously when she and Juan Carlos encountered him immediately after the shooting . . . seemed unusually quiet and he "didn't have no answers to their questions." (Opposition, p. 19.) In fact, Gina' testimony supported the conclusion that appellant was *not* acting suspiciously after the shooting. When she opened the door of the house, she saw people leaving the garage. (RT 534-5.) When she came outside with Juan Carlos, she saw appellant, Nene, Marquita, and Mike. (RT 535.) Appellant was not doing anything unusual, he was just standing there along with everyone else.[8] (RT 551.)

**C. *There Is a Reasonable Probability That the Outcome of the Trial Would Have Been Different Had the Defense Known of the Wrongly Withheld Information.***

Respondents do not contest that disclosure was required in the case at bar. Instead they argue only that the evidence was not "material." (Opposition, p.18.) That the evidence here was "material," however, is manifest. Evidence is "material" if there is a reasonable probability that disclosure would have led to a different result at trial. (See *Kyles, supra,* at 432-34.) Deciding whether the withheld evidence satisfies this standard requires a cumulative evaluation. (*See id.*, at 436-38.) Gauging the collective impact of the withheld evidence requires this court to step back and consider

---

[7] When questioned further, Gina said that once at the station, she tried to tell a police officer that it wasn't Nene who "did it." She indicated that telling the police that was part of the reason that she went to the police station. (RT 544.)

[8] Gina testified:
Q: "Did he ever say anything?
A: no
Q: Did he look unusual in any way?
A: No, he just didn't say anything." (RT 542.)

9

the strength of the prosecution's case, paying close attention to the critical nature of Salgado's testimony. (See *Barker v. Fleming* (9th Cir. 2005) 423 F.3d 1085.) This court must evaluate the impact of the undisclosed evidence, not in isolation, but in light of the rest of the trial record. (*U.S. v. Bowie* (D.C. Cir. 1999) 198 F.3d 905, 912.)

As petitioner has already discussed, the case of *U.S. v. Bowie* (D.C. Cir. 1999) 198 F.3d 905 is instructive. There the prosecutor sent a letter to defense counsel, post-trial, disclosing that one of the testifying officers was under investigation for his testimony in an unrelated case and that the investigation had begun before the start of the defendant's trial. As the prosecutor failed to disclose evidence affecting the credibility of the government witness, the Court analyzed the facts under due process principles and *Brady*. (*Id.* at 908.) In *Bowie*, the evidence was not deemed "material" because a second officer had largely corroborated the first officer's testimony, diminishing the impact of the impeachment evidence. The court, therefore, found that there was not a reasonable probability that the jury would have acquitted the defendant if the wrongfully withheld evidence had been disclosed. (*Id.*, at 912.)

In sharp contrast to the facts in *Bowie*, Salgado's uncorroborated testimony was the glue that held the prosecution's case together. There was no direct evidence of petitioner's guilt. Indeed, even the victim did not believe that it was petitioner who had shot him.[9] (RT 469, 701,724, 860, 861, 862, 875.) It was only Salgado's testimony that placed the gun in petitioner's hand. There can be no doubt, therefore, that evidence of Officer Salgado's filing false police reports and framing defendants in the past and the

---

[9] Pichardo believed that Nene had shot him. He only began to doubt his belief after receiving phone calls from Nene while he was hospitalized after the shooting. (RT 305, 455, 456, 676, 702, 724, 863, 872.)

investigation into this misconduct was material in the instant case. Although the defense theory centered around Salgado's veracity, the defense lacked impeachment evidence. Information about the many falsified police reports authored by Salgado and the investigation into his misdeeds would have opened up a line of cross-examination that would have been devastating to Salgado's all-important credibility. (Petitioner's Exhibit H.) Given the dearth of credible evidence supporting petitioner's conviction, and the prosecutor's admitted importance of Salgado's testimony, it is reasonably probable that the jury would have acquitted petitioner if the information had been disclosed.

To reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed. (See *Kyles v.Whitely*, *supra,* 514 U.S. at 434.) A reasonable probability has been described as being somewhat greater than 1% but less than 50%. (*U.S. v. Bowie, supra*, 198 F.3d 909.) Clearly in this case, at a minimum, there is a reasonable probability that petitioner would have been acquitted had the defense theory been bolstered by evidence of Officer Salgado's history of fabricating evidence and framing defendants.

Under the totality of the circumstances, the verdict in the instant matter is not worthy of confidence, and due process of law entitles petitioner to a new trial. (*United States v. Bagley* (1985) 473 U.S. 667; *Kyles v. Whitley* (1995) 514 U.S. 419, 432-34; *Carriger v Stewart, supra,* 132 F.3d 480.).

## II.

**THE STATE COURT UNREASONABLY CONCLUDED THAT THE EVIDENCE WAS SUFFICIENT TO PROVE THAT THE SHOOTING WAS WILLFUL, DELIBERATE, AND PREMEDITATED.**

According to respondents, the Court of Appeal's determination that the shooting was done with premeditation cannot be deemed unreasonable. (Opposition, p. 12.) The Court of Appeal found that "[T]hough a close

1  question," there was sufficient evidence of premeditation and deliberation to
2  sustain the jury's finding. (Petitioner's Exhibit A, p.10, 12.) The court's
3  conclusion, however, was based largely on its belief that "clear evidence of
4  motive exists." *(Id* at.12.) This is simply wrong.
5        The Court of Appeal found that the motive for the shooting was that
6  appellant believed that Pichardo had stolen his CD player. (Ibid.) According
7  to Pichardo, however, appellant did not seem angry about the CD player. (RT
8  254, 293, 310.) Pichardo never had any negative interactions with appellant.
9  (RT 245.) It was Nene who had been in a foul, disturbed mood and had
10 accused him of stealing a CD player. (RT 721.) Furthermore, it was Nene
11 who suggested that Pichardo leave the garage. (RT 253, 297.) If anyone had
12 a motive to shoot Pichardo, the evidence pointed toward Nene.
13       Furthermore, there was no evidence of any plan to have Pichardo come
14 to appellant's garage on the day of the shooting or on any other day. The
15 Court of Appeal strained to find evidence of planning in the fact that Pichardo
16 had heard that appellant thought that he had stolen his CD player and decided
17 to go to appellant's house. (*Ibid.*) There was no evidence, however, that
18 appellant had invited Pichardo to the garage or that appellant had any idea that
19 Pichardo was coming over that day. (*Cf. People v. Sanchez* (2001) 26 Cal.4th
20 834, 843; *People v. Herrera* (1999) 70 Cal.App.4th 1456 [defendants went to
21 the scene to confront rival gang members].) Ramiro Pichardo testified that on
22 the day of the shooting, he had gone to appellant's garage of his own volition.
23 (RT 237, 290.)
24       Respondents rely on the gun being located in the garage, as did the
25 Court of Appeal, to support evidence of planning. (Opposition, p. 12.) The
26 only evidence that appellant had a gun in the garage, however, came through
27 the untrustworthy testimony of Officer Salgado and the inherently unreliable
28 videotaped statements that Juan Carlos made to Officer Brown under threat

from Salgado. That aside, the fact that a defendant used a gun cannot, alone, be viewed as a factor sufficient in itself to show a plan to kill. (RT 568.)

In cases where the use of a weapon has been held to support a finding of premeditation and deliberation, there has been further evidence that the defendant took some time to obtain or prepare the weapon before using it. In those cases it was the very fact that defendant took deliberate steps to ready the weapon that was deemed to show sufficient planning to support the inference of premeditation and deliberation. (See, e.g., *People v. Thomas* (1992) 2 Cal.4th 517; *People v. Perez* (1992) 2 Cal.4th 1117; see also, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 547 [evidence that defendant either retrieved hammer in advance or went to garage to obtain hammer and kill victim was indicative of planning activity]; *People v. Morris* (1988) 46 Cal.3d. 23 ["Defendant's possession of a weapon in advance of the killing, and his rapid escape to a waiting car moments afterwards, amply support an inference of planning activity"], overruled on other grounds in *People v. Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6.)

Neither did the way in which the shooting occurred evidence premeditation and planning. Pichardo was shot just once, and the bullet lodged in his back. (RT 443, 447, 449.) Respondents echo the Court of Appeal in citing case law holding that firing at vital body parts, such as the head and neck, can show preconceived deliberation. (Petitioner's Exhibit A, p.11.) In this matter, however, there was no close-range gunshot to a vital body part. Neither was the shot so particular and exacting as to permit an inference that defendant was acting according to a preconceived design.

When considering the sufficiency of the evidence of a state court conviction, "a federal court must look to state law to determine the elements of the crime." (*Quartararo v. Hanslmaier* (2nd Cir. 1999) 186 Fd.3d 91, 97, cert. denied, 528 U.S. 1170 (2000). The record in this case does not disclose

substantial evidence from which a reasonable trier of fact could find that appellant premeditated and deliberated beyond a reasonable doubt. (*People v. Perez*, *supra,* 2 Cal.4th at 1124.) The state court's decision was, therefore, contrary to, and an unreasonable interpretation of, clearly established federal law. Therefore, petitioner's conviction must be reversed in accordance with federal due process principles. (See *In re Winship* (1970) 397 U.S. 358*; Jackson v. Virginia* (1979) 443 U.S. 307, 318-19; U.S.Const. Amend. 5, 14; see also, Cal. Const. Art. 1, sec. 15.)

Furthermore, retrial on this issue is barred by the double jeopardy clause of the United States and California Constitutions. (*People v. Seel* (2004) 34 Cal.4th 535; U.S. Const. Amd. 5; Cal. Const. Art. 1, sec. 15.)

### III.
**THE STATE COURT UNREASONABLY CONCLUDED THAT THE EVIDENCE WAS SUFFICIENT TO SUPPORT A VERDICT THAT APPELLANT SHOT RAMIREZ.**

The Court of Appeal recognized that critical eyewitnesses to the shooting, including the victim, provided conflicting reports of the events. (Petitioner's Exhibit A, p. 7.) The Court also acknowledged that the victim retreated from his positive identification of Nene as the shooter only after he had received apologetic phone calls from him while in the hospital. (*Id.* at p.8.) Nonetheless, the Court found that other evidence supported the conclusion that appellant fired the shot. (*Ibid*.)

The evidence that the Court of Appeal found in support of the jury's verdict was the testimony of Delgado, Juan Carlos and his then-girlfriend, Gina Guardado, and the Ochoas. The only direct evidence linking appellant to the shooting was the unreliable hearsay statement of Griselda Delgado, which came in through Officer Salgado's testimony. (RT 567-8.) Juan Carlos was not in the garage during the shooting. (ART 5, 15.) As has been throughly

14

discussed in petitioner's original points and authorities and in the arguments above, evidence that Delgado saw the shooting and Juan Carlos' testimony about what petitioner said after the shooting were tainted by Officer Salgado, and therefore not believable. The Ochoa's respective testimony was suspect because petitioner was not welcome in their home and there were language barriers to understanding what he might have told them when he came to their house after the shooting. Furthermore, Gina Guardado's testimony did not add substantial evidence to support the theory that petitioner pulled the trigger.

The Court of Appeal was wrong in its assessment of the evidence. Based on the record in this case, a reasonable jury could not have found beyond a reasonable doubt that appellant shot Pichardo. Accordingly, due process principles require that appellant's conviction be reversed. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 318-19; U.S. Const. 5th, 14th Amend., Cal. Const. Art. 1, sec. 15.)

## IV.
## CONCLUSION.

Officer Salgado's conviction for falsifying police reports casts petitioner's case in an entirely new light. The withheld impeachment evidence would have devastated Officer Salgado's credibility and the failure to disclose such evidence violated petitioner's due process rights.

Although the defense argued that Salgado was lying, it could not back up its allegations sufficiently to satisfy the jury because it lacked the proof that ultimately surfaced. Petitioner could not effectively cross-examine Officer Salgado because the prosecution failed to disclose important impeachment evidence. Furthermore, petitioner's due process rights were violated when the

State allowed Officer Salgado to testify falsely.  "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." (*Napue v. Illinois* (1959) 360 U.S. 264; see also *Hayes v. Brown* (9th Cir. 2005) 399 F.3d.972, 981.)

Moreover, the state court's decision was contrary to, and an unreasonable interpretation of, clearly established federal law as the record in this case does not disclose substantial evidence from which a reasonable trier of fact could find that appellant premeditated and deliberated beyond a reasonable doubt. (*People v. Perez*, *supra*, 2 Cal.4th at 1124.)  When all the evidence is viewed in the light most favorable to the prosecution, it adds up only to a suspicion that appellant might have shot Pichardo.  Therefore, under due process principles, appellant's conviction must be reversed for insufficiency of the evidence. (See *Jackson v. Virginia*, *supra,* 443 U.S. at pp. 318, 319; U.S. Const. 14th Amend., Cal.Const. Art. I, sec. 15; *People v. Jones* (1990) 51 Cal.3d 294, 314; *People v. Johnson* (1980) 26 Cal.3d 557.)

Our criminal justice system is based on the principle of fundamental fairness. "Society wins not only when the guilty are convicted but when criminal trials are fair." (*Brady v. Maryland* (1963) 373 U.S. 83, 87.) Petitioner's trial was not fair.

For all the foregoing reasons[10], Petitioner's conviction must be reversed.

DATED:    February 19, 2008            Respectfully submitted,

                                        /S/

                                        BOBBIE STEIN
                                        Attorney for Petitioner
                                        **ANDAZOLA**

---

[10] Respondents discuss pinpoint jury instructions in their opposition. Petitioner, however, has not raised this issue in this proceeding (Opposition, p. 13-17.)

**DECLARATION OF SERVICE BY MAIL**

**Re: In re on Habeas Corpus JUAN ANDAZOLA**

I, the undersigned, declare that I am over 18 years of age and not a party to the within cause; my business address is 503 Dolores Street, Suite 201, San Francisco, CA 94110.  Today, I served a true copy of the attached **Response to Opposition to PETITION FOR WRIT OF HABEAS CORPUS** on each of the following, by placing same in an envelopes addressed as follows:

Attorney General
455 Golden Gate Avenue Rm 11000
San Francisco, CA 94103

Howard Jameson
PO BOX 302
Martinez, CA 94553

Juan Andazola
V-15894-ASU-B-2
Pelican Bay State Prison
Crescent City, CA 95531

Each said envelope was then sealed and deposited in the United States Mail at San Francisco, California, the county in which I am employed, with the postage thereon fully prepaid.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.  Executed on February 19, 2008, at San Francisco, California.

                                                  /S/
                                      Bobbie Stein