United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN M. ANDAZOLA,

                Petitioner,                          No. C 07-6227 PJH

        v.                                  **ORDER DENYING PETITION FOR
                                            WRIT OF HABEAS CORPUS**
MATTHEW CATE, Secretary,
California Department of Corrections
and Rehabilitation; et al.,

                Respondents.
_____/

        Before the court is a petition for writ of habeas corpus, filed by state prisoner Juan

M. Andazola ("petitioner") pursuant to 28 U.S.C. § 2254.  Petitioner is presently

incarcerated at Pelican Bay State Prison, following a judgment of conviction in the Superior

Court of California, County of Contra Costa.

        The court ordered respondent to show cause why the writ should not be granted.

Respondent has filed an answer and an opposition to the petition, and has lodged exhibits

with the court.  Petitioner has responded with a traverse.  For the reasons set out below,

the petition is denied.

                                    **BACKGROUND**

A.      Procedural Background

        On October 8, 2002, an information was filed in Contra Costa Superior Court

charging petitioner with violation of California Penal Code § 187/664(a), attempted willful,

deliberate, and premeditated murder of Ramiro Pichardo (Count One); and violation of

United States District Court
For the Northern District of California

California Penal Code § 245(a)(2), assault with a firearm upon Ramiro Pichardo (Count Two).

The information further alleged as to Count One an enhancement under California Penal Code § 12022.53(b), (c), (d), for personal use of a firearm causing great bodily injury; and as to Counts One and Two, two separate enhancements under California Penal Code §§ 12022.7(b) and 12022.5(a)(1), for great bodily injury and for personal use of a firearm.

On September 18, 2003, following a jury trial, petitioner was found guilty of both attempted premeditated murder and assault with a firearm. All enhancements were found true.

On December 5, 2003, petitioner was sentenced to life with the possibility of parole on Count One, with an additional consecutive sentence of 25 years to life for the enhancement, pursuant to Penal Code § 12022.53(d). The remaining enhancements as to Count One were stricken for purposes of sentencing. A concurrent three-year term for Count Two was stayed pursuant to Penal Code § 654. The enhancements as to Count Two were stricken for purposes of sentencing.

Petitioner filed a timely notice of appeal on December 5, 2003. The Court of Appeal affirmed the conviction on February 22, 2006. On the same day, the Court of Appeal summarily denied petitioner's petition for writ of habeas corpus.

On April 3, 2006, and April 5, 2006, respectively, petitioner filed timely petitions for review and for writ of habeas corpus, with the California Supreme Court. The court denied the petition for review on June 14, 2006, without comment, and denied the petition for writ of habeas corpus on February 14, 2007, also without comment. Petitioner filed the present petition on December 10, 2007.

B.    Factual Background

Ramiro Pichardo ("Pichardo") was shot in the back at approximately 5:00 p.m. on the afternoon of April 3, 2002. The shooting took place in a garage located behind a house in Pittsburg, California. The house and garage belonged to petitioner Juan Andazola.

At trial, Pichardo testified that he went to petitioner's house around 2:30 p.m. on

2

**United States District Court**
For the Northern District of California

April 3, 2002.  He testified that he had been told that "the gentlemen at the house" suspected him of stealing a CD (compact disc) player, and he wanted to clear up the accusation.  He had also been told that he needed to "watch out" because "the gentleman" was "upset."  He stated that he had been to the house previously, had met petitioner on two or three occasions, and had never had any negative interactions with him.

Upon arriving at the house, Pichardo spoke briefly with an acquaintance, Denicio or Dionicio "Nene" Boforquez ("Boforquez").  Pichardo and Boforquez had known each other casually for years, although they were not close friends.  Following their brief conversation, Pichardo and Boforquez entered the small garage where several people were talking, smoking marijuana, lifting weights, and listening to music.

Pichardo testified that, in addition to Boforquez, the group inside the garage included a man named "Mike;" petitioner; petitioner's wife, Marquita; and Griselda Delgado ("Delgado").  Pichardo stated that he lifted weights and smoked marijuana for about half an hour.  Either Pichardo or Boforquez raised the issue of the CD player, and Pichardo denied he had stolen it.  Boforquez then told Pichardo that he should leave the garage.

Pichardo testified that he was standing approximately on a direct line between petitioner and Boforquez, and that he turned to his left side and looked at petitioner.  He was thinking of shaking petitioner's hand, and started walking toward petitioner, but then saw an angry look on petitioner's face, and turned away.  As he was turning, he suddenly "blacked out."

When he regained consciousness, he was lying on the garage floor, unable to feel his legs or stand.  Although he knew where he was, he was confused about what had happened.  It was only when he saw the blood on the floor that he realized he had been shot.  Although he initially told the investigating police officers that Boforquez had been behind him when he was shot, he testified at trial that he was "pretty sure" it was petitioner.  However, he also stated that he never saw a gun in petitioner's hand.

Pichardo crawled outside, at which point Boforquez covered him with a blanket.  Mike then carried him to the front yard, and Pichardo asked someone to call the police.

3

United States District Court

For the Northern District of California

1   After the paramedics arrived, Pichardo was transported to the hospital, where he learned

2   he had been shot in the back.

3       Dr. Burton Baker, a surgeon, treated Pichardo on the evening of the shooting for the

4   injuries he had sustained earlier in the day.  At trial, Dr. Baker testified that Pichardo, whom

5   he described as "alert" and "oriented," told him he had been using methamphetamine[1] and

6   marijuana with another man who had accused him of stealing something from him, and had

7   then shot him in the back with a pistol at a distance of about five feet.  The bullet entered

8   below the left shoulder blade, and lodged in Pichardo's spinal canal, rendering him

9   paralyzed below the waist.

10      Pittsburg Police Inspector Wasteney testified at trial that he interviewed Pichardo at

11  the hospital on the night of the shooting.  Pichardo told Inspector Wasteney that he was

12  getting ready to shake hands with petitioner, and that the next thing he remembered was

13  that he was shot from behind.  According to Inspector Wasteney, Pichardo stated that he

14  believed that Boforquez had been standing behind him, and that it was possibly Boforquez

15  who had shot him.

16      Officer Tony Del Greco also visited Pichardo in the hospital, along with Inspector

17  Huppert, interviewing him for approximately two hours.  Officer Del Greco characterized the

18  conversation as "on and off," noting that Pichardo was in extreme pain, and that he would

19  provide a statement, "then he'd be screaming for help because he was in such pain," and

20  then the interview would resume after Pichardo had been subdued.

21      According to Officer Del Greco, Pichardo stated that he had gone to petitioner's

22  home to lift weights, and that Boforquez had been in a disturbed mood and had accused

23  him of stealing a CD player.  Pichardo also stated that he had seen Boforquez put his right

24  hand into his right front pants pocket, a move that Pichardo found unusual.  Pichardo

25  stated that after the argument regarding the CD player, he lifted weights, and that

26  approximately half an hour later, he decided to leave the garage.

27

28      [1] At trial, Pichardo denied using methamphetamine prior to the shooting in the garage.

4

United States District Court

For the Northern District of California

1    Pichardo told Officer Del Greco that while he was attempting to shake hands with

2   petitioner, he was shot in the back.  At the time he was shot, he believed that Boforquez

3   was standing behind him.  He told Officer Del Greco that he was 100% certain it was

4   Boforquez who had shot him.  Officer Del Greco also testified, however, that Pichardo

5   provided conflicting information about the events surrounding the shooting.

6    Police Detective Bruce Brown was the lead investigator on the case.  At trial, he

7   testified that he had interviewed Pichardo three times following the shooting, each time for

8   about an hour.  During the first interview, at the hospital on the evening of the shooting,

9   Pichardo told Detective Brown that he thought he had been shot in the back as he was

10   facing petitioner, that Boforquez had been standing behind him, and that he was relatively

11   positive (10 on a scale of 1 to 10) that Boforquez was the shooter.

12    Later that night, however, between the first and second Brown interviews, Pichardo

13   received a telephone call from Boforquez, after which he apparently reassessed his

14   conclusion.  Detective Brown believed that Pichardo may have been threatened, because

15   he became "wishy-washy" in later interviews.

16    However, Pichardo testified that he did not feel threatened, and explained the way in

17   which the call had influenced his interpretation of the shooting:

18    I had assumed that it was [Boforquez] at first, but then I'm thinking well, he
       couldn't do that because I know him.  [¶] But then again, the conversation I
19    had before I was going to leave was like it might have been considered
       confrontational.  And then, as he called me at the hospital, I thought why is he
20    crying to me like this over the phone.  And then he's saying Juan did it.  So
       I'm thinking maybe he did do it or maybe he didn't because he was behind me
21    when I did turn, and I didn't see [Boforquez] on the other side of me. [¶] So I
       mean that then caused confusion because I'm thinking . . . who really did do it
22    then?

23    Detective Brown testified that in the subsequent interviews, Pichardo referred to

24   petitioner as the shooter and also referred to Boforquez as the shooter, stating that if given

25   the opportunity, he would ask each one, "Why did you do this to me?"

26    Police Detective Ed Sanchez testified at trial that he had interviewed Delgado on the

27   night of the shooting.  She told him she was a friend of petitioner's wife, Marquita, and that

28   she had walked to petitioner's home shortly after the shooting.  She stated that she saw

United States District Court

For the Northern District of California

1   Pichardo lying on the sidewalk in front of the house.  She claimed not to know the identity

2   of the shooter.

3       Police Officer Javier Salgado testified at trial that he received a telephone call from

4   Delgado two days after the shooting, on April 5, 2002.  According to Officer Salgado,

5   Delgado told him that her initial statement to Detective Sanchez had been false, and that

6   she wanted to tell Detective Sanchez the truth.

7       Officer Salgado picked Delgado up at her house and gave her a ride to the police

8   station.  According to Officer Salgado, Delgado told him during the drive that she had been

9   inside the garage when Boforquez and Pichardo started to argue about the CD player, and

10  that Marquita (petitioner's wife) had told them to stop yelling and to leave the residence.

11  She also stated that Pichardo had looked over at petitioner, and had gone to shake hands

12  and say good-bye.

13      At that point, according to Officer Salgado's version of Delgado's statement,

14  petitioner had pushed Pichardo's hand away, and had grabbed a handgun off a shelf and

15  pointed it at Pichardo.  When Pichardo saw the gun, he ducked and turned away,

16  whereupon petitioner fired one shot into Pichardo's back.  At the moment of the shooting,

17  according to this version, Boforquez was behind Pichardo.

18      Detective Brown testified that when Delgado reached the police station, he spoke

19  with her in an interview room with a concealed video recorder.  Detective Brown stated that

20  during that conversation, Delgado agreed to tell Brown the truth, so long as she would not

21  "get involved" in the case.  When Detective Brown told her he could not make that promise,

22  Delgado refused to talk, explaining that she had "kids at home."  She left the station without

23  giving Detective Brown a statement.

24      Officer Salgado and Gordon Cromwell ("Cromwell" – an inspector for the Contra

25  Costa County District Attorney's Office) both testified that they were present when Delgado

26  met with an assistant district attorney on August 14, 2002, immediately before petitioner's

27  preliminary hearing.  Cromwell testified that Delgado denied having stated that she had

28  seen petitioner with a gun in his hand.  However, Officer Salgado testified that Delgado

United States District Court

For the Northern District of California

1    repeated to him privately that she had seen petitioner shoot Pichardo in the back.

2        Both Officer Salgado and Cromwell heard Delgado express fear that she and her

3    children would be hurt if she testified truthfully at the hearing.  Both Officer Salgado and

4    Cromwell testified that they had encountered Delgado at various times after petitioner's

5    preliminary hearing, and that Delgado had apologized to each of them for not telling the

6    truth at the hearing, and again expressed fear for herself and her children.

7        At trial, Delgado testified that she lived across the street from petitioner, and was

8    friends with Marquita (petitioner's wife).  She stated that she was present in the garage at

9    the time of the shooting, and that she had come over because Marquita had called and

10   asked her to babysit.  When she arrived, Boforquez opened the garage door in response to

11   her knock.  In addition to Boforquez, the other persons present included petitioner,

12   Marquita, and three other people.

13       Delgado testified that while she was in the garage, she heard Boforquez and

14   Pichardo arguing about "weights" – about who would lift weights first, or who could lift the

15   most weight.  She recalled that "they were mad."  She also heard Boforquez and Pichardo

16   arguing about a stolen CD player, and stated that petitioner had asked Pichardo to leave.

17   However, although she indicated that she had been standing only about three or four feet

18   away from Pichardo, she insisted that she did not see the shooting.  She stated that after

19   the shooting, she saw Boforquez leave the garage, and saw petitioner try to pick up

20   Pichardo.

21       Delgado denied telling Officer Salgado that she had seen petitioner shoot Pichardo,

22   and denied offering to tell Detective Brown the truth on the condition that she not "get

23   involved."  She also denied later apologizing to Officer Salgado and Cromwell for her

24   testimony at the preliminary hearing.

25       Gina Guardado ("Guardado"), the girlfriend of petitioner's cousin Juan Carlos

26   Andazola ("Juan Carlos"), testified at trial that she was at petitioner's house late in the

27   afternoon on the day of the shooting.  She had been dropped off at the house, and did not

28   go into the garage.  She was in the kitchen making a TV dinner and watching the children,

United States District Court

For the Northern District of California

1    when she suddenly heard a lot of screaming and running and yelling coming from outside.

2    She opened the door, and saw that everyone was leaving, so she decided to leave, too.

3    Juan Carlos was leaving the house at the same time.

4           Guardado stated that once outside the house, she saw Marquita, petitioner, and

5    Boforquez.  She also saw Pichardo, who was lying on the ground, and Mike, who was

6    helping Pichardo, and heard Pichardo ask whether he had been shot.  She walked away

7    from the house with Juan Carlos and Boforquez, up the hill, and saw petitioner head off in a

8    different direction.

9           According to Guardado, at some point shortly thereafter, Boforquez separated from

10   them.  As Guardado and Juan Carlos continued on, walking under an overpass, they were

11   joined by petitioner.  He "didn't have no answers" to their questions and, in fact, didn't

12   speak at all, and "[s]o we told him we were going out way, he should go his way.

13   Everybody just went their own way."  Guardado and Juan Carlos later went to the police

14   station, in part because the police asked to talk to them, and in part because they had

15   heard that Boforquez was a suspect, but they did not believe that he had shot Pichardo.

16          Juan Carlos testified at trial that he and Guardado were at petitioner's house on the

17   afternoon of the shooting, but claimed that they were unaware of how the shooting

18   occurred.  He acknowledged that he had implicated petitioner as the shooter in a

19   videotaped interview with Detective Brown on April 5, 2002, although he later claimed that

20   he had done so only because Officer Salgado had threatened to arrest him if he did not

21   identify someone as the shooter.  He also testified that he actually did not think that

22   Boforquez had shot Pichardo.

23          The videotape of Detective Brown's interview with Juan Carlos was played for the

24   jury.  Detective Brown began by telling Juan Carlos that he was arresting Boforquez for

25   attempted murder.  Juan Carlos responded, "That's not even what happened," because (he

26   asserted) petitioner had shot Pichardo.  Juan Carlos stated that he and Guardado were

27   inside the house when they heard a shot; that they went outside and saw petitioner running

28   away from the garage; and that it appeared that "he was putting something" under his shirt.

United States District Court

For the Northern District of California

1  Juan Carlos stated that he had seen petitioner with a .22-caliber revolver in the garage just

2  a few days earlier, but that he did not see petitioner with a gun on the day of the shooting.

3      Juan Carlos also explained to Detective Brown that he and Guardado left the scene

4  with Boforquez, and that Boforquez separated from them after a few minutes; and that a

5  short time later, he and Guardado saw petitioner running toward them from some train

6  tracks.  He told Detective Brown that a day or two after the shooting, he heard petitioner

7  talk about how he wanted to "shoot [Pichardo] in the face but he moved too quick."

8      At trial, Juan Carlos testified that most of the statements he made to Detective

9  Brown were false, and that it was Officer Salgado who had told him to make all the false

10  statements, including the statement that he had seen petitioner, after the commotion, with

11  his hands under his shirt; the statement that petitioner had a surprised look on his face

12  before he left the scene; the statement that he had seen petitioner run off in a different

13  direction from the house; the statement that he had left the house walking with Guardado

14  and Boforquez; and the statement that he had seen petitioner by the overpass, by the train

15  track.

16      Kathleen Ochoa, petitioner's aunt and Juan Carlos' mother, lived three blocks from

17  petitioner's house with her husband Fermin Ochoa.  Kathleen and Fermin Ochoa both

18  testified at trial that petitioner came to their house on the afternoon of the shooting.

19  According to Kathleen Ochoa, when petitioner entered her house, he appeared upset and

20  told her that someone had tried to rob him, and, that during the struggle, a gun had fired.

21  She initially testified that petitioner blurted out something like, "I just shot somebody."  On

22  cross-examination, however, she admitted she could not remember petitioner's exact

23  words.

24      Fermin Ochoa testified through a Spanish interpreter that on the day of the shooting,

25  petitioner had first spoken to him in English, and then in Spanish; and that petitioner had

26  told him that he (petitioner) had shot somebody at his home.  Fermin Ochoa also

27  acknowledged that he did not like petitioner.

28      Following the presentation of evidence, the jury found petitioner guilty of attempted

9

United States District Court
For the Northern District of California

1   willful, deliberate, and premeditated murder, and assault with a firearm.

2   **DISCUSSION**

3   A.   Legal Standard

4   Because this federal habeas petition was filed after April 1, 1996, the Antiterrorism

5   and Effective Death Penalty Act ("AEDPA") applies.  Delgado v. Lewis, 223 F.3d 976, 979

6   (9th Cir. 2000).  Under the AEDPA, a district court may not grant a petition challenging a

7   state conviction or sentence on the basis of a claim that was reviewed on the merits in state

8   court unless the state court's adjudication of the claim:

9   (1) resulted in a decision that was contrary to, or involved an unreasonable
    application of, clearly established Federal law, as determined by the Supreme
10  Court of the United States; or (2) resulted in a decision that was based on an
    unreasonable determination of the facts in light of the evidence presented in
11  the State court proceeding.

12  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed

13  questions of law and fact, Williams v. Taylor, 529 U.S. 362, 407-09 (2000), while the

14  second prong applies to decisions based on factual determinations, Miller-El v. Cockrell,

15  537 U.S. 322, 340 (2003).

16  A state court decision is "contrary to" Supreme Court authority, that is, falls under the

17  first clause of § 2254(d)(1), only if it "applies a rule that contradicts the governing law set

18  forth in [Supreme Court] cases" or "confronts a set of facts that are materially

19  indistinguishable from" those in a Supreme Court case, yet reaches a different result.

20  Williams, 529 U.S. at 405-06.

21  A state court decision involves an "unreasonable application of" clearly established

22  federal law, falling under the second clause of § 2254(d)(1), if it either correctly identifies

23  the governing legal principle from the Supreme Court's decisions but unreasonably applies

24  that principle to the facts of the prisoner's case; or extends, or fails to extend, a clearly

25  established legal principle to a new context in a way that is objectively unreasonable.

26  Bockting v. Bayer, 505 F.3d 973, 977-78 (9th Cir. 2007) (citations and quotations omitted).

27  The federal court on habeas review may not issue the writ "simply because that

28  court concludes in its independent judgment that the relevant state-court decision applied

10

United States District Court

For the Northern District of California

1    clearly established federal law erroneously or incorrectly." <u>Williams</u>, 529 U.S. at 411.

2    Rather, the application must be "objectively unreasonable" to support granting the writ. <u>Id.</u>

3    at 409.

4         Under 28 U.S.C. § 2254(d)(2), a state court decision based on a factual

5    determination "will not be overturned on factual grounds unless objectively unreasonable in

6    light of the evidence presented in the state-court proceeding." <u>Miller-El</u>, 537 U.S. 322 at

7    340.  To grant relief under 2254(d)(2), a federal court must be "left with a firm conviction

8    that the determination made by the state court was wrong and that the one [petitioner]

9    urges was correct." <u>Torres v. Prunty</u>, 223 F.3d 1103, 1108 (9th Cir. 2000).

10         When there is no reasoned opinion from the highest state court to consider the

11   petitioner's claims, the court looks to the last reasoned opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>,

12   501 U.S. 797, 801-06 (1991); <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079, n. 2 (9th Cir.

13   2000).

14         When a state court decision does not articulate the rationale for its determination or

15   does not analyze a claim under federal constitutional law, a review of that court's

16   application of clearly established federal law is not possible. <u>See</u> <u>Delgado</u>, 223 F.3d at

17   981-82; <u>see also</u> 2 J. Liebman & R. Hertz, <u>Federal Habeas Corpus Practice and Procedure</u>,

18   § 32.2, at 1424-26 & nn.7-10 (4th ed. 2001).  When confronted with such a decision, the

19   federal court must conduct an independent review of the record and the relevant federal

20   law to determine whether the state court clearly erred in its legal analysis. <u>Delgado</u>, 223

21   F.3d at 982.

22   B.    Analysis

23         As grounds for habeas relief, petitioner claims (1) that he was denied due process

24   because there was insufficient evidence that he was the shooter, and that even if he was in

25   fact the shooter, there was insufficient evidence that he acted with premeditation and

26   deliberation; and (2) that the prosecution failed to disclose impeachment evidence

27   regarding an investigating and testifying police officer, in violation of the Fifth and

28

United States District Court
For the Northern District of California

1   Fourteenth Amendments.[2]

2        1.    Sufficiency of the evidence

3        Petitioner contends that there was insufficient evidence to support a finding that he

4   was the shooter; or assuming that he was the shooter, that there was insufficient evidence

5   to support a finding that he acted with premeditation and deliberation.  Plaintiff raised the

6   issue of sufficiency of the evidence on appeal, and the California Court of Appeal denied

7   relief as to this ground in an order filed February 22, 2006.

8        The Due Process Clause "protects the accused against conviction except upon proof

9   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

10  charged."  In re Winship, 397 U.S. 358, 364 (1970).  The law regarding claims of

11  insufficiency of evidence is clearly established.

12       A federal court reviewing collaterally a state court conviction does not determine

13  whether it is satisfied that the evidence established guilt beyond a reasonable doubt.

14  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  When reviewing a claim of insufficient

15  evidence in a habeas petition, a federal court must determine whether, viewing the

16  evidence and the inferences to be drawn from it in the light most favorable to the

17  prosecution, any rational trier of fact could find the essential elements of the crime beyond

18  a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Only if no rational trier

19  of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.

20  See Jackson, 443 U.S. at 324; Brown v. Farwell, 525 F.3d 787, 794 (9th Cir. 2008).

21            a.    Whether there was sufficient evidence that petitioner was the

22                  shooter

23       Petitioner argues that the evidence that he was the shooter was not credible or of

24  solid value, and was therefore insufficient to support the verdict.  The California Court of

25  Appeal rejected this claim, finding that despite the fact that "critical eyewitnesses to the

26

27       [2] In the opposition to the petition, respondent addresses a claim of jury instruction error,
28  which raised by petitioner in the state court appeal.  However, petitioner did not raise this claim
    in the petition herein.

**United States District Court**
For the Northern District of California

1   shooting, including the victim, provided conflicting reports of the events[,] . . . the jury could

2   reasonably have found that [petitioner] shot Pichardo."

3        Although the state appellate court did not explicitly cite the controlling Supreme

4   Court authority found in Jackson, the court nonetheless cited and relied on state law stating

5   principles that are identical to and not contrary to federal law – People v. Ceja, 4 Cal. 4th

6   1134, 1139 (1993); People v. Morales, 5 Cal. App. 4th 917, 925 (1992); People v. Johnson,

7   26 Cal. 3d 557, 576-77 (1980).  A state court need not cite United States Supreme Court

8   cases so long as the state court's reasoning and result do not contradict Supreme Court

9   precedent.  See Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam)

10        The Court of Appeal noted that Pichardo initially thought Boforquez was the shooter,

11   but pointed out that the evidence showed that this was because, at the time of the initial

12   police interviews, Pichardo thought Boforquez was the only person standing behind him

13   and did not remember that he had turned quickly just before he was shot.

14        The Court of Appeal also noted that Pichardo had admitted that Boforquez's

15   telephone call had caused him to think differently about his interpretation of the shooting –

16   not because of any threat issued, but because Boforquez's tearful apology and insistence

17   that petitioner had shot the gun "caused confusion [as to] who really did do it."  The Court of

18   Appeal found that the jury could have reasonably deduced that the value of Pichardo's

19   initial recollection could have been diminished by the trauma of the event, the fact that he

20   was shot in the back, the resulting injuries, and his admitted drug use at the time of the

21   shooting.

22        The Court of Appeal found that additional evidence supported the conclusion that

23   petitioner was the shooter, pointing to testimony by Officer Salgado, Juan Carlos,

24   Guardado, and Kathleen and Fermin Ochoa.

25        First, the Court of Appeal noted that Officer Salgado testified that Delgado had told

26   him that she saw petitioner fire the shot.  The court acknowledged that Delgado denied

27   having made that statement to Officer Salgado, but found that the jury could have

28   reasonably found her recantation unconvincing, in light of the testimony by Salgado and

United States District Court

For the Northern District of California

1   Cromwell that Delgado had expressed fear about the safety of herself and her children if

2   she testified truthfully, and that she had apologized to each of them, separately, for not

3   telling the truth at the preliminary hearing; and in light of the videotaped conversation with

4   Detective Brown where she stated that she "told Salgado that [she] was gonna . . . tell who

5   it was but . . . didn't want to get involved."

6        Second, the Court of Appeal cited the statements by Juan Carlos in the videotaped

7   interview with Detective Brown, noting that Juan Carlos had told Brown that immediately

8   after the shooting, he approached the garage and saw Boforquez, who wanted to help

9   Pichardo; that he saw petitioner leave the scene and put something under his shirt or in his

10  pocket; that he had seen petitioner with a gun in the garage only a few days earlier; that he

11  saw petitioner run back from the train tracks where he suggested that petitioner may have

12  hidden the gun; that he had heard petitioner bragging to a friend about the shooting, saying

13  he "was gonna shoot [Pichardo] in the face but [Pichardo] turned too quick."

14       The court noted that Juan Carlos had denied the truth of all these statements at trial,

15  claiming he had "made up" the statements because he had been threatened by Officer

16  Salgado; but also noted that the jury had viewed the videotape of the interview with

17  Detective Brown.  The court found that given the specificity of Juan Carlos' account during

18  the taped interview, the jury could have reasonably concluded that his statements to

19  Detective Brown were not fabrications.

20       Third, the Court of Appeal pointed to Guardado's testimony that when she and Juan

21  Carlos met with petitioner after the shooting, he behaved suspiciously and didn't respond to

22  their questions; and that she and Juan Carlos had approached the police a few days after

23  the shooting because they both believed the police were after the wrong man (Boforquez).

24       Finally, the Court of Appeal noted that both Kathleen and Fermin Ochoa had testified

25  that petitioner had come to their home after the shooting and had told each of them that he

26  had shot someone.  The court found that although Mrs. Ochoa had admitted on cross-

27  examination that she was unsure of petitioner's exact words, and Mr. Ochoa had

28  acknowledged that he did not like petitioner, the jury was entitled to believe that petitioner

14

United States District Court

For the Northern District of California

1    had confessed the crime to his aunt and uncle.

2         On habeas review, a federal court evaluating the evidence under In re Winship and

3    Jackson should take into consideration all of the evidence presented at trial. LaMere v.

4    Slaughter, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports

5    conflicting inferences, a federal habeas court "must presume – even if it does not

6    affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor

7    of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's

8    credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune,

9    376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances,

10   Jackson does not permit a federal habeas court to revisit credibility determinations. See

11   id.; see also People of the Territory of Guam v. McGravey, 14 F.3d 1344, 1346-47 (9th Cir.

12   1994).

13        Here, the state court's denial of petitioner's claim did not result in a decision that was

14   based on an unreasonable determination of the facts in light of the evidence presented in

15   the trial. Viewing the evidence and inferences that can be drawn from that evidence in the

16   light most favorable to the prosecution, the court finds that a rational trier of fact could have

17   found that petitioner was the shooter.

18             b.       Whether there was insufficient evidence that petitioner acted with

19                      premeditation and deliberation

20        Petitioner contends that even if he did shoot Pichardo, the evidence was insufficient

21   to prove that the shooting was willful, deliberate, and premeditated. The Court of Appeal

22   rejected this argument, finding that substantial evidence supported the jury's finding.

23        California appellate courts typically rely on three kinds of evidence in resolving the

24   question of premeditation – motive, planning activity, and manner of killing. People v.

25   Stitely, 35 Cal. 4th 514, 543 (2005). These factors need not be present in any particular

26   combination, but where the record evidence discloses evidence in all three categories, the

27   verdict will generally be sustained. Id.

28        Here, the Court of Appeal found clear evidence of motive, and also found evidence

United States District Court
For the Northern District of California

of planning activity and manner of killing sufficient to support a finding of premeditation. Pichardo testified that he had gone to petitioner's house to "clear . . . up" the matter of the allegedly stolen CD player, and that he had been advised that Pichardo was upset. The court found that one reasonable interpretation of the testimony was that petitioner was not only upset about the theft, but also wanted Pichardo to come to his house to explain the situation. Thus, petitioner had reason to believe that Pichardo would come to his home, and had an opportunity to provide for that eventuality by obtaining a firearm. The court noted that petitioner's cousin Juan Carlos testified that he had seen petitioner with a gun in the garage a few days before the shooting.

The Court of Appeal also pointed to Pichardo's testimony that in preparation for leaving the garage, he had gone over to shake petitioner's hand, but had backed off because petitioner had an angry look on his face that he had not noticed before. The court found that unbeknownst to Pichardo, petitioner had a gun in the garage, which he grabbed and used to shoot Pichardo. The court noted Juan Carlos' testimony that petitioner had stated soon after the shooting that he intended to shoot Pichardo in the face, but Pichardo had "moved too quick."

Under California law, "[a]n intentional killing is premeditated and deliberate if it occurred as a result of preexisting thought and reflection rather than unconsidered or rash impulse." Stitely, 35 Cal. 4th at 543 (citations and quotations omitted). It is not necessary, however, that the requisite reflection span a specific or extended period of time. Id. The fact that there is no evidence of long-term planning is not decisive. "The test is not time, but reflection." People v. Bloyd, 43 Cal. 3d 333, 348 (1987). The act of obtaining a weapon is evidence of planning consistent with a finding of premeditation and deliberation. People v. Koontz, 27 Cal. 4th 1041, 1081-82 (2002).

The Court of Appeal found that viewing the evidence in the light most favorable to the People, the jury could have reasonably found that petitioner had a motive to shoot Pichardo, that he planned to do so unless Pichardo convincingly established his innocence of the theft, that he armed himself with a firearm while Pichardo was in the garage, and that

**United States District Court**

For the Northern District of California

1   he initially decided to shoot Pichardo in the face.  The court concluded that this constituted

2   evidence of deliberation and premeditation sufficient to support the verdict.

3        The state court's denial of petitioner's claim was neither contrary to, nor an

4   unreasonable application of, clearly established law.  Viewing the evidence and inferences

5   that can be drawn from that evidence in the light most favorable to the prosecution, the

6   court finds that a rational trier of fact could have found the essential elements of the crime

7   beyond a reasonable doubt.

8        2.        Whether the prosecution improperly failed to disclose impeachment evidence

9        Petitioner asserts that the prosecution improperly failed to disclose impeachment

10  evidence regarding an investigating and testifying officer, in violation of the Fifth and

11  Fourteenth Amendments.  Specifically, petitioner argues that the prosecution was required

12  to disclose Officer Salgado's pattern of falsifying police reports and required to disclose the

13  criminal investigation into his conduct.  Plaintiff raised this issue in a habeas petition before

14  the California Court of Appeal, and again in a habeas petition before the California

15  Supreme Court.  Both petitions were denied in summary orders, filed February 22, 2006

16  and February 14, 2007, respectively.

17       On February 25, 2003, more than six months before the trial, petitioner filed a

18  pretrial motion for production of all documents in the possession of the Pittsburg Police

19  Department relating to Officer Salgado, including personnel records that recorded or

20  reflected any instances of untruthfulness, fabrication or falsification of reports or other

21  evidence; any instances of tampering with evidence; any instances of use of, or threats of,

22  force or violence during an investigation, including during the investigation of witnesses;

23  and any instances of failure to follow proper procedures regarding collection of evidence, or

24  regarding interviewing of witnesses or interrogation of suspects.  On March 26, 2003, the

25  trial court granted the motion, but after reviewing the records in camera, found that there

26  was "nothing to disclose."

27       On September 8, 2003, the first day of the trial, petitioner filed a motion under Brady

28  v. Maryland, 373 U.S. 83 (1963), seeking disclosure of impeachment and exculpatory

17

United States District Court

For the Northern District of California

1  evidence, including, among other things, evidence relating to "[a]ny and all prosecutions,

2  investigations, or possible prosecutions pending that could be brought against government

3  witnesses," and any evidence "which may tend to impeach or discredit any prosecution

4  witness."  Petitioner's counsel subsequently stated in a declaration filed in support of the

5  habeas petition filed with the California Supreme Court that he did not receive any

6  information from the prosecution about any falsification of police reports or fabrication of

7  evidence by Officer Salgado.

8          According to the police report submitted by petitioner with the present petition, and

9  also with the petition filed in the California Supreme Court, the Pittsburg Police Department

10  initiated an investigation in mid-May 2004, into allegations that Officer Salgado had falsified

11  police reports during the period between June 2001 and May 2004.  Following the

12  completion of the initial investigation, on May 20, 2004, Officer Salgado was placed on

13  administrative leave.  The matter was subsequently referred to the District Attorney's Office

14  for review.

15          On September 23, 2004, Officer Salgado was fired by the Pittsburg Police

16  Department, and pleaded "no contest" to five felony counts of falsifying police reports

17  (Penal Code § 118.1).  The five felony counts were based on actions taken by Officer

18  Salgado on July 24, 2002, November 6, 2002, September 11, 2002, December 4, 2002,

19  and on May 22, 2003, in connection with arrests of suspects purportedly under the

20  influence of drugs.

21          In Brady v. Maryland, the Supreme Court held that "the suppression by the

22  prosecution of evidence favorable to an accused upon request violates due process where

23  the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

24  faith of the prosecution."  Id., 373 U.S. at 87.  The duty to disclose such evidence applies

25  even when there has been no request by the accused.  United States v. Agurs, 427 U.S.

26  97, 107 (1976).

27          Evidence is "material" under Brady "if there is a reasonable probability that, had the

28  evidence been disclosed to the defense, the result of the proceeding would have been

United States District Court

For the Northern District of California

1 different." United States v. Bagley, 473 U.S. 667, 682 (1985).  "A 'reasonable probability' is

2 a probability sufficient to undermine confidence in the outcome."  Id.  There are three

3 components of a true Brady violation:  "[t]he evidence at issue must be favorable to the

4 accused, either because it is exculpatory, or because it is impeaching; that evidence must

5 have been suppressed by the State, either willfully or inadvertently; and prejudice must

6 have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

7 Petitioner argues that Salgado's testimony was a key part of the government's case

8 against him, and that if Salgado had been properly impeached, it would have been easy for

9 the jury to accept Delgado's testimony that Salgado had fabricated a report about what she

10 had told him.  Moreover, petitioner asserts, it would have eliminated the only purported

11 eyewitness account, and would have bolstered Juan Carlos' repudiation of his videotaped

12 interview, where he implicated petitioner.  Petitioner contends that no reasonable juror

13 hearing the evidence about Salgado's pattern of falsifying police reports over a period of

14 years would vote to convict petitioner on the record presented at trial.

15 Brady imposes a duty on police officers as well as prosecutors to disclose

16 exculpatory evidence.  See Tennison v. City and County of San Francisco, 548 F.3d 1293,

17 1301 (9th Cir. 2008).  This duty extends as well to impeachment evidence, whether known

18 to the prosecution or "others acting on the government's behalf including the police."

19 Strickler, 527 U.S. at 280-81 (1999); see also Giglio v. United States, 405 U.S. 150, 154

20 (1972) (impeachment evidence is exculpatory evidence within the meaning of Brady).

21 The proponent of a Brady claim – i.e., the defendant (here, the petitioner) – "bears

22 the initial burden of producing some evidence to support an inference that the government

23 possessed or knew about material favorable to the defense and failed to disclose it."

24 United States v. Price, __ F.3d __, 2009 WL 1408117 at *7 (9th Cir., May 21, 2009).  "Once

25 the defendant produces such evidence, the burden shifts to the government to demonstrate

26 that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that

27 he could have learned from others acting on the government's behalf."  Id. (citations and

28 quotations omitted).

United States District Court

For the Northern District of California

1    In the present case, had the prosecutor or the Pittsburg Police Department been in

2    possession of evidence that Officer Salgado had falsified police reports prior to the time of

3    petitioner's trial in September 2003, petitioner arguably could have established, under

4    Brady, that the evidence was required to be turned over to the defense as impeachment

5    evidence from which the jury could possibly have inferred that Officer Salgado was not a

6    credible or reliable witness.

7    As presented here, however, the claim that the government withheld evidence

8    relating to Officer Salgado's falsification of police reports and other evidence appears to be

9    based solely on speculation rather than on real evidence subject to disclosure under Brady.

10   A Brady claim founded on mere speculation is without merit.  See Wood v. Bartholomew,

11   516 U.S. 1, 6 (1995); see also Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (vague

12   speculation or mere conclusions unsupported by record not sufficient to state a claim of

13   suppression of exculpatory or impeachment evidence under Brady).

14   Petitioner's argument, in essence, is that because a Pittsburg Police Department

15   internal investigation conducted in May 2004 revealed that Officer Salgado may have

16   falsified police reports in connection with arrests for drug offenses during the period

17   between June 2001 and May 2004, the Pittsburg Police Department must have been aware

18   of Salgado's wrongful actions eight months earlier, at the time of petitioner's September

19   2003 trial and conviction for attempted murder and assault with a firearm.

20   Petitioner contends that "[a]n analysis of the investigative reports from Officer

21   Salgado's criminal case reveals that a very small percentage of the subjects of the falsified

22   police reports were ever charged by the District Attorney's office," and that "[i]t is

23   reasonable to assume, therefore, that the District Attorney knew that there were problems

24   with Salgado's arrests and reports since they [sic] declined to prosecute so many subjects

25   of his arrests."

26   Nevertheless, petitioner has not produced, and the record does not contain, any

27   evidence to support the assertion that the Pittsburg Police Department or the Contra Costa

28   District Attorney's Office knew at the time of petitioner's trial that Officer Salgado had filed

United States District Court

For the Northern District of California

1   false police reports.[3]  As petitioner has not shown that the prosecution actually withheld

2   (intentionally or otherwise) any material information prior to the time of his trial, he has not

3   shown misconduct.  See Phillips v. Woodford, 267 F.3d 966, 987 (9th Cir. 2001) (petitioner

4   not entitled to explore Brady claims characterized as "mere suppositions").  Accordingly,

5   the court finds that petitioner has failed to meet his burden, and the petition must be

6   denied.

## CONCLUSION

8        For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

9   With regard to the claims of insufficiency of evidence, the state court's decision was neither

10  contrary to, nor an unreasonable application of, clearly established federal law; nor was it

11  based on an unreasonable determination of the facts in light of the evidence presented.

12  With regard to the Brady claim, petitioner has failed to meet his burden, as he merely

13  speculates that the evidence or information was known to the government at the time of his

14  trial.

15       This order fully adjudicates this case.  The clerk shall close the file.

16

17  **IT IS SO ORDERED.**

18  Dated: June 15, 2009

19                                                   _____
                                                     PHYLLIS J. HAMILTON
20                                                   United States District Judge

21

22

23  _____

24       [3] The police report summarizing the May 2004 internal investigation states that two
    Pittsburg Police Officers had "conducted an internal audit of all drug influence cases" and had
25  "concluded that Salgado's police reports contained false information because of the numerous
    similarities found in all of the reports."  However, no dates are provided for the internal audit,
26  and there is no indication in the record that the audit had been completed at the time of
    petitioner's trial.  Moreover, an audit is not the same as an investigation, and there is no
27  evidence that any actual findings had been made regarding Officer Salgado's reporting
    practices prior to the May 2004 police report.  In addition, the police report does not suggest
28  that either the audit or the investigation disclosed any improprieties with regard to non-drug
    arrests, as this was.