UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN MANUEL ANDAZOLA,

        Petitioner,

    v.

JEANNE S. WOODFORD,

        Respondent.

_____/

No. C 07-6227 PJH

**ORDER GRANTING PETITION
FOR WRIT OF HABEAS CORPUS**

    Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by state prisoner, Juan Manuel Andazola ("Andazola").  On December 4, 2009, the court granted Andazola's Federal Rule of Civil Procedure 60(b) motion for relief from its June 15, 2009 judgment in conjunction with its order denying Andazola's habeas petition, and reopened the case for the limited purpose of considering the materiality and/or prejudice prong of Andazola's claim under *Brady v. Maryland*, 373 U.S. 83 (1963).  Having reviewed the parties' papers, and having carefully considered their arguments, the record, and the relevant legal authorities, the court hereby GRANTS the petition.

**BACKGROUND**

**A.**    **State Court Procedural Background**

    On October 8, 2002, an information was filed in Contra Costa Superior Court charging Andazola with violation of California Penal Code §§ 187 and 664(a), attempted willful, deliberate, and premeditated murder of Ramiro Pichardo (Count One); and violation

United States District Court
For the Northern District of California

1  of California Penal Code § 245(a)(2), assault with a firearm upon Ramiro Pichardo (Count

2  Two).  The information further alleged as to Count One an enhancement under California

3  Penal Code § 12022.53(b), (c), (d), for personal use of a firearm causing great bodily injury;

4  and as to Counts One and Two, two separate enhancements under California Penal Code

5  §§ 12022.7(b) and 12022.5(a)(1), for great bodily injury and for personal use of a firearm.

6      On September 18, 2003, a jury found Andazola guilty of both attempted

7  premeditated murder and assault with a firearm, and found true all of the enhancements as

8  well.

9      On December 5, 2003, Andazola was sentenced to life with the possibility of parole

10 on Count One, with an additional consecutive sentence of 25 years to life for the

11 enhancement, pursuant to Penal Code § 12022.53(d).  The remaining enhancements as to

12 Count One were stricken for purposes of sentencing.  A concurrent three-year term for

13 Count Two was stayed pursuant to Penal Code § 654.  The enhancements as to Count

14 Two were stricken for purposes of sentencing.

15     Andazola filed a timely notice of appeal on December 5, 2003.  The California Court

16 of Appeal affirmed the conviction on February 22, 2006.  On the same day, the Court of

17 Appeal summarily denied Andazola's petition for writ of habeas corpus.

18     On April 3, 2006, and April 5, 2006, respectively, petitioner filed timely petitions for

19 review and for writ of habeas corpus, with the California Supreme Court.  The state

20 supreme court denied the petition for review on June 14, 2006, without comment, and

21 denied the petition for writ of habeas corpus on February 14, 2007, also without comment.

22 Petitioner filed the present petition on December 10, 2007.

23 **B.    Factual Background**

24     Andazola's conviction stems from the following facts, which were detailed in the

25 court's June's 15, 2009 order, and are reiterated here.

26     The victim, Ramiro Pichardo ("Pichardo") was shot in the back at approximately 5:00

27 p.m. on the afternoon of April 3, 2002.  The shooting took place in a garage located behind

28

2

United States District Court

For the Northern District of California

a house in Pittsburg, California.  The house and garage belonged to petitioner Juan
Andazola.

At trial, Pichardo testified that he went to Andazola's house around 2:30 p.m. on
April 3, 2002.  He testified that he had been told that "the gentlemen at the house"
suspected him of stealing a CD (compact disc) player, and he wanted to clear up the
accusation.  He had also been told that he needed to "watch out" because "the gentleman"
was "upset."  He stated that he had been to the house previously, had met Andazola on
two or three occasions, and had never had any negative interactions with him.

Upon arriving at the house, Pichardo spoke briefly with an acquaintance, Denicio or
Dionicio "Nene" Boforquez ("Boforquez").  Pichardo and Boforquez had known each other
casually for years, although they were not close friends.  Following their brief conversation,
Pichardo and Boforquez entered the small garage where several people were talking,
smoking marijuana, lifting weights, and listening to music.

Pichardo testified that, in addition to Boforquez, the group inside the garage included
a man named "Mike;" petitioner; Andazola's wife, Marquita; and Griselda Delgado
("Delgado").  Pichardo stated that he lifted weights and smoked marijuana for about half an
hour.  Either Pichardo or Boforquez raised the issue of the CD player, and Pichardo denied
he had stolen it.  Boforquez then told Pichardo that he should leave the garage.

Pichardo testified that he was standing approximately on a direct line between
Andazola and Boforquez, and that he turned to his left side and looked at Andazola.  He
was thinking of shaking Andazola's hand, and started walking toward Andazola, but then
saw an angry look on Andazola's face, and turned away.  As he was turning, he suddenly
"blacked out."

When he regained consciousness, he was lying on the garage floor, unable to feel
his legs or stand.  Although he knew where he was, he was confused about what had
happened.  It was only when he saw the blood on the floor that he realized he had been
shot.  Although he initially told the investigating police officers that Boforquez had been

3

United States District Court

For the Northern District of California

1   behind him when he was shot, he testified at trial that he was "pretty sure" it was Andazola.

2   However, he also stated that he never saw a gun in Andazola's hand.

3       Pichardo crawled outside, at which point Boforquez covered him with a blanket.

4   Mike then carried him to the front yard, and Pichardo asked someone to call the police.

5   After the paramedics arrived, Pichardo was transported to the hospital, where he learned

6   he had been shot in the back.

7       Dr. Burton Baker, a surgeon, treated Pichardo on the evening of the shooting for the

8   injuries he had sustained earlier in the day.  At trial, Dr. Baker testified that Pichardo, whom

9   he described as "alert" and "oriented," told him he had been using methamphetamine and

10  marijuana with another man who had accused him of stealing something from him, and had

11  then shot him in the back with a pistol at a distance of about five feet.[1]  The bullet entered

12  below the left shoulder blade, and lodged in Pichardo's spinal canal, rendering him

13  paralyzed below the waist.

14      Pittsburg Police Inspector Wasteney testified at trial that he interviewed Pichardo at

15  the hospital on the night of the shooting.  Pichardo told Inspector Wasteney that he was

16  getting ready to shake hands with Andazola, and that the next thing he remembered was

17  that he was shot from behind.  According to Inspector Wasteney, Pichardo stated that he

18  believed that Boforquez had been standing behind him, and that it was possibly Boforquez

19  who had shot him.

20      Officer Tony Del Greco also visited Pichardo in the hospital, along with Inspector

21  Huppert, interviewing him for approximately two hours.  Officer Del Greco characterized the

22  conversation as "on and off," noting that Pichardo was in extreme pain, and that he would

23  provide a statement, "then he'd be screaming for help because he was in such pain," and

24  then the interview would resume after Pichardo had been subdued.

25      According to Officer Del Greco, Pichardo stated that he had gone to Andazola's

26  home to lift weights, and that Boforquez had been in a disturbed mood and had accused

27  _____

28      [1]At trial, Pichardo denied using methamphetamine prior to the shooting in the garage.

4

United States District Court

For the Northern District of California

1    him of stealing a CD player.  Pichardo also stated that he had seen Boforquez put his right

2    hand into his right front pants pocket, a move that Pichardo found unusual.  Pichardo

3    stated that after the argument regarding the CD player, he lifted weights, and that

4    approximately half an hour later, he decided to leave the garage.

5          Pichardo told Officer Del Greco that while he was attempting to shake hands with

6    Andazola, he was shot in the back.  At the time he was shot, he believed that Boforquez

7    was standing behind him.  He told Officer Del Greco that he was 100% certain it was

8    Boforquez who had shot him.  Officer Del Greco also testified, however, that Pichardo

9    provided conflicting information about the events surrounding the shooting.

10         Police Detective Bruce Brown was the lead investigator on the case.  At trial, he

11   testified that he had interviewed Pichardo three times following the shooting, each time for

12   about an hour.  During the first interview, at the hospital on the evening of the shooting,

13   Pichardo told Detective Brown that he thought he had been shot in the back as he was

14   facing Andazola, that Boforquez had been standing behind him, and that he was relatively

15   positive (10 on a scale of 1 to 10) that Boforquez was the shooter.

16         Later that night, however, between the first and second Brown interviews, Pichardo

17   received a telephone call from Boforquez, after which he apparently reassessed his

18   conclusion.  Detective Brown believed that Pichardo may have been threatened, because

19   he became "wishy-washy" in later interviews.

20         However, Pichardo testified that he did not feel threatened, and explained the way in

21   which the call had influenced his interpretation of the shooting:

22         I had assumed that it was [Boforquez] at first, but then I'm thinking well, he
         couldn't do that because I know him.  [¶] But then again, the conversation I
23       had before I was going to leave was like it might have been considered
         confrontational.  And then, as he called me at the hospital, I thought why is he
24       crying to me like this over the phone.  And then he's saying Juan did it.  So
         I'm thinking maybe he did do it or maybe he didn't because he was behind me
25       when I did turn, and I didn't see [Boforquez] on the other side of me. [¶] So I
         mean that then caused confusion because I'm thinking . . .  who really did do
26       it then?

27         Detective Brown testified that in the subsequent interviews, Pichardo referred to

28

United States District Court

For the Northern District of California

1   Andazola as the shooter and also referred to Boforquez as the shooter, stating that if given

2   the opportunity, he would ask each one, "Why did you do this to me?"

3       Police Detective Ed Sanchez testified at trial that he had interviewed Delgado on the

4   night of the shooting.  She told him she was a friend of petitioner's wife, Marquita, and that

5   she had walked to Andazola's home shortly after the shooting.  She stated that she saw

6   Pichardo lying on the sidewalk in front of the house.  She claimed not to know the identity

7   of the shooter.

8       Police Officer Javier Salgado testified at trial that he received a telephone call from

9   Delgado two days after the shooting, on April 5, 2002.  According to Officer Salgado,

10  Delgado told him that her initial statement to Detective Sanchez had been false, and that

11  she wanted to tell Officer Salgado the truth.

12      Officer Salgado picked Delgado up at her house and gave her a ride to the police

13  station.  According to Officer Salgado, Delgado told him during the drive that she had been

14  inside the garage when Boforquez and Pichardo started to argue about the CD player, and

15  that Marquita (petitioner's wife) had told them to stop yelling and to leave the residence.

16  She also stated that Pichardo had looked over at Andazola, and had gone to shake hands

17  and say good-bye.

18      At that point, according to Officer Salgado's version of Delgado's statement,

19  Andazola had pushed Pichardo's hand away, and had grabbed a handgun off a shelf and

20  pointed it at Pichardo.  When Pichardo saw the gun, he ducked and turned away,

21  whereupon Andazola fired one shot into Pichardo's back.  At the moment of the shooting,

22  according to this version, Boforquez was behind Pichardo.

23      Detective Brown testified that when Delgado reached the police station, he spoke

24  with her in an interview room with a concealed video recorder.  Detective Brown stated that

25  during that conversation, Delgado agreed to tell Brown the truth, so long as she would not

26  "get involved" in the case.  When Detective Brown told her he could not make that promise,

27  Delgado refused to talk, explaining that she had "kids at home."  She left the station without

28

giving Detective Brown a statement.

Officer Salgado and Gordon Cromwell ("Cromwell" – an inspector for the Contra Costa County District Attorney's Office) both testified that they were present when Delgado met with an assistant district attorney on August 14, 2002, immediately before Andazola's preliminary hearing.  Cromwell testified that Delgado denied having stated that she had seen Andazola with a gun in his hand.  However, Officer Salgado testified that Delgado repeated to him privately that she had seen Andazola shoot Pichardo in the back.

Both Officer Salgado and Cromwell heard Delgado express fear that she and her children would be hurt if she testified truthfully at the hearing.  Both Officer Salgado and Cromwell testified that they had encountered Delgado at various times after Andazola's preliminary hearing, and that Delgado had apologized to each of them for not telling the truth at the hearing, and again expressed fear for herself and her children.

At trial, Delgado testified that she lived across the street from Andazola, and was friends with Marquita (Andazola's wife).  She stated that she was present in the garage at the time of the shooting, and that she had come over because Marquita had called and asked her to babysit.  When she arrived, Boforquez opened the garage door in response to her knock.  In addition to Boforquez, the other persons present included petitioner, Marquita, and three other people.

Delgado testified that while she was in the garage, she heard Boforquez and Pichardo arguing about "weights" – about who would lift weights first, or who could lift the most weight.  She recalled that "they were mad."  She also heard Boforquez and Pichardo arguing about a stolen CD player, and stated that Andazola had asked Pichardo to leave. However, although she indicated that she had been standing only about three or four feet away from Pichardo, she insisted that she did not see the shooting.  She stated that after the shooting, she saw Boforquez leave the garage, and saw Andazola try to pick up Pichardo.

Delgado denied telling Officer Salgado that she had seen Andazola shoot Pichardo,

United States District Court

For the Northern District of California

and denied offering to tell Detective Brown the truth on the condition that she not "get involved." She also denied later apologizing to Officer Salgado and Cromwell for her testimony at the preliminary hearing.

Gina Guardado ("Guardado"), the girlfriend of Andazola's cousin Juan Carlos Andazola ("Juan Carlos"), testified at trial that she was at Andazola's house late in the afternoon on the day of the shooting. She had been dropped off at the house, and did not go into the garage. She was in the kitchen making a TV dinner and watching the children, when she suddenly heard a lot of screaming and running and yelling coming from outside. She opened the door, and saw that everyone was leaving, so she decided to leave, too. Juan Carlos was leaving the house at the same time.

Guardado stated that once outside the house, she saw Marquita, Andazola, and Boforquez. She also saw Pichardo, who was lying on the ground, and Mike, who was helping Pichardo, and heard Pichardo ask whether he had been shot. She walked away from the house with Juan Carlos and Boforquez, up the hill, and saw Andazola head off in a different direction.

According to Guardado, at some point shortly thereafter, Boforquez separated from them. As Guardado and Juan Carlos continued on, walking under an overpass, they were joined by Andazola. He "didn't have no answers" to their questions and, in fact, didn't speak at all, and "[s]o we told him we were going our way, he should go his way. Everybody just went their own way." Guardado and Juan Carlos later went to the police station, in part because the police asked to talk to them, and in part because they had heard that Boforquez was a suspect, but they did not believe that he had shot Pichardo.

Juan Carlos testified at trial that he and Guardado were at Andazola's house on the afternoon of the shooting, but claimed that they were unaware of how the shooting occurred. He acknowledged that he had implicated Andazola as the shooter in a videotaped interview with Detective Brown on April 5, 2002, although he later claimed that he had done so only because Officer Salgado had threatened to arrest him if he did not

United States District Court

For the Northern District of California

1   identify someone as the shooter.  He also testified that he actually did not think that

2   Boforquez had shot Pichardo.

3         The videotape of Detective Brown's interview with Juan Carlos was played for the

4   jury.  Detective Brown began by telling Juan Carlos that he was arresting Boforquez for

5   attempted murder.  Juan Carlos responded, "That's not even what happened," because (he

6   asserted) Andazola had shot Pichardo.  Juan Carlos stated that he and Guardado were

7   inside the house when they heard a shot; that they went outside and saw Andazola running

8   away from the garage; and that it appeared that "he was putting something" under his shirt.

9   Juan Carlos stated that he had seen Andazola with a .22-caliber revolver in the garage just

10  a few days earlier, but that he did not see Andazola with a gun on the day of the shooting.

11        Juan Carlos also explained to Detective Brown that he and Guardado left the scene

12  with Boforquez, and that Boforquez separated from them after a few minutes; and that a

13  short time later, he and Guardado saw Andazola running toward them from some train

14  tracks.  He told Detective Brown that a day or two after the shooting, he heard Andazola

15  talk about how he wanted to "shoot [Pichardo] in the face but he moved too quick."

16        At trial, Juan Carlos testified that most of the statements he made to Detective

17  Brown were false, and that it was Officer Salgado who had told him to make all the false

18  statements, including the statement that he had seen Andazola, after the commotion, with

19  his hands under his shirt; the statement that Andazola had a surprised look on his face

20  before he left the scene; the statement that he had seen Andazola run off in a different

21  direction from the house; the statement that he had left the house walking with Guardado

22  and Boforquez; and the statement that he had seen Andazola by the overpass, by the train

23  track.

24        Kathleen Ochoa, Andazola's aunt and Juan Carlos' mother, lived three blocks from

25  Andazola's house with her husband Fermin Ochoa.  Kathleen and Fermin Ochoa both

26  testified at trial that Andazola came to their house on the afternoon of the shooting.

27  According to Kathleen Ochoa, when Andazola entered her house, he appeared upset and

28

9

**United States District Court**

For the Northern District of California

1   told her that someone had tried to rob him, and, that during the struggle, a gun had fired.

2   She initially testified that Andazola blurted out something like, "I just shot somebody." On

3   cross-examination, however, she admitted she could not remember Andazola's exact

4   words.

5       Fermin Ochoa testified through a Spanish interpreter that on the day of the shooting,

6   Andazola had first spoken to him in English, and then in Spanish; and that Andazola had

7   told him that he (Andazola) had shot somebody at his home.  Fermin Ochoa also

8   acknowledged that he did not like Andazola.

9       Following trial, the jury found Andazola guilty of attempted willful, deliberate, and

10  premeditated murder, and assault with a firearm.

11  **C.    Federal Habeas Proceedings**

12      In his petition, among other claims, Andazola claimed that the prosecution

13  improperly failed to disclose impeachment evidence regarding one of the investigating and

14  testifying officers, Officer Salgado, in violation of the Fifth and Fourteenth Amendments.

15  Specifically, Andazola argued that the prosecution was required to disclose Officer

16  Salgado's pattern of falsifying police reports and was required to disclose the subsequent

17  criminal investigation into his conduct.

18      In the court's June 15, 2009 order, the court denied relief on Andazola's claim,

19  concluding that Andazola had not satisfied the second element necessary for a *Brady* claim

20  to succeed: that the evidence had been suppressed by the prosecution, either willfully or

21  inadvertently.  *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (in order for a *Brady* claim to

22  succeed, (1) the evidence at issue must be favorable to the accused, either because it is

23  exculpatory or impeaching; (2) that evidence must have been suppressed by the

24  prosecution, either willfully or inadvertently; and (3) prejudice must have ensued).  As a

25  result, the court did not reach either the first or third elements necessary for a successful

26  *Brady* claim.

27      Subsequently, Andazola filed a July 6, 2009 application for a certificate of

28

10

United States District Court

For the Northern District of California

1    appealability in which he asserted that the court overlooked a request for an evidentiary

2    hearing.  On July 9, 2009, the court issued an order construing Andazola's application in

3    part as a motion for relief from judgment under Rule 60(b)(6) and ordered additional

4    briefing.  Andazola subsequently filed a supplemental opening brief, the state filed a

5    response, and Andazola filed a reply.

6         On December 4, 2009, the court granted relief under Rule 60(b)(6).  The court

7    concluded that relief from judgment was warranted because in its June 15, 2009 order, it

8    decided Andazola's *Brady* claim on grounds that the state clarified in its post-judgment

9    briefs that it had in fact conceded.  In its August 10, 2009 supplemental brief, the state

10   expressly asserted that it had conceded the second element of the *Brady* claim, and noted

11   that the prosecutor's awareness or notice of Officer Salgado's misconduct was not an issue

12   with respect to the *Brady* claim.  Instead, the state clarified that its position was that the

13   evidence regarding Officer Salgado's misconduct was not material or prejudicial.  *See*

14   *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003) (the terms "material" and

15   "prejudicial" are used interchangeably to describe the third component);  *see also Benn v.*

16   *Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002) ("[e]vidence is not 'material' unless it is

17   'prejudicial,' and not 'prejudicial' unless it is 'material'").

18        Accordingly, the court reopened the case so that it could consider anew the

19   materiality issue associated with Andazola's *Brady* claim.  The court, however, expressly

20   stated that it would not reconsider its June 15, 2009 order regarding Andazola's other

21   habeas claim, which consisted of two sub-claims.

22                                    **ISSUE**

23        The only issue currently before the court is whether the state appellate courts'

24   summary denials of Andazola's *Brady* claim were contrary to, or involved an unreasonable

25   application of, clearly established Federal law, as determined by the Supreme Court of the

26   United States.  There is no dispute now that the suppressed information was impeaching,

27   and that it was in fact suppressed by the prosecution, thus satisfying the first two elements

28

                                       11

United States District Court

For the Northern District of California

1    of a *Brady* claim.  Accordingly, the sole issue is whether the information was "material"

2    pursuant to the third element of a *Brady* claim.

3    <center>**STANDARD OF REVIEW**</center>

4        This court may entertain a petition for writ of habeas corpus "on behalf of a person

5    in custody pursuant to the judgment of a state court only on the ground that he is in custody

6    in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

7    2254(a).  Because the petition in this case was filed after the effective date of the

8    Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act

9    apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district

10   court may not grant a petition challenging a state conviction or sentence on the basis of a

11   claim that was reviewed on the merits in state court unless the state court's adjudication of

12   the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

13   application of, clearly established Federal law, as determined by the Supreme Court of the

14   United States; or (2) resulted in a decision that was based on an unreasonable

15   determination of the facts in light of the evidence presented in the State court proceeding."

16   28 U.S.C. § 2254 (d).

17       A state court decision is "contrary to" Supreme Court authority, falling within the first

18   clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

19   reached by [the Supreme] Court on a question of law or if the state court decided a case

20   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

21   *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established federal law" under §

22   2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

23   the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72

24   (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

25   [Supreme] Court decisions as of the time of the relevant state court decision."  *Id.*

26       "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

27   may grant the writ if the state court identifies the correct governing legal principle from [the

28

United States District Court

For the Northern District of California

1    Supreme] Court's decisions but unreasonably applies that principle to the facts of the

2    prisoner's case." *Id.* at 74.  However, this standard "requires the state court decision to be

3    more than incorrect or erroneous." *Id.*  For the federal court to grant habeas relief, the

4    state court's application of the Supreme Court authority must be "objectively unreasonable."

5    *Id.* at 74-75.  The "objectively unreasonable" standard is different from the "clear error"

6    standard in that "the gloss of clear error fails to give proper deference to state courts by

7    conflating error (even clear error) with unreasonableness." *Id.* at 75; *see also Clark v.*

8    *Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

9    court, in its independent review of the legal question, is left with a firm conviction that the

10   state court was erroneous . . . Rather, the habeas court must conclude that the state

11   court's application of federal law was objectively unreasonable." *Andrade*, 538 U.S. at 75;

12   *see also Clark*, 331 F.3d at 1068.

13        As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

14   habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

15   state court resulted in a decision that was based on an unreasonable determination of the

16   facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

17   2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

18   determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

19   determining the "unreasonable determination of facts in light of the evidence" under §

20   2254(d)(2).  *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

21   relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

22   determination made by the state court was wrong and that the one [petitioner] urges was

23   correct." *Id.* at 1108.

24        However, when the state court decision does not articulate the rationale for its

25   determination or does not analyze the claim under *federal* constitutional law, a review of

26   that court's application of clearly established federal law is not possible.  *See Delgado v.*

27   *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with such a decision, a

28

United States District Court

For the Northern District of California

1  federal court must conduct an independent review of the record and the relevant federal

2  law to determine whether the state court's decision was "contrary to, or involved an

3  unreasonable application of, "clearly established federal law." *Id.* at 982.

> When a state court does not furnish a basis for its reasoning, we have no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context. . . .[A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the 'objectively reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. . . .  Only by that examination may we determine whether the state court's decision was objectively reasonable.

*Id.*

## DISCUSSION

### A.   *Brady* Claim

The facts related to Andazola's *Brady* claim are as follows.  On February 25, 2003, more than six months before Andazola's trial, Andazola filed a pretrial motion for production of all documents in the possession of the Pittsburg Police Department relating to Officer Salgado, including personnel records that recorded or reflected any instances of untruthfulness, fabrication or falsification of reports or other evidence; any instances of tampering with evidence; any instances of use or threats of force or violence during an investigation, including during the investigation of witnesses; and any instances of failure to follow proper procedures regarding collection of evidence, or regarding interviewing of witnesses or interrogation of suspects.  On March 26, 2003, the trial court granted the motion, but after reviewing the records in camera, found that there was "nothing to disclose."

On September 8, 2003, the first day of trial, Andazola filed a motion under *Brady v. Maryland*, 373 U.S. at 383, seeking disclosure of impeachment and exculpatory evidence, including, among other things, evidence relating to "[a]ny and all prosecutions, investigations, or possible prosecutions pending that could be brought against government

14

United States District Court

For the Northern District of California

witnesses," and any evidence "which may tend to impeach or discredit any prosecution witness." Andazola's counsel subsequently stated in a declaration filed in support of the habeas petition filed with the California Supreme Court that he did not receive any information from the prosecution about any falsification of police reports or fabrication of evidence by Officer Salgado.

According to the police report submitted by Andazola with his federal habeas petition, and also with his petition filed in the California Supreme Court, the Pittsburg Police Department initiated an investigation in mid-May 2004, into allegations that Officer Salgado had falsified police reports during the period between June 2001 and May 2004 - the same period during which the investigation in this case occurred. Following the completion of the initial investigation, on May 20, 2004, Officer Salgado was placed on administrative leave. The matter was subsequently referred to the District Attorney's Office for review.

On September 23, 2004, Officer Salgado was fired by the Pittsburg Police Department, and pleaded "no contest" to five felony counts of falsifying police reports (Penal Code § 118.1). The five felony counts were based on actions taken by Officer Salgado on July 24, 2002, November 6, 2002, September 11, 2002, December 4, 2002, and on May 22, 2003, in connection with arrests of suspects purportedly under the influence of drugs.

Regarding materiality, Andazola argues that Salgado's testimony was a key part of the government's case against him, and that if Salgado had been properly impeached, it would have been easy for the jury to accept Delgado's testimony that Salgado had fabricated a report about what she had told him. Moreover, Andazola asserts, it would have eliminated the only purported eyewitness account, and would have bolstered Juan Carlos' repudiation of his videotaped interview, in which he implicated Andazola. Andazola contends that no reasonable juror hearing the evidence about Salgado's pattern of falsifying police reports over a period of years would vote to convict Andazola on the record presented at trial.

**United States District Court**
For the Northern District of California

1   The state responds by attempting to downplay the importance of Salgado's

2   testimony, characterizing it as simply "adding to" other evidence suggesting that Andazola

3   was the shooter.  Specifically, the state points to Kathleen Ochoa and Fermin Ochoa's

4   testimony on direct examination, which suggested that Andazola made a statement that he

5   was the shooter.  It also points to Juan Carlos' testimony and that of his girlfriend,

6   suggesting that Boforquez, initially implicated by the victim, was not the shooter.  The state

7   however concedes that the prosecutor characterized Salgado's testimony as the "lynchpin"

8   in her closing argument.

9       The terms "material" and "prejudicial" are used interchangeably to describe the third

10   component of a *Brady* claim.  *Bailey*, 339 F.3d at 1116 n. 6;  *see also Benn*, 283 F.3d at

11   1053 n. 9 ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is

12   'material'").  The "touchstone of materiality is a 'reasonable probability' of a different result."

13   *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  This reasonable probability is "shown when the

14   government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

15   *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  Thus, "[a] showing of

16   materiality does not require demonstration by a preponderance that disclosure of the

17   suppressed evidence would have resulted ultimately in the defendant's acquittal," but must

18   only establish that "the favorable evidence could reasonably be taken to put the whole case

19   in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 434-

20   35; *see also United States v. Golb*, 69 F.3d 1417, 1430 (9th Cir. 1995) (the ultimate

21   question is whether there is a reasonable probability that, had the evidence been disclosed,

22   the result of the proceeding would have been different such that confidence in outcome is

23   undermined); *Bailey*, 339 F.3d at 1118 (suppression of "lynchpin" evidence left little

24   confidence in outcome of trial).  The ultimate question for materiality is thus whether

25   "disclosure of the suppressed evidence to competent counsel would have made a different

26   result reasonably probable."  *Kyles*, 514 U.S. at 441.

27       A determination of materiality under the *Brady* standard requires the evidence to be

28

United States District Court

For the Northern District of California

1   considered collectively, and in light of the strength of the prosecution's case.  *See id.* at

2   434; *see also Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005).  Thus, to determine

3   materiality, the exculpatory evidence must be considered with the evidence that was

4   actually considered at trial to determine whether or not the trial, in the absence of the

5   suppressed evidence, resulted in a verdict "worthy of confidence."  *Kyles*, 514 U.S. at 434.

6        As noted, Andazola raised the *Brady* issue in a habeas petition before the California

7   Court of Appeal, and again in a habeas petition before the California Supreme Court.

8   However, because both petitions were denied in summary orders, the state appellate

9   courts' decisions do not articulate the rationale for their determinations and do not analyze

10  the claim under federal constitutional law.  Thus, a review of the courts' applications of

11  clearly established federal law is not possible.  *See Delgado*, 223 F.3d at 981-82.

12  Accordingly, this court must conduct an independent review of the record and the relevant

13  federal law to determine whether the state courts' decisions were "contrary to, or involved

14  an unreasonable application of, clearly established federal law."  *Id.* at 982.

15       This court's review of the record and relevant law leads the court to conclude that

16  the issue of materiality is not a particularly close call.  Not only did Salgado's alleged

17  misconduct in the other cases occur during the same period that the investigation in this

18  case was being conducted, the misconduct – the falsification of evidence– was very similar

19  to the allegations of misconduct made by two of the prosecution's witnesses in this case,

20  Delgado, a percipient witness to the shooting, and Juan Carlos, a testifying but non-

21  percipient witness.  Delgado was interrogated by a number of officers, but Salgado was the

22  only one who claimed she had confided to him that Andazola was the shooter and that she

23  had done so privately, out of the presence of any corroborating witnesses.  Although

24  Officers Brown and Cromwell, who had both spoken with Delgado, testified that she had

25  expressed concerns for her own safety if she testified truthfully and had apologized for not

26  testifying truthfully, neither testified that they had ever heard Delgado name Andazola as

27  the shooter.

28

1    Additionally, at trial, Juan Carlos, Andazola's cousin, retracted earlier videotaped

2   statements he made implicating Andazola.  He testified at trial that he had only made the

3   earlier statements because Salgado threatened to arrest him if he did not identify someone

4   as the shooter, adding that his statements were false and made at the direction of Salgado.

5    This was, no doubt a tough case for the prosecution.  A man was shot under

6   circumstances that should have produced eyewitnesses.  The only person purporting to be

7   an eyewitness before trial, denied being an eyewitness at trial and further denied making

8   pretrial statements to Officer Salgado implicating Andazola.  Thus Salgado's testimony

9   concerned the only purported eyewitness to the shooting, and it was quite properly

10  characterized as the lynchpin of the prosecution's case.  Given the allegations regarding

11  Salgado's misconduct in this very case, combined with the importance of his testimony to a

12  successful prosecution, the court easily finds that the withheld information regarding

13  Salgado's similar misconduct in other cases was material and prejudicial.  The evidence

14  demonstrating a pattern of such behavior on Salgado's part "could reasonably be taken to

15  put the whole case in such a different light as to undermine confidence in the [jury's]

16  verdict." *Kyles*, 514 U.S. at 434-35.  The court, therefore, concludes that the state courts'

17  summary denials of Andazola's *Brady* claim were indeed contrary to, or involved an

18  unreasonable application of, clearly established Federal law, as determined by the

19  Supreme Court of the United States.

20  **B.    Other Claims**

21   Andazola's other due process claims are DENIED for the reasons set forth in the

22  court's June 15, 2009 order.

23  **CONCLUSION**

24   For the above reasons, the court GRANTS habeas relief on Andazola's *Brady* claim.

25   Accordingly, Andazola's conviction is VACATED.  The respondent shall release

26  petitioner from custody unless the state commences proceedings to retry petitioner within

27  one hundred and twenty (120) days of the date of entry of judgment on this order.

28

18

1    The clerk shall send an informational copy of this order to the district attorney of

2  Contra Costa County, in addition to the usual service on counsel of record.

3      **IT IS SO ORDERED.**

4  Dated:   March 31, 2011

5

6      _____
       PHYLLIS J. HAMILTON
7      United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28